**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

```
_____
                               )
CLIFFORD F. SMITH              )
                               )
            Plaintiff,         )
                               )
     v.                        ) Civil Action No. 05-2042 (CKK)
                               )
ALPHONSO R. JACKSON,           )
Secretary,                     )
U.S. Department of Housing     )
and Urban Development          )
                               )
            Defendant.         )
                               )
_____)
```

## MOTION TO DISMISS AND FOR SUMMARY JUDGMENT

The defendant, pursuant to Rules 12(b)(6)and 56 of the Federal Rules of Civil Procedure, moves the Court to dismiss and for summary judgment on the grounds that the undisputed facts demonstrate that the plaintiff fails to state a claim on which relief may be granted and that the defendant is entitled to judgment as a matter of law.

In support of this motion, the defendant submits the accompanying Exhibits, which include the Report of Investigation (ROI), and the depositions of Clifford Smith and Thomas Vincent.

Respectfully submitted,


__/s/_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney


__/s/_____
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney


__/s/_____
DIANE M. SULLIVAN, D. C. BAR # 12765
Assistant United States Attorney
Judiciary Center Building
555 Fourth Street, N.W.
Room E4919
Washington, D.C. 20530
(202) 514-7205

Of Counsel:
JENNIFER EVERT
Office of General Counsel
U.S. Department of Housing
and Urban Development

2

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

```
_____
                               )
CLIFFORD F. SMITH              )
                               )
          Plaintiff,           )
                               )
     v.                        ) Civil Action No. 05-2042 (CKK)
                               )
ALPHONSO R. JACKSON,           )
Secretary,                     )
U.S. Department of Housing     )
and Urban Development          )
                               )
          Defendant.           )
                               )
_____)
```

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S
MOTION TO DISMISS AND FOR SUMMARY JUDGEMENT**

**INTRODUCTION**

Plaintiff, Clifford F. Smith, brings this action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000, et seq.[1] Plaintiff, a current Management Analyst employed by the U.S. Department of Housing and Urban Development (The Agency or HUD), alleges that he was subjected to harassment and disparate treatment based on his race (African American) and

---

[1] Although the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 et seq., is not cited as a basis for jurisdiction in plaintiff's complaint and only a passing reference to age discrimination is mentioned, plaintiff raised this claim at the administrative level. Race discrimination under Title VII and age discrimination under the ADEA are analyzed under the familiar McDonnell Douglas three part "shifting burden" test and are addressed together in this Memorandum. See Barnette v. Chertoff, 453 F.3d 513, 515 (D.C. Cir. 2006); see also Reeves v. Plumbing Prods., Inc., 530 U.S. 133, 141 (2000). The plaintiff has abandoned his sex discrimination claim (Complaint, caption, ¶¶ 1-2; ROI, Exhibit 3).

color (Black) and age (67 yrs. old), as well as retaliation,
when, over a six-week period, his former supervisor allegedly
attacked his performance, shouted and made threats to the
plaintiff, changed his work schedule, charged plaintiff with
Absence without Leave (AWOL), issued a "Proposal to Suspend," and
physically blocked his path when plaintiff tried to leave his
office.[2]

The undisputed facts demonstrate that plaintiff's claims
fail as a matter of law, and defendant's motion to dismiss and
for summary judgment should be granted.

## FACTUAL BACKGROUND

Plaintiff, Clifford F. Smith, a former Contract Oversight
Specialist, and a current Management Analyst, GS-13, at the U.S.
Department of Housing and Urban Development (HUD), began his
employment with HUD in 1984 (Plaintiff's Deposition Transcript
(I)("Pl. Dep. I"), pp. 9-23).  In 2002, plaintiff was a
GS-1101-13 Contract Oversight Specialist in the Office of
Housing, Procurement Management Division (Report of Investigation
(ROI), Ex. 11).  His first-line supervisor in that position was

---

[2] Although the complaint makes a passing reference to a
denial of a reasonable accommodation (see Compl. ¶ 14),
Plaintiff failed to raise or pursue a claim under the
Rehabilitation Act at the administrative level.  Thus, he has
failed to exhaust his administrative remedies.  Moreover,
plaintiff must do more than submit statements of medical
diagnoses. Toyota Motor Mfg., Kentucky, Inc. v. Williams, 534
U.S. 184, 189 (2002); see also 29 C.F.R. §
1630.2(j)(2)(ii)(2001).

2

Thomas R. Vincent, Deputy Director of the Procurement Management Division (ROI, Ex. 20).

Plaintiff's allegations of discrimination, harassment, and retaliation arose out of plaintiff's handling of a contract that he was assigned in March of 2002 referred to as the SASI contract (Vincent Dep., p. 14). The team leader for the SASI contract was Brenda Lambert, a GS-14, supervisory Contract Oversight Specialist (ROI, Ex. 7, p. 2 and 27). On April 25, 2002, Ms. Lambert attempted to question plaintiff on the status of the SASI contract which was due to be issued on April 26, 2002 (ROI, Exhibit 7). When plaintiff spoke to Ms. Lambert, he refused to provide her with the status of the contract or when it would be completed. Ms. Lambert reminded plaintiff that the contract was due the next day, April 26, 2002. Plaintiff refused to respond to her inquiries and told Ms. Lambert to "get out" of his office and leave him alone on several occasions (Id.; see also Pl. Dep. II, p. 16). Finally, with an impending due date and plaintiff's persistent recalcitrant behavior, Ms. Lambert reported plaintiff's conduct to Mr. Don F. Schade, the Director of the Procurement Management Division, and plaintiff's second-line supervisor (Id.; ROI, Ex. 6, p. 1). Mr. Schade accompanied Ms. Lambert into plaintiff's office to find out the status of the work (Id., Ex. 7, p. 9). Plaintiff either did not or was unable to explain to Mr. Schade the status of his assignment or when he

would complete the assignment (Id., Ex. 7, p. 9-10).  Plaintiff was instructed by Mr. Schade to bring the completed assignment to him in an hour (Id.).

Plaintiff did not show up in Mr. Schade's office at the designated time (2:15 p.m.).  Mr. Schade called plaintiff into his office at approximately 3:00 p.m. to discuss the assignment. Plaintiff's first-line supervisor, Thomas Vincent, and his team leader, Brenda Lambert, were also present (Id.).  Plaintiff's supervisors asked plaintiff about the projected completion of his assignment and why he had changed the due date of the contract.[3] His supervisors informed plaintiff that he was to have the assignment completed by 5:00 p.m. before going home (Id.).  When it became obvious that the assignment would not be completed by 5:00 p.m., Mr. Vincent advised plaintiff that he had to come into the office the next day, Friday, April 26, 2002 to finish the assignment (Id., p. 10).  Plaintiff was on a compressed work schedule (also referred to as CWS).  Friday, April 26, 2002 and Monday, April 29, 2002 were his scheduled days off.  Plaintiff advised Mr. Vincent and Ms. Lambert that he would not come in on Friday to complete the assignment, even though he was advised that he would be paid or receive compensatory time off (Id., p. 10; Vincent Dep., p. 47).

---

[3] The plaintiff had no authority to change the due date for issuing the contract (Vincent Dep., p. 128-129).

4

A review of the document plaintiff e-mailed to his supervisors before leaving on Thursday, April 25, 2002 revealed that plaintiff had not completed the assignment or incorporated the required comments (Id.; Vincent Dep., pp. 49-51). Plaintiff did not come to work on either Friday April 26, 2002 or Monday, April 29, 2002 to complete his assignment on the contract.

When plaintiff returned to the office on Tuesday, April 30, 2002, Mr. Vincent made clear to the plaintiff that his failure to follow a direct order by a manager was grounds for disciplinary action and that plaintiff was required to comply with such an order whether he liked it or not (Vincent Dep., pp. 67-68). Mr. Vincent advised plaintiff that there would be consequences for his insubordination (Id., pp. 68-69).

On April 30, 2002, because of plaintiff's failure to complete his assignment by the April 26, 2002 deadline, Mr. Vincent temporarily revoked plaintiff's compressed work schedule (CWS) to " . . . enable management to meet the operational needs of the office and to better monitor [plaintiff's] workload management (ROI, Ex. 14). After sixty (60) days, Mr. Vincent would conduct a review to see if plaintiff's ability to meet the demands of his workload and meet deadlines warranted a return to CWS (Id.; Vincent Dep., p. 68-69).

Plaintiff ignored the revocation of his compressed work schedule by his supervisor, and continued to work the hours of

5

his CWS schedule during the month of May and June (ROI, Exs. 17, 23; Pl. Dep. II, pp. 77-78). On May 22, 2002, Mr. Vincent again advised plaintiff by email that his work schedule had been changed and that if he failed to comply with the new work schedule he would be charged AWOL (ROI, Ex. 17).

On May 30, 2002, plaintiff filed a grievance and his Union filed a demand to bargain regarding the revocation of his compressed schedule and for placing him on AWOL for failure to work as required by the new schedule (ROI, Exs. 2, 15, 21; Pl. Dep. II, pp. 51-53). Plaintiff sought to stop what he referred to as "blatant disparate treatment" (Id., Ex. 15). On September 9, 2002, the Agency denied his grievance (ROI, Ex. 21; Pl. Dep. II, pp. 52-53).

Throughout the early part of May, plaintiff's supervisors attempted to have plaintiff complete his assignment on the SASI contract, but were unsuccessful. Finally, the contract was reassigned to the most junior person in the office, Bella Wood, to complete. It was awarded on May 17, 2002 (ROI, Exs. 9; see also Ex. 7; Vincent Dep., pp. 129, 131-132).

Plaintiff submitted to Mr. Vincent notes from Dr. Yasmin Panahy dated May 3, 2002 and May 9, 2002. Dr. Panahy indicated that "plaintiff was under undue stress at work" and that she recommended that "this recent contract (SASI) . . . be reassigned and that he be reassigned to the other team" (ROI, Ex. 17,

6

Attachments X and Y).

After receipt of the notes from plaintiff's physician, Mr. Vincent provided them to the  Labor Relations Office who assisted Mr. Vincent in drafting a request for additional medical information.  Mr. Vincent requested additional medical information on May 21, 2002 and June 11, 2002.  Plaintiff failed to provide the requested information.  Finally, on June 17, 2002, the Director of the Resource Management Division, sent a third request for medical information, but again, plaintiff failed to respond (ROI, Exs. 18, 19; Pl. Dep. II, pp. 28-32, 94-96).

On May 31, 2002, Mr. Vincent proposed a five day suspension for plaintiff because plaintiff failed to follow a direct order, failed to follow a proper order, failed to comply with the new work schedule, and because of his insolent and disrespectful behavior towards his team leader. This proposed suspension arose out of the events surrounding plaintiff's failure to complete the SASI contract, and ignoring the temporary revocation of plaintiff's CWS schedule (ROI, Ex. 17).

Despite plaintiff's failure to respond to the requests for additional medical information, plaintiff was relieved of the SASI contract, and on June 13, 2002, plaintiff was temporarily relocated to the 9th floor of the HUD Headquarters Building and ordered to report directly to Don Schade, Director of the Procurement Management Division, and Bernard Morton, the other

7

team leader as Dr. Panahy had requested (ROI, Ex. 6).  Plaintiff
was also relieved of some additional duties and responsibilities
as requested.  Id.  On July 29, 2002, plaintiff was advised that,
effective August 4, 2002, he was to return to his original work
station and would be permanently placed under Mr. Schade's
supervision.  On August 1, 2002, plaintiff filed a workers'
compensation claim alleging that he was disabled for work because
of the harassment and hostile work environment he was subjected
to by his supervisor.  The Department of Labor denied his claim.
Plaintiff failed to report to work from August 1, 2002 until June
2003 (ROI, Ex. 23; Exhibit 3).

Plaintiff first contacted an EEO counselor regarding
allegations of race, sex and age discrimination on June 24, 2002
(ROI, Ex. 2).  On July 31, 2002, plaintiff filed a formal EEO
complaint (ROI, Ex. 2).  In his formal EEO complaint, plaintiff
alleged that because of his race, sex and age, he was subjected
to harassment and subjected to discriminatory treatment by his
supervisor, Thomas Vincent, when he received threats of
discipline, when his compressed work schedule (CWS) was revoked,
when he was charged with AWOL, when his supervisor blocked his
path and when his supervisor proposed a five-day suspension.  Id.

On July 13, 2005, the Agency issued a Final Decision,
finding that plaintiff was not subjected to a hostile work
environment or discriminated against on the basis of his race,

8

sex or age (Exhibit 1).  The Agency had previously dismissed three of plaintiff's claims, including the claims relating to the revocation of his CWS and placing him on AWOL, because he had elected to file a grievance on those issues before he filed his EEO complaint.  The Final Agency Decision found that plaintiff failed to sustain his burden of proof on the two remaining claims of harassment and discrimination, i.e., that on May 31, 2002, the Agency issued a Proposal to Suspend and that on May 22, 2002 and on or about June 5, 2002, Thomas Vincent physically blocked plaintiff's path as he tried to leave his office (Id.).  This suit followed.

**ARGUMENT**

I.    **Legal Standards**

A.    **Motion to Dismiss**

A court may resolve a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) in either of two ways. First, the court may determine the motion based solely on the complaint. Herbert v. National Acad. Of Sciences, 974 F.2d 192, 197 (D.C. Cir. 1992). Alternatively, to determine the existence of jurisdiction, a court may look beyond the allegations of the complaint, consider affidavits and other extrinsic information, and ultimately weigh the conflicting evidence. See id.; Rann, 154 F. Supp.2d at 64.

A motion to dismiss brought pursuant to Rule 12(b)(6) should

9

be granted if it is beyond doubt that a plaintiff can demonstrate no set of facts that supports his claim entitling him to relief. See Conley v. Gibson, 355 U. S. 41, 45-46 (1957); see Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1117 (D.C. Cir. 2000). Although the plaintiff is given the benefit of all inferences that reasonably can be derived from the facts alleged in the complaint, the court need not accept inferences that are not supported by such facts, nor must the court accept plaintiff's legal conclusions cast in the form of factual allegations. Kowal v. MCI Communications Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994).

**B.    Summary Judgment**

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment: "shall be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56.

Summary judgment is not a disfavored procedural shortcut, but rather is an integral part of the overall design of the rules of civil procedure, which is to secure the just, speedy, and inexpensive determination of every action. Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986). The party moving for summary judgment bears the initial responsibility of informing the trial court of the basis for its motion and identifying those portions

10

of the record that it believes demonstrate the absence of a genuine issue of material fact. Alexis v. District of Columbia, 44 F. Supp. 2d 331, 337 (D.D.C. 1999); Celotex Corp., 477 U.S. at 323.  When the moving party has carried its burden, the responsibility shifts to the nonmoving party to show that there is, in fact, a genuine issue of material fact for trial.  Alexis, 44 F. Supp. 2d at 337.  The opposing party must provide "specific facts showing that there is a genuine issue for trial," and "may not rely on mere allegations or denials to prevail." (Id.).  The trial court must enter summary judgment against a nonmoving party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial. Celotex, 477 U.S. at 322; see also Alexis, 44 F. Supp. 2d at 337 ("Rule 56 (c) mandates summary judgment" in this circumstance) (emphasis added).

   C.   **The Burden Shifting Analysis**

   Title VII makes it unlawful for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.  42 U.S.C. § 2000e-2(a)(1).

   When, as here, the record contains no direct evidence of

11

discrimination, allegations of race discrimination under Title VII and age discrimination under the ADEA are both analyzed under the familiar McDonnell Douglas three-part "shifting burdens" test. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); see also Brown v. Brody, 199 F.3d 446, 452 (D.C.Cir.1999) (applying McDonnell Douglas framework to federal employee' s Title VII claims); Barnette v. Chertoff, 453 F.3d 513, 515 (D.C.Cir.2006) (applying framework to ADEA claims). Once a plaintiff establishes a prima facie case, the burden of production shifts to the defendant to articulate a legitimate nondiscriminatory reason for the challenged action. Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981) (defendant's burden articulated for Title VII cases). The defendant's burden is one of production, not of proof. See Aka v. Washington Hosp. Ctr., 156 F.3d 1284 (D.C. Cir. 1998). Thus, the defendant's burden is satisfied if he simply explains what he has done or produces evidence of legitimate, nondiscriminatory reasons for the action. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993).

Importantly, the ultimate burden of persuading the court that the defendant intentionally discriminated remains at all times with the plaintiff under the McDonnell Douglas test. Barth v. Gelb, 2 F.3d 1180, 1185-86; St. Mary's, 509 U.S. at 507; Aka, 156 F.3d at 1288. Thus, even if a plaintiff establishes a prima

12

<u>facie</u> case, the employer prevails unless the employee succeeds in discrediting the employer's explanation. <u>See</u> <u>Sami v. Billington</u>, 195 F.3d 1, 3 (D.C. Cir. 1999).  To do so, the plaintiff must present objective evidence that undermines the defendant's proffered explanation for its actions and/or independent evidence of the employer's discriminatory intent. <u>See</u> <u>Aka</u>, 156 F.3d at 1289.  Moreover, even if a plaintiff creates a genuine issue of material fact with respect to the employer's proffered reason, he will not always be deemed to have presented enough evidence to survive summary judgment (<u>Id</u>. at 1290).  A "weak issue of material fact" regarding the employer's explanation will not prevail in the face of "abundant independent evidence" showing that no discrimination has occurred (<u>Id</u>. at 1291).

## II.   **Plaintiff's Claims Regarding Change in Work Schedule and AWOL Should Be Dismissed**

On April 30, 2002, plaintiff filed a grievance and his Union filed a demand to negotiate over management's revocation of plaintiff's Compressed Work Schedule (CWS) and charging plaintiff AWOL for ignoring the new work schedule.  Plaintiff claimed that the revocation of his CWS and charging him AWOL was "blatant disparate treatment" (ROI, Ex. 15).

28 C.F.R. 1614.301 (Relationship to Negotiated Grievance Procedure) provides in pertinent part:

> " . . . an aggrieved employee who files a grievance with an agency whose negotiated agreement permits the acceptance of grievances which allege discrimination

13

> may not thereafter file a complaint on the same claim
> under Part 1614 irrespective of whether the agency has
> informed the individual of the need to elect or of
> whether the grievance has raised an issue of
> discrimination . . ."

HUD's Negotiated Agreement provides for the acceptance of grievances which allege discrimination (see Exhibit 1). See Rosell v. Wood, 357 Supp.2d 123 (D.D.C. 2004). In Rosell, the Court held that even if an employee's EEO complaint had a different legal theory than his grievance, if the plaintiff's complaints are "rooted in the same factual nucleus," then they "concern the same matter" (Id. at 131). Although the plaintiff claimed hostile work environment (harassment), race and age discrimination in his June 2002 formal EEO complaint because of the revocation of his CWS and the AWOL complaints these complaints "are rooted in the same factual nucleus" as the grievance (Id.). See Guerra v. Cuoma, 176 F.3d 547 (D.C. Cir. 1999); Facha v. Cisneros, 914 F.Supp. 1142 (E.D. Pa. 1996; see also Wiggins v. Powell, 2005 WL 555417 (D.D.C.).

By electing to proceed under HUD's negotiated grievance procedure, plaintiff removed his discrimination claims regarding the change in his work schedule and the AWOL charge from consideration under the statutes and regulations governing discrimination claims. See Johnson v. Peterson, 996 F.2d 397, 399 (D.C. Cir. 1973). Consequently, those claims should be dismissed.

14

### III. Plaintiff Fails to Establish Sufficient Evidence of a Hostile Work Environment

Plaintiff has failed to establish that he was subjected to treatment that was sufficiently severe or pervasive as to constitute a hostile work environment, or provide any evidence that his supervisor's alleged actions were a result of his membership in a protected class.  To establish the existence of a hostile work environment based on harassment because of race or age in violation of Title VII and the ADEA, a plaintiff must prove that:  1) he was subjected to discriminatory intimidation, ridicule, and insult; 2) the actions were based upon his membership in a protected class; 3) he found the actions to be abusive or hostile, and 4) the actions were sufficiently severe or pervasive that a reasonable person would find that they altered the conditions of his employment and created an abusive or hostile work environment. See Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993).  "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment -- an environment that a reasonable person would find hostile or abusive -- is beyond Title VII's purview." Id. at 510 U.S. 19.

A workplace environment becomes "hostile" only if the offensive conduct "permeate[s] [the workplace] with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the

15

victim's employment and create an abusive working environment."
Barbour v. Browner, 181 F.3d 1342, 1347-48 (D.C. Cir. 1999)
(quoting Oncale v. Sundowner Offshore Servs, Inc., 523 U.S. 75,
78 (1998)); see also Clark County School District v. Breeden, 532
U.S. 268, 271 (2001); Holbrook v. Reno, 196 F.3d 255, 262 (D.C.
Cir. 1999).

To determine whether those conditions exist, the courts
consider: 1) the frequency of the discriminatory conduct; 2) the
severity of the conduct; 3) whether the conduct is physically
threatening or merely offensive; and 4) whether the conduct
unreasonably interferes with the employee's performance.
Faragher v. Boca Raton, 524 U.S. 775, 787-88 (1998).  "Properly
applied, this will filter out complaints attacking, 'the ordinary
tribulations of the workplace, such as the sporadic use of
abusive language, gender related jokes and occasional teasing.'"
Id. at 787.

Neither Title VII nor the ADEA is a general civility code
for the modern workplace. They are not intended to purge the
workplace of all verbal or physical harassment or vulgarity.
Stewart v. Evans, 275 F.3d 1126, 1133 (D.C. Cir. 2002). "Thus,
the behavior must be severe in order 'to ensure that courts and
juries do not mistake ordinary socializing in the workplace--such
as male-on-male horseplay or intersexual flirtation--for
discriminatory conditions of employment.'" Jones v. Potter, 301

16

F.Supp.2d 1, (D.D.C. 2004), quoting <u>Oncale</u>, 523 U.S. at 81.  In determining whether the behavior was objectively offensive, the Court must judge the behavior "from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" <u>Stewart</u>, 275 F.3d at 1133, quoting <u>Harris</u>, 510 U.S. at 23.

     Moreover, not all abusive behavior is actionable, even if it is motivated by discriminatory animus. <u>Barbour</u>, 181 F.3d at 1347. Cases abound with examples of conduct that is rude, inappropriate, politically incorrect, boorish, and otherwise offensive, that does not rise to the level of a Title VII violation.  For example, uttering an ethnic slur or a racial epithet is not, by itself, actionable conduct, no matter how offended the employee is by the remark.  A single offensive remark does not sufficiently alter the employee's terms and conditions. <u>Rogers v. EEOC</u>, 454 F.2d 234, 238 (5th Cir. 1971). In the same vein, isolated instances of verbal abuse rooted in protected status are likewise inadequate to prove the level of severity that the law requires.  "'[S]imple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" <u>Coles v. Kelly Temporary Services</u>, Inc., 287 F.Supp. 25, 27 (D.D.C. 2003), quoting <u>Faragher</u>, 524 U.S. at 788. <u>See</u> <u>also</u> <u>Adusumilli v. City of Chicago</u>, 164 F.3d 353, 361 (7th

17

Cir. 1998); <u>Penry v. Fed. Home Loan Bank of Topeka</u>, 155 F.3d
1257, 1260-61 (10th Cir. 1998); <u>Sprague v. Thorn Americas, Inc</u>.,
129 F.3d 1355, 1356 (10th Cir. 1997).

Not only must the conduct be severe, it must also be
motivated by the plaintiff's membership in a protected class. As
this Circuit held in <u>Stewart</u>, Title VII is only directed at
workplace harassment based on the plaintiff's membership in a
protected class. <u>Id</u>. at 1133, citing <u>Oncale</u>, 523 U.S. at 80; <u>see
also</u> <u>Harris</u>, 510 U.S. at 21; <u>Gonzalez v. Western Resources, Inc</u>.,
36 F. Supp. 2d 1289, 1294-95 (D. Kan. 1999) ("Only those actions
which are based on the plaintiff's national origin can be used to
support this [hostile work environment] claim."); <u>Crawford v.
Medina General Hospital</u>, 96 F.3d 830, 836 (6th Cir. 1996) (age
discrimination case confirming that alleged hostility and
abusiveness must stem from the perpetrator's disdain for people
over a particular age.").

Against this backdrop, plaintiff cannot establish that he
was subjected to a hostile work environment prohibited by Title
VII or the ADEA.  The conduct as alleged, even if believed to be
true, is simply not sufficiently severe or pervasive enough to be
considered harassment.  Plaintiff alleges that Mr. Vincent
frequently yelled at him during discussions about his work over a
period of several weeks in late April and early May 2002, called
plaintiff into his office numerous times a day, repeatedly called

him on the phone, constantly sent him emails, changed his CWS, charged him with AWOL and physically blocked his path when he sought to leave the office (Compl., ¶¶ 6-19).

As this Court has held, "yelling" at a subordinate or criticizing their work (even unfairly so) does not create a hostile work environment. <u>Singh</u>, 300 F.Supp.2d at 56-58.  This work related conduct which occurred only over several weeks is simply not so severe as to alter the conditions of plaintiff's employment (<u>Id</u>.).  Admittedly, Mr. Vincent's management style, on occasion, may have been intense.  He has been described as "hyper" by one employee, and his tone of voice could become strong and louder on occasion (<u>See</u> Affidavit of Bella Wood, ROI, Ex. 9 at 2-3).  Another employee in the office, James Smallwood, described the atmosphere in the office  as having "hot moments," and describing Mr. Vincent as someone who would "get behind it" when things were not going well with a contracting issue (ROI Ex. 8 at 3-4).  Even if this type of conduct was commonplace, occasional yelling, with nothing more, falls far short of describing a hostile work environment. In addition, it shows no evidence of race or age bias. <u>Singh</u>, 300 F.Supp.2d at 56-58.  Mr. Vincent's actions may have been perceived by plaintiff  to be "unnecessary," "annoying" or "disparaging," but given the circumstances surrounding plaintiff's conduct, no reasonable person could conclude that Mr. Vincent created an objectively

19

hostile or abusive work environment sufficient to alter the conditions of plaintiff's employment.

Alternatively, even if plaintiff could show that he was subjected to  intimidation, ridicule and insult, he has failed to produce a scintilla of evidence that Mr. Vincent's actions were based on plaintiff's race or age.  The undisputed evidence is that plaintiff failed to finish an assignment by the established deadline, refused a direct order to appear for work to complete his assignment the next day, and then ignored the revocation of his CWS and refused to report to work under his new schedule. The actions of Mr. Vincent were the direct result of plaintiff's conduct, not his race or age.  Significantly, none of the other employees involved believed Mr. Vincent's conduct or management style demonstrated any impermissible discriminatory motive.[4]

The plaintiff also alleged that Mr. Vincent was "threatening" him and that he physically blocked his path, but the record evidence demonstrates that these "threats"  related solely to plaintiff's refusal to adhere to the new work schedule or complete his work assignment.  Admittedly Mr. Vincent advised plaintiff that his CWS was temporarily revoked, that he would place him on AWOL if he ignored the new schedule, and that his

_____

[4] Ms. Lambert is a Black female and was over 40 at the time. Bella Wood is from the Philippines and was 51 years old.  Mr. James Underwood, is a Black male and was 50 years old (ROI, Ex. 10).

conduct would have consequences (Vincent Dep. 102-104).  A stern reminder that failing to show up for work when scheduled could result in disciplinary action is a perfectly reasonable action for a supervisor. Moreover, plaintiff's admitted behavior towards his team Leader, Ms. Lambert, and Mr. Vincent is fairly described as arrogant, rude, insolent and insubordinate.

### III. __Plaintiff Cannot Establish Discrimination Based on Race or Age__

Plaintiff cannot establish sufficient evidence that would permit a reasonable juror to conclude he was the victim of race or age discrimination.  Plaintiff has failed to produce any evidence that permits an inference of discrimination. Stella v. Mineta, 284 F.3d 135 (D.C. Cir. 2002).  He has failed to produce any evidence that he was treated differently than other similarly situated employees not within the protected groups when his CWS was revoked, when he was charged AWOL for failure to report to work after his schedule was changed, or when he was issued a proposed suspension. See Neuren v. Adducci, Mastriani, Meek & Schmidt, 43 F.3d 1507, 1514 (D.C. Cir. 1995); Barbour v. Browner, 181 F.3d 1345 (D.C. Cir. 1999).  Although the "similarly situated" analysis is not the only way to create an inference of discrimination, there has to be some evidence in the record to support such an inference. Stella, 284 F.3d at 145.  Here, the record is devoid of such evidence.

Regardless of plaintiff's inability to establish a prima

<u>facie</u> case of race or age discrimination, the defendant has articulated non-discriminatory reasons for its actions. <u>St. Mary's Honor Society</u>, 509 U.S. at 507. Plaintiff's CWS schedule was changed because he failed to complete his assignment by the due date and failed to adjust his schedule to see that it was completed on time. Plaintiff was charged with AWOL because he ignored management's revocation of his CWS and continued to work on the schedule he preferred. The proposed suspension was because plaintiff failed to follow a direct order, failed to complete an assignment, failed to report to work consistent with the new work schedule, and because he was insolent and disrespectful towards his team leader. The plaintiff does not deny that he engaged in the conduct that resulted in his suspension. Rather, plaintiff argues that his conduct was justified (ROI, Ex 18; Pl. Dep. II, p. 31).

Plaintiff has failed to demonstrate any evidence that the reasons given for the actions taken were pretext for race or age discrimination. <u>Burdine</u>, 450 U.S. at 256. It is not enough for plaintiff to show that the reasons given were not just, fair, or reasonable. Plaintiff must show that the reasons were "phony." <u>Fischbach v. Dep't of Corr.</u>, 86 F.3d 1180, 1183 (D.C. Cir. 1996)(quoting <u>Pignato v. Am. Trans. Air., Inc.</u>, 14 F.3d 342, 349 (7th Cir. 1994))("once the employer has articulated a nondiscriminatory explanation for its action, . . . the issue is

22

not the correctness or desirability of [the] reasons offered . . .[but] whether the employer honestly believes in the reasons it offers.")(Id.)(internal quotations omitted)).  There is nothing to suggest that Mr. Vincent did not honestly believe the reasons he gave for the actions he took.  Mr. Vincent's explanation for his actions is not so implausible, incoherent, weak, inconsistent, or contradictory that a rational fact finder could conclude that the reasons were unworthy of belief. Stover v. Martinez, 382 F.3d 1064, 1076 (10th Cir. 2004).

Plaintiff's disagreement with Mr. Vincent's decisions, his dislike of Mr. Vincent's management style, and his resentment of Ms. Lambert's supervision do not suffice as a substitute for evidence of discriminatory motive.  In other words, plaintiff's unsupported allegations, conclusory statements, and personal opinions cannot create a factual issue of pretext. See Exxon v. Federal Trade Commission, 663 F.2d 120 (D.C. Cir. 1980); Green v. Dalton, 164 F.3d 671, 675 (D.C Cir. 1990). Viewing the facts in a light most favorable to the plaintiff, he cannot demonstrate pretext.

D.    **Plaintiff Cannot Prove Retaliation**

Plaintiff alleges that "constant threats, harassment and acts of ordering plaintiff back to a hostile work environment . . . was an act of retaliation for plaintiff's complaints to the Union" (Complaint, ¶ 35).  Plaintiff failed to exhaust his

administrative remedies as to his claim of retaliation (ROI, Ex. 1).  Plaintiff's administrative EEO complaint raised claims of race, sex and age discrimination, but failed to raise a claim of retaliation (ROI, Ex. 2). See National Railroad Passenger Corp. v. Morgan, 536 U.S. 101 (2002); see also Marinelli v. Chao, 222 F.Supp.2d 402, 410 (discussing Rehabilitation Act and ADEA) and 28 C.F.R. § 1614.105(a)(2).[5]  Accordingly, plaintiff's retaliation claim should be dismissed.

But even if plaintiff is found to have properly exhausted his administrative remedies, he cannot prove retaliation.  A plaintiff establishes a prima case of retaliation by demonstrating that  (1) he engaged in protected behavior; (2) the employer took a materially adverse action against plaintiff that a reasonable employee would believe was designed to dissuade a reasonable worker from making or supporting a charge of discrimination; and (3) there is a causal link between the adverse action and the protected activity.  Rochon v. Gonzales, 438 F.3d 1211, 1219-20 (D.C. Cir. 2006). See also Burlington N. & Santa Fe Ry. Co. v. White, 126 S. Ct. 2405 (2006).  The Supreme

---

[5] Plaintiff's assertions that he was retaliated against for his complaints to the Union reinforces his intent to raise disparate treatment based on race, sex and age in his union grievance. See supra pp. 13-14.  Alternatively, should plaintiff argue that his Union grievance was not prior EEO activity brought under the negotiated agreement, then his grievance cannot be the predicate for a retaliation charge. Ramsey v. Potomac Elec. Power Co., 468 F.Supp.2d 51, 59 (D.D.C. 2006).  Thus, plaintiff cannot establish a prima facie case of retaliation.

Court and the D.C. Circuit recently clarified that Title VII's anti-retaliation provision pertains only to those employer actions that are materially adverse to a reasonable employee or applicant. Rochon, 438 F.3d at 1219-20. Therefore, a plaintiff must demonstrate "materially adverse consequences . . . such that a reasonable trier of fact could conclude that the plaintiff has suffered objectively tangible harm" which would have dissuaded a reasonable employee from making or supporting a charge of discrimination. Rochon at 1219, citing Brown v. Brody, 199 F.3d at 457.

Plaintiff cannot demonstrate that the defendant took a materially adverse action against the plaintiff when he was advised to return to his original work station on July 29, 2002. As noted previously, the agency promptly removed plaintiff from Mr. Vincent's supervision on June 13, 2002 and placed him under the direct supervision of Mr. Schade (ROI, Ex. 6). Plaintiff admitted that he had no problems working under Mr. Schade and his new team leader (Pl. Dep. II, pp. 80-81). In fact, plaintiff had no contact with Mr. Vincent (or Ms. Lambert) between June and August 2002 (Pl. Dep. II, pp. 82-83). Plaintiff's only complaint was that Mr. Vincent signed his time sheets during this period reflecting his AWOL status when plaintiff continued to ignore his new work schedule. As Deputy Director, Mr.Vincent was assigned to the task of signing all leave slips. Notably, the same letter

that advised plaintiff that he would return to his former work station under the supervision of Mr. Schade also advised him that his CWS was reinstated effective July 14, 2002 and that any charges of AWOL after that date would be rescinded (ROI, Ex. 20). Plaintiff's dissatisfaction with his work location, without more, does not amount to a materially adverse action. Plaintiff's personal preference to remain on the 9th floor does not amount to a materially adverse consequence such that he can sustain his burden of proof of retaliation. Burlington, 126 S.Ct. 2410.

Furthermore, defendant has repeatedly articulated non-discriminatory reasons for his actions concerning the plaintiff. Namely, plaintiff's own conduct precipitated the actions taken by management. Plaintiff has failed to produce a scintilla of evidence that the reasons articulated by the defendant are pretext for discrimination or retaliation. Therefore, assuming arguendo that plaintiff could establish a prima facie case, no reasonable juror could conclude that defendant's reasons were a pretext for discrimination or retaliation. Aka, 156 F.3d at 1289; Barth, 2 F.3d at 1185-86; Samii, 195 F.3d at 3. This fact creates an alternative grounds to grant defendant's dispositive motion.

## CONCLUSION

For the foregoing reasons, defendant's motion should be granted.

Respectfully submitted,

__/s/_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney


__/s/_____
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney


__/s/_____
DIANE M. SULLIVAN, D. C. BAR # 12765
Assistant United States Attorney
Judiciary Center Building
555 Fourth Street, N.W.
Room E4919
Washington, D.C. 20530
(202) 514-7205

Of Counsel:
JENNIFER EVERT
Office of General Counsel
U.S. Department of Housing
and Urban Development

27

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

```
_____
                                )
CLIFFORD F. SMITH               )
                                )
              Plaintiff,         )
                                )
      v.                         )  Civil Action No. 05-2042 (CKK)
                                )
ALPHONSO R. JACKSON,             )
Secretary,                       )
U.S. Department of Housing       )
and Urban Development            )
                                )
              Defendant.         )
                                )
_____)
```

**DEFENDANT'S STATEMENT OF MATERIAL FACTS**
**AS TO WHICH THERE IS NO GENUINE DISPUTE**

In accordance with Local Rule 7(h), defendant submits the following statement of material facts as to which there is no genuine dispute.

1.   At all relevant times, plaintiff was a GS-1101-13 Contract Oversight Specialist, Office of Housing, Procurement Management Division, U.S. Department of Housing and Urban Development (HUD)(ROI, Ex. 1).

2.   From March 2002 until June 13, 2002, plaintiff's first-line supervisor was Thomas Vincent, Deputy Director of the Procurement Management Division (ROI, Ex. 27).  Plaintiff's second-line supervisor was Don Schade, Director, Procurement Management Division.

3.   At that time, Brenda Lambert was plaintiff's team leader (ROI, Exs. 7 at 2 and 27).  The other team leader in the

office was Bernard Morton (ROI, Ex. 6, p. 5).

4.   On April 25, 2002, Mr. Vincent ordered plaintiff to come to work on Friday, April 26, 2002 to complete his assignment on the SASI contract which was due on April 26, 2002 (Plaintiff's Dep., II[1] 27-29).  Plaintiff refused to come to work on April 26, 2002, nor did he come to work on April 29, 2002 (Id.).

5.   As a result of plaintiff's failure to complete his assignment and his refusal to come in to work the next day for that purpose, on April 30, 2002, Mr. Vincent temporarily changed plaintiff's work schedule from a compressed work schedule (CWS) to a fixed schedule, Monday through Friday (ROI, Ex. 14).

6.   Despite Mr. Vincent's revocation of plaintiff's CWS, plaintiff continued to work the hours of his compressed work schedule during  the month of May and June (ROI, Exs 17 and 23; Pl. Dep., II 77,78).

7.   On May 22, 2002, Thomas Vincent advised plaintiff, in an email, that his work schedule had been changed, and that if he did not come to the office in accordance with his new schedule, he would be charged AWOL (ROI, Ex. 17).

8.   Plaintiff was charged with Absence Without Leave (AWOL) for his failure to comply with the new work schedule (ROI, Ex. 2).

---

[1] Plaintiff had his deposition taken on two dates.  A "I" denotes the first deposition taken on December 4, 2006, and a "II" denotes his second deposition taken on February 27, 2007.

2

9.   On May 29, 2002, the local AFGE filed a Demand to Bargain regarding the change to plaintiff's work schedule (ROI, Ex. 15).

10.   On May 29, 2002, plaintiff also filed a Union grievance challenging the change in his work schedule, and for placing him on AWOL (ROI, Exs. 15 and 21; Pl. Dep. II, 51-53).  Plaintiff asserted in his grievance that the actions taken were "blatant disparate treatment" (Id.).

11.   On May 31, 2002, the Agency issued plaintiff a Proposal to Suspend for five days on the charges of failure to follow a direct order, failure to follow a proper order, insolent or disrespectful conduct towards your team leader, and absence without leave (ROI, Ex. 17).

12.   Plaintiff responded to the Agency's Proposal to Suspend, both orally and in writing (ROI, Ex. 18).

13.   The plaintiff was suspended for two days without pay on August 19 and 20, 2002 (See attached records from plaintiff's Official Personnel Folder (OPF) and the Agency's Decision on the Proposal to Suspend, attached as Exs. 5 and 6).

14.   Plaintiff submitted two notes from Yasmin Panahy, MD, regarding his absences from work dated May 3 and May 9, 2002 (ROI Ex. 16).  Dr.Panahy requested that the SASI contract be reassigned and that plaintiff be reassigned to the other team leader, Bernard Morton (Id.).

3

15.  On May 21, 2002, Thomas Vincent, in a memorandum to the plaintiff, acknowledged the correspondence from Dr. Panahy and requested that plaintiff provide the Agency with additional medical information so that the Agency could determine what reasonable accommodation would be necessary (ROI, Ex. 16).

16.  On June 11, 2002, Thomas Vincent made a second request for medical information to the plaintiff, because plaintiff did not respond to Mr. Vincent's May 21, 2002 letter (ROI, Ex. 19).

17.  On June 17, 2002, Theodore Ford, Director of the Resource Management Division, also sent a memorandum to the plaintiff requesting additional medical information (ROI, Ex. 19).

18.  Despite plaintiff's failure to respond to the May 21, 2002 and June 11, 2002 requests for additional medical information, on June 13, 2002, plaintiff was temporarily relocated to the 9th floor of the HUD Headquarters Building and ordered to report to Don Schade, the Director of Procurement Management, and Bernard Morton who was the other team leader in the Division (ROI, Ex. 6; Pl. Dep. II, p. 80).

19.  Plaintiff experienced no problems working for Mr. Schade or Mr. Morton during June and July 2002 (Pl. Dep. II, pp. 81-82).

20.  Plaintiff had no contact with Mr. Vincent or Ms. Lambert after he was reassigned to Mr. Shade's supervision and

4

Bernard Morton became plaintiff's team leader on June 13, 2003 (Pl. Dep. II, pp. 82-83).

21. On July 29, 2002, plaintiff was advised that he was reassigned to his previous workspace on the 2nd floor effective August 4, 2002 and that Don Schade would become his permanent supervisor.  Plaintiff was also informed that the change to his work schedule had expired on July 5, 2002, and that any charges of AWOL after July 14, 2002, would be expunged (ROI, Ex. 20).

22. On August 1, 2002, plaintiff filed a Workers' Compensation Claim asserting that he was unable to work due to the agency's actions which allegedly created a hostile work environment (ROI, Ex. 22).

23. On September 9, 2002, the Agency denied plaintiff's Step 1 Grievance regarding the AWOL charge and change to plaintiff's work schedule (ROI, Ex. 21; Pl. Dep. II, pp. 52-53).

24. On October 29, 2002, the Agency issued a response to plaintiff's request for workers compensation benefits (ROI, Ex. 22).

25. On January 23, 2003, the Department of Labor, Office of Workers' Compensation Programs denied plaintiff's workers' compensation claim (Exhibit 4).

Respectfully submitted,

__/s/_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney


__/s/_____
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney


__/s/_____
DIANE M. SULLIVAN, D. C. BAR # 12765
Assistant United States Attorney
Judiciary Center Building
555 Fourth Street, N.W.
Room E4919
Washington, D.C. 20530
(202) 514-7205

Of Counsel:
JENNIFER EVERT
Office of General Counsel
U.S. Department of Housing
and Urban Development