IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CLIFFORD F. SMITH | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 05-2042 (CKK) |
| ALPHONSO R. JACKSON, | ) | |
| Secretary, US. Department of | ) | |
| Housing and Urban Development | ) | |
| | ) | |
| Defendant. | ) | |

<u>PLAINTIFF'S OPPOSITION TO DEFENDANT'S</u>

<u>MOTION TO DISMISS AND FOR SUMMARY JUDGMENT</u>

The Plaintiff, pursuant to Rules 12(b) (6) and 56 of the Federal Rules of Civil Procedure,

moves this Honorable Court to dismiss defendant's motion to dismiss and for summary judgment

on the grounds that the undisputed facts demonstrate that the plaintiff has stated a claim on which

relief may be granted and that the defendant is not entitled to judgment as a matter of law.

In support of this motion, the plaintiff submits the accompanying Exhibits, which include

the Dr. Yasmin Panahy and Dr. Richard Katz's report, Clifford Smiths' answers to Defendants

Interrogatories, Consuella B. Dockett's Memorandum to the Agency, Clifford Smiths Memorandum

to Mr. Vincent, Smiths' Employee Grievance, Smiths Accommodation Request, Offence/Incident

Report to Federal protective Services, and the depositions of Clifford Smith and Thomas Vincent.

Respectfully submitted,

_____/s/_____

Rev. Uduak James Ubom, Esq. (D.C. Bar 449102)

7600 Georgia Ave. NW., Suite 411

Washington, DC 20012

Tel. (202) 723-8900,  Fax (202) 723-5790

Attorney for Plaintiff

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 7, 2007, I caused a true and accurate copy of the forgoing Plaintiff Opposition Motion to be served, electronically, via ECF filing upon;

DIANE N. SULLIVAN, D. C, BAR #12765

Assistant United States Attorney,

Civil Division,  Judiciary Center Building,

555 Fourth Street, N.W.,

Washington, DC. 20530

Counsel for Defendant


_____/s/_____

Rev. Uduak James Ubom, Esq.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CLIFFORD F. SMITH | ) | |
|     Plaintiff, | ) | |
| v. | ) | Civil Action No. 05-2042 (CKK) |
| ALPHONSO R. JACKSON, | ) | |
| Secretary, US. Department of | ) | |
| Housing and Urban Development | ) | |
| | ) | |
|     Defendant. | ) | |

PLAINTIFF'S RESPONSIVE STATEMENT OF FACTS

In accordance with Local Rule 7(h), Plaintiff submits the following statement of material

facts as to which there is no genuine dispute.

1.  Plaintiff admits paragraph 1.

2.  Plaintiff admits paragraph 2.

3.  Plaintiff admits paragraph 3.

4.  Plaintiff admits in part and denies paragraph 4 in part.  Plaintiff admits that he was

assigned the SASI contract and that Mr. Vincent asked him to come to work on Friday April 26,

2002.  Plaintiff denies that the contract was due on April 26, 2002.  Plaintiff also states that he

informed Mr. Vincent that April 26, and April 29, 2002 was his days off, as such he is not required

to work on those days off.  Moreover, even though plaintiff had informed Mr. Vincent that his

computer was inoperable, he managed to complete his assignment before leaving the office on April

25, 2002.  Plaintiff did not refuse to come to work on his assigned days of work but on his off work

days.  Plaintiff returnee to work on April 30, 2002 as required.

5.    Plaintiff denies paragraph 5, and states that Mr. Vincent changed his work schedule because Plaintiff was insubordinate, and as a black man stood up to him.

6.    Plaintiff admits paragraph 6.  Plaintiff continued to work his CWS during the month of May and June pursuant to instructions given to him by AFGE Local 476 at HUD.

7.    Plaintiff admits paragraph 7.

8.    Plaintiff admits paragraph 8.  Plaintiff states that he was advised by his Union to continue to work his CWS, because the Union had sent Mr. Vincent a "Demand to Bargain Letter" which he tore and threw in the trash without responding.

9    Plaintiff denies paragraph 9.  The letter from the local AFGE Demanding to Bargain regarding the change to plaintiff work schedule was given to Mr. Vincent on April 30, 2002 and not May 29, 2002, (ROl, Ex, 15).

10.    Plaintiff denies paragraph 10.  Plaintiff filed a Union grievance challenging the change in his work schedule, and for placing him on AWOL on April 30, 2002.  (ROI, Exs. 15 and 21; P1, Dep. II, 51-53) Plaintiff asserted in his grievance that the actions taken were "blatant disparate treatment" (Id

11.    Plaintiff admits paragraph 11.  Plaintiff responded the Proposal for Suspension, and denied the entire allegation.

12.    Plaintiff admits paragraph 12.

13.    Plaintiff admits paragraph 13.

14.    Plaintiff admits paragraph 14 in part.  And states that Yasmin Panahy, MD, did not request that plaintiff be reassigned to the other team leader, Bernard Morton.

4

15.     Plaintiff admits paragraph 15.  But states that Dr. Panahy's letter to the Agency specifically answered Mr. Vincent request for provide reasonable.

16.     Plaintiff admits paragraph 16, but states that the letter sent to the Agency answered Mr. Vincent's request for information.

17.     Plaintiff admits paragraph 17. And informed Mr. Ford that Dr Panahy advised Plaintiff that his letter to the agency was sufficient to answer their request.

18.     Plaintiff admits paragraph 18 in part but denies that he was relocated because he failed to respond to a request for information.  Instead Plaintiff states that on June 12, 2002, Mr. Vincent confronted Plaintiff with more threats to the point
that Plaintiff had to call the Union Representative Gloria Anderson to come to his office. Ms. Anderson was subjected to such irrational, undignified abuse by Mr. Vincent to the extent that the Representative advised Plaintiff to leave with her.  Vincent was barking and raving insults at me and the representative and threatening Plaintiff's demise to the extent that the Union contacted Labor Relations, Employee Relations.  On June 12, 2002, Plaintiff was immediately moved from the hostile environment to non-hostile office, and advised that there would be no further contact with the Thomas Vincent or the team leader, Brenda Lambert.  Plaintiff was advised that the Director would be his new supervisor and his new team leader would be Bernard Morton.  Plaintiff continued to feel sick because of the mistreatment by Vincent that he visited the Health Unit and again his blood pressure was highly elevated to the point that he had to remain there for some time.

19.     Plaintiff admits paragraph 19.

20.     Plaintiff admits paragraph 20.

21.     Plaintiff admits paragraph 21.

22.    Plaintiff admits paragraph 22.

23.    Plaintiff admits paragraph 23.

24.    Plaintiff admits paragraph 24.

25.    Plaintiff admits paragraph 25.

26.    In Plaintiff's words, "Initially, the problem existed since my arrival into the Procurement Management Division in 1998.  I entered the new arena under protest and I was the only Systems Accountant reassigned to replace a GS -14, without a promotion, that was another ploy by my old managers so that a favored individual of their choosing would receive the promotion.  Due to the ill feeling and difficult circumstances created by the DD I became totally dependent upon myself and my colleagues to accomplish my office duties (things were in such array we all had to rely on each other for support).  Except for periodic staff meetings, we had practically no contact.  From 98 thru 01, I was discontented about my performance appraisals which I received a 'Fully Successful" and I refused to sign off on them even though it stated that it did not matter.  This was because I deserved and 'Outstanding" considering what I had accomplished throughout this period of time, and my prior ratings.  The outright defamation of my character became blatant in the latter part of 01 when I started working with my prior Director, and his Assistant on a contract.  Prior to them I worked with two individuals located in their Department on the potential contract for their program area and all was going well.

With the assignment of the new persons (Gabrielle Scandone who had at the time no knowledge of what had transpired with the contract nor was the former GTM's), things started spiraling into major problems and delays. The overall picture changed when I had requested to be taken off the contract due to the lousy disposition and unqualified individuals that replaced the original GTM's.  The contract package finally reached the Contract Office and the table of contents had to be adjusted and a change of information would have to be added.  I received an email concerning the changes, and the TL volunteered my services to because she was not able to make the adjustment.  This was normally a Contract task completed in the Contract award office, so to be spiteful I was directed to accomplish the task, and I explained this but received negative responses.  The team leader came into my office (we had a major disagreement the day before) and asked me about the changes and I said that I had every thing under control, but revising the content sheet of the contract was not my task, and that she should leave me along so I could get my work done.  The TM went to the Director and embellishing the incident told him that I said to 'get the hell out of my office' which was not true, at least not in those exact terms, **she lied.**

I believe the spat I had with the new appointed Team leader (TL), on April 25, 2002, angered her to the point that she was seeking vengeance? A meeting ensued, after several contacts by the Director occurring in my office, and a meeting was commenced with the Director, Deputy Director (DD), Team leader and myself in the Directors office at about 3:40:pm at which time I was asked to input the information from the email into the contract within a specific period (20 minutes) of time. I disagreed with the timing and the Director became livid with rage using profanity, and demanded that I complete it by 5:00 PM. (all of this began approximately on April 25, 2002 and lasted through July 30, 2002)

However, I explained that I would see what I could but I would not concur on the exact time It would be finished knowing that the Contract Specialist had already informed me that the contract

was a 'done deal' and I did not have to do anything, and also realizing that the time element was nothing more than an excuse by them to trap me.  The DD and the TL both said that it could be done, yet neither had the experience nor knowledge to do so and when I informed them of what I knew about the contract they totally disregarded the information.

The DD then explained to me since I was having major computer problems (can be verified by James Smallwood), after I spoke to him, to have the input completed before I left for the day.  I continued to have computer trouble and I informed him, and this was about 4:45 pm. Since he was preparing to go home he asked me to have it done before I left. At exactly 5:00 PM he called me into his office (*and the TL just left as I walked into his office), and told me that SINCE I WAS NOT FINISHED AT 5:00 PM I would have to come in the following day. Since it was my day off I explained to him that I had made plans that could not be changed and I would not be in, and also that the information demanded of me was really irrelevant since the contract was in the hands of the contract specialist.  He left the office and upon his departure said to me that if I did not come in the following day I would be subject to disciplinary action. I did not come in since I had completed the package into his in box then I left for the day. Things starting to gather momentum, with verbal abuse, and harassment when I returned to work Monday, It was at this time the DD started berating me on a daily basis throughout the day using the contract as a disguise since he felt that things were not moving fast enough.  He started criticizing me exclaiming that "I did not know what I was doing", I was incompetent, I had better get certain things done or I would suffer disciplinary action, and I was presented with a memorandum revoking my Compressed Work Schedule (CWS) since I did not come to work that Friday, which was my day off (I had already worked my 40 hours, and I did not want compensatory time off).  This was nothing more than retaliation for my not working on my day off, and I knew there was a lot more to these attacks than the contract situation which was really non-existent.  His verbal and email attacks became so frequent, and the daily routine of calling me into his office at least eight or nine times a day inquiring about a contract that he felt I was responsible for not having it awarded even after I had explained the status to him, and that the contract office was processing the contract for award (and it was out of my hands). These, sometimes explosive, meeting in which I thought he was losing it, began to affect my daily routine, and I would have to go to the medical clinic on the 7th floor due to the acceleration of my blood pressure, and heart palpations in which case they would keep me there for periods of time or call my doctor who would tell them to tell me to go home since I did not want an ambulance to take me to the hospital.  The DD would be informed of these occurrences, but disregarded them and charge me with LWOP and AWOL.  At one time I thought he was really trying to cause my demise with his 'I don't care attitude'.  I also believe that the Director knew of the situation but refused and was involved due to the fact that the DD had him over a barrel because of a conflict of interest issue concerning him and his wife who also worked in Procurement Contracts area.  Mr. Vincent, Deputy Director (DD) called me into his office several times on May 2, 2002 to discuss the status of a contact.  During this conversation the DD made negative remarks and threatened me again as usual with disciplinary action.  I requested a Union representative be present due to the frequency and nature of these meetings but he denied my request.  I later suffered chest pains, warm feeling and shortness of breath and went to the health unit to check my medical condition.  A nurse at the health unit took my blood pressure following the meeting with Mr. Vincent.  My blood pressure had escalated to a dangerous level.  My blood pressure was s190/77 at 2:10 p.m., 188/91 at 2:15 p.m. and 183/98 at 2:25 p.m.  I was retained at the health unit for a considerable time.  I was advised to go home due to the hostile environment I encountered at work.  I saw Dr. Yasmin Panahy the following morning.  Dr. Panahy advised me to remain home and out of the hostile work environment since it could become very dangerous and possibly fatal.  I returned to Dr. Panahy's

office on May 6, 2002, and I was advised to stay home and not to return to work. I was provided with two disability certificates to present to my employer.

On May 14, 2002, I returned to work and submitted two disability certificates to Mr. Vincent. The certificates specifically state that a stressful hostile environment could be dangerous and life threatening to me. Mr. Vincent disregarded these notices from the physician and continued harassing me and threatening me with disciplinary action for missing work and following the physician's instructions. Mr. Vincent threatened and placed me on Absence Without Leave status (AWOL) and on Leave Without Pay (LWOP). Mr. Vincent held numerous meetings with me on May 14, 2002, which occurred as frequently as five to eight or more times per day. Mr. Vincent would follow up these encounters with many e-mails per day in which he charged me with various disciplinary infractions. The situation reached a point where I on many occasions, had to go to the health unit only to be informed that my blood pressure was so high I could not return to work.

On May 22, 2002, Mr. Vincent stormed into my office at approximately 5:20 p.m. in a hysterical manner and demanded that I work on days I was not previously scheduled to work. I tried to leave the office to avoid confrontation and to prevent another stressful occurrence which would again elevate my blood pressure. However, Mr. Vincent blocked the doorway and I could not leave. I picked up a cup from my desk and said I needed to get water from the cooler. He finally moved aside, however Mr. Vincent followed me to the water cooler and in a boisterous manner continued to threaten me with disciplinary action, and AWOL if I failed to work on the days Mr. Vincent requested. I went into a colleague's office as Mr. Vincent turned away and yelled that I was going to "pay dearly" and was "going to suffer the consequences." I felt anxious as a result of this encounter. I was drained and felt pains in my chest and experienced a shortness of breath.

Mr. Vincent contacted me by phone on May 30, 2002, pursuant to my request to contact a contractor to clarify an outstanding issue. Mr. Vincent maliciously yelled at me during this phone conversation and treated me in an undignified manner. After this conversation, I went to the health unit and was again retained because of an escalated blood pressure level.

On June 5, 2002, Mr. Vincent entered my office and began harassing and verbally abusing me. Mr. Vincent returned a few seconds later along with team leader Brenda Lambert. Mr. Vincent blocked the doorway and prevented me from leaving my office. Mr. Vincent told me that I was going to respond to his questions. As I attempted to leave, Mr. Vincent threatened me and blocked my way out and told me to "push him out of the way or squeeze by." I called security and they referred me to the Federal Protection Agency. The incident was reported the following morning.

On June 12, 2002, Mr. Vincent again confronted me with threats. This time, I had to call a union representative to my office. The union representative appeared at my office and encountered the irrational and undignified behavior of Mr. Vincent. The union representative had a several words with Mr. Vincent and then told me to leave with her due to the hostile encounter with Mr. Vincent and the potential for violence in the work place and the union representative felt threaten of physical harm by Mr. Vincent. Mr. Vincent screamed to me not to leave with the union representative and made more threats. I left with the union representative and she immediately reported the incident to Labor Relations, Employee Relations.

After this incident, I again reported to the health unit where I was retained due my high blood pressure level. My blood pressure was at 170/100 at 3:00 p.m. and at 140/70 at 3:20 p.m. and 3:45 p. m., respectively. This elevated blood pressure level was largely due to the encounter with Mr. Vincent. My blood pressure was elevated even though I am on blood pressure medication. When I returned to my office, I was informed that I would be immediately moved from the hostile environment to a non-hostile office on the ninth floor. I was informed I would now report to the Director and have no more contact with supervisor Thomas Vincent or team leader Brenda Lambert.

8

Even though I was assigned to another office and Mr. Vincent was replaced by the Director as my new supervisor, Mr. Vincent continued his harassment and showing up at my new office. In addition, Mr. Vincent was still placing me on AWOL and signing my time and attendance cards. During this short period in the new location, I continued to frequently experience sharp needle-like pains in my chest, shortness of breath, blood pressure escalations and numbness in my right hand. I also experienced an outbreak of blisters. These symptoms are consistent with symptoms I exemplified while being in a hostile work environment while supervised by Mr. Vincent. On July 31, 2002, I was informed that I had to return back to the same hostile work environment from which I was recently removed. On August 1, 2002, my primary physician and psychiatrist disagreed with the decision, noting it would be detrimental to my physical and mental health. I informed my Doctor and I was told not to report back to the old office because it would be detrimental to my health. So I filed for workman's Compensation due to stress and medical reasons. I was out of work for eleven (11) months under the care of my Doctors, and returned receiving a letter from Linda Nessi, Operation's Director concerning  a change in the immediate environment ( Tom Vincent, Deputy Director was forced to retire and Don Schade, Director resigned for another position outside of the Department)July.  Plaintiff filed this complaint based on the aforementioned actions taken against him".  (Plaintiff Exhibit 4, Answers to Interrogatories pp 3-7).

Respectfully submitted,


_____/s/_____

Rev. Uduak James Ubom, Esq. (D.C. Bar 449102)

7600 Georgia Ave. NW., Suite 411

Washington, DC 20012

Tel. (202) 723-8900,  Fax (202) 723-5790

Attorney for Plaintiff

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 7, 2007, I caused a true and accurate copy of the forgoing Plaintiff Opposition Motion to be served, electronically, via ECF filing upon;

DIANE N. SULLIVAN, D. C, BAR #12765

Assistant United States Attorney,

Civil Division, Judiciary Center Building,

555 Fourth Street, N.W.,

Washington, DC. 20530

Counsel for Defendant


_____/s/_____

Rev. Uduak James Ubom, Esq.

9

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

CLIFFORD F. SMITH                      )
      Plaintiff,                    )
v.                                     ) Civil Action No. 05-2042 (CKK)
ALPHONSO R. JACKSON,                   )
Secretary, US. Department of           )
Housing and Urban Development          )
                                       )
      Defendant.                   )

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND FOR SUNMARY JUDGEMENT

### INTRODUCTION

Plaintiff, Clifford F. Smith,  a 71 year old African American brings this action under Title, VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §5 2000, and section 1981.  Plaintiff, who was a Contract Analyst at the time of the alleged discrimination is currently a Management Analyst employed by the U.S. Department of Housing and Urban Development (hereinafter "HUD").  Plaintiff states that he was subjected to discrimination, harassment, disparate treatment and retaliation based on his race, color, as well as retaliation, when, his former supervisor attacked his performance, shouted and made threats to the plaintiff, changed his work schedule, charged plaintiff with Absence without Leave (AWOL), issued a "Proposal to Suspend, and physically blocked his path when plaintiff tried to leave his office.

The undisputed facts demonstrate that plaintiff has met his burden under Title VII, and this Court should allow a jury of Plaintiff's peers to hear his case, and dismiss defendant's motion to dismiss and for summary judgment.

## FACTUAL BACKGROUND

Plaintiff, Clifford F. Smith, a former Contract Oversight Specialist, and a current Management Analyst, GS-13, at HUD, began his employment with HUD in 1984 (Plaintiff Deposition Transcript (I) ("Pl. Dep. I"), pp. 9-23). In 2002, plaintiff was a GS-11Ol-13 Contract Oversight Specialist in the Office of Housing, Procurement Management Division (Report of Investigation (ROl), Ex. 11). His first-line supervisor in that position was Thomas R, Vincent, Deputy Director of the Procurement Management Division (ROl, Ex, 20).

Plaintiff's states that he suffered discrimination, harassment, and retaliation while working for Mr. Vincent at HUD. Plaintiff was assigned a contract which was previously assigned to another officer in March 2002. (Smith's Deposition II, at 6.) That contract was referred to as the SASI contract (Vincent Dep., p. 14) The team leader for the SASI contract was Brenda Lambert, a GS-14, supervisory Contract Oversight Specialist (ROl, Ex. 7, p. 2 and 27). On April 25, 2002, Ms. Lambert questioned plaintiff on the status of the SASI contract which was supposedly due to be issued on April 26, 2002 (ROl, Exhibit 7). Plaintiff advised his superior that he had changed the date of the contract, and was not rude to Ms. Lambert. (Smith's Depo. II, at 12, 13, and 17). Ms. Lambert reported plaintiff's conduct to Mr. Don F. Schade, the Director of the Procurement Management Division, and plaintiff's second-line supervisor (Id ROI, Ex. 6, p. 1). Mr. Schade accompanied Ms. Lambert into plaintiff's office to find out the status of the work

(Id.., Ex. 7, p. 9). Plaintiff explained to Mr. Schade the status of his assignment and informed his superiors that his computer has broken down.

Plaintiff's supervisors asked plaintiff about the projected completion of his assignment and why he had changed the due date of the contract. His supervisors informed plaintiff that he was to have the assignment completed by 5:00 p.m. before going home (Id)   Mr. Vincent advised plaintiff that he had to come into the office the next day, Friday, April 26, 2002 to finish the assignment (Id., p. 10) . Plaintiff was on a compressed work schedule (also referred to as OWS) . Friday, April 26, 2002 and Monday, April 29, 2002 were his scheduled days off. Plaintiff advised Mr. Vincent and Ms. Lambert that he would not come in on Friday to complete the assignment. (Id p. 10; Vincent Dep., p. 47)

Plaintiff states that he completed the assignment before he left the office on April 25, 2002 and left the completed work for Mr. Vincent who had already left for the day. (Smith Depo II, at 30-31).  The plaintiff had no authority to change the due date for issuing the contract (Vincent Dep., p. 128-129).  Plaintiff did not come to work on either Friday April 26, 2002 or Monday, April 29, 2002 because he had already completed his assignment on the contract. (Smith Depo II at 30-31).

When plaintiff returned to the office on Tuesday, April 30, 2002, Mr. Vincent made clear to the plaintiff that his failure to follow a direct order by a manager was grounds for disciplinary action and that plaintiff was required to comply with such an order whether he liked it or not (Vincent Dep., pp. 67-68). Mr. Vincent advised plaintiff that there would be consequences for his insubordination (Id., pp. 68-69).  Plaintiff explained to Mr. Vincent that he had already completed the assignment.

On April 30, 2002, Mr. Vincent Mr. Vincent temporarily revoked plaintiff's compressed work schedule (CWS), because he was upset with Plaintiff.  (ROl, Ex. 14) . Plaintiff was advised by his Union to continue to work under his compressed work schedule during the month of May and June (ROl, Exs, 17, 23; P1, Dep. II, pp. 77-78). On May 22, 2002, Mr. Vincent again advised plaintiff by email that his work schedule had been changed and that if he failed to comply with the new work schedule he would be charged AWOL (ROl, Ex. 17).

On May 30, 2002, plaintiff filed a grievance and his Union filed a demand to bargain regarding the revocation of his compressed schedule and for placing him on AWOL for failure to work as required by the new schedule (ROI, Exs. 2, 15, 21; P1, Dep. II, pp. 51-53). Plaintiff sought to stop what he referred to as "blatant disparate treatment" (Id Ex. 15) On September 9, 2002, the Agency denied his grievance (ROl, Ex. 21; P1. Dsp. II, pp. 52-53)

Plaintiff submitted to Mr. Vincent notes from Dr. Yasmin Panahy dated May 3, 2002 and May 9, 2002, Dr. Panahy indicated that 'plaintiff was under undue stress at work" and that she recommended that "this recent contract (SASI) . . . be reassigned and that he be reassigned to the other team" (ROl, Ex. 17, Attachments X and Y).  Plaintiff also submitted notes from Dr. Richard Katz of the George Washington University. (Plaintiff's Exhibit 1.)

After receipt of the notes from plaintiff's physician, Mr. Vincent requested for additional medical information even though the medical information contained in the reports were sufficient to give Plaintiff reasonable accommodation. Mr. Vincent requested additional medical information on May 21, 2002 and June 11, 2002. Plaintiff

failed to provide the requested information. Finally, on June 17, 2002, the Director of the Resource Management Division, sent a third request for medical information, but again, plaintiff relied on the ones previously provided by his doctors (ROT, Exs, 18, 19; P1. Dep. II, pp. 28—32, 94—96)

On May 31, 2002, Mr. Vincent proposed a five day suspension for plaintiff alleging plaintiff failed to follow a direct order, failed to follow a proper order, failed to comply with the new work schedule, and because of his insolent and disrespectful behavior towards his team leader. This proposed suspension arose out of the events surrounding plaintiff's failure to complete the SASI contract, and ignoring the temporary revocation of plaintiff's CWS schedule (ROT, Ex. 17).  Plaintiff responded and refuted the allegations in the proposed suspension.

On June 13, 2002, Plaintiff' was temporarily relocated to the 9th floor of the HUD Headquarters Building and ordered to report directly to Don Schade, Director of the Procurement Management Division, and Bernard Morton, the other team leader as Dr. Panahy had requested (ROT, Ex. 6) . Plaintiff was also relieved of some additional duties and responsibilities as requested. Id  On July 29, 2002, plaintiff was advised that, effective August 4, 2002, he was to return to his original work station and would be permanently placed under Mr. Schade's supervision.

On August 1, 2002, plaintiff filed a workers' compensation claim alleging that he was disabled for work because of the harassment and hostile work environment he was subjected to by his supervisor. The Department of Labor denied his claim. Plaintiff failed to report to work from August 1, 2002 until June 2003 (ROI, Ex. 23; Exhibit 3)

Plaintiff contacted an EEO counselor regarding allegations of race, sex and age discrimination on June 24, 2002 (ROT, Ex. 2) . On July 31, 2002, plaintiff filed a formal EEO complaint (ROI, Ex, 2) . In his formal EEO complaint, plaintiff stated that because of his race, sex and age, he was subjected to harassment and subjected to discriminatory treatment by his supervisor, Thomas Vincent, when he received threats of discipline, when his compressed work schedule (CWS) was revoked, when he was charged with AWOL, when his supervisor blocked his path and when his supervisor proposed a five-day suspension. Id.  On July 13, 2005. the Agency issued a Final Decision.  (Exhibit 1) . The Agency had previously dismissed three of plaintiff claims, including the claims relating to the revocation of his CWS and placing him on AWOL, because he had elected to file a grievance on those issues before he filed his SEQ complaint. Plaintiff filed this complaint based on the above facts and those stated on Plaintiff's responsive statement of facts.

## ARGUMENT

### I.     Legal Standards

### A.     Motion to Dismiss

A motion to dismiss brought pursuant to Rule 12(b) (6) should only be granted if it is beyond doubt to the Court that a plaintiff cannot demonstrate any set of facts that supports his claim entitling him to relief.  See Conley v. Gibson,  355 U. S. 41, 45-4 6 (1957) ; see also Sparrow v, United Air Lines, Inc 216 F 1111, 1117 (D Cir 2000). Plaintiff is given the benefit of all inferences that reasonably can be derived from the facts alleged in the complaint.  The court need not but may accept inferences that are not supported by such facts, nor must the court accept plaintiff legal conclusions cast in the

form of factual allegations. <u>Kowal v, MCI Communications Corp</u> 16 F 1271, 1276 (D

Cir, 1994).

      B.    <u>Summary Judgment</u>

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment: shall

be granted if the pleadings, depositions, answers to interrogatories, and admissions on

file, together with the affidavits, if any, show that there is no genuine issue as to any

material fact and that the movant is entitled to a judgment as a matter of 1aw Fed. R. Civ.

P. 56. The party moving for summary judgment bears the in responsibility of informing

the trial court of the basis for its motion and identifying those portions of the record that

it believes demonstrate the absence of a genuine issue of material fact. <u>Alexis v. District

of Columbia</u> 44 F. Supp. 2d 331, 337 (D.C. 1999).

      When and if the moving party has carried its burden, the responsibility shifts to

the nonmoving party to show that there is, in fact, a genuine issue of material fact for

trial. <u>Alexis</u>, 44 F. Supp. 2d at 337. The opposing party must provide "specific facts

showing that there is a genuine issue for trial," and "may not rely on mere allegations or

denials to prevail (Id).

      C.    The Burden

      Title VII makes it unlawful for an employer to fail or refuse to hire or to discharge

any individual, or otherwise to discriminate against any individual with respect to his

compensation, terms, conditions, or privileges of employment, because of such individual

race, color, religion, sex, or national origin. 42 U § 2000e-2(a) (1).

16

The record herein contains direct evidence of Mr. Vincent's discrimination against Plaintiff because of his race.  Plaintiff agrees that allegations of race discrimination under Title VII and age discrimination under the ADEA are both analyzed under the familiar McDonnell Douglas three-part "shifting burdens" test. See McDonnell Douglas Corp. v, Green 411 U.S. 792, 93 S,Ct. 1817, 36 L.Ed 668 (1973); see also Brown v, Brody 199 F,3d 446, 452 (D.C. Cir. 1999) (applying McDonnell Douglas framework to federal employee' s Title VII claims); Barnette v. Chertoff 453 F.3d 513, 515 (D.C.Cir.2006) (applying framework to ADEA claims).

Once a plaintiff establishes a prima facie case, the burden of production shifts to the defendant to articulate a legitimate nondiscriminatory reason for the challenged action. Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981) (defendant's burden articulated for Title VII cases

II.    **Plaintiff's Claims Regarding Change in Work Schedule and AWOL Should Be Sustained**

On April 30, 2002, plaintiff filed a grievance and his Union filed a demand to negotiate over management's revocation of plaintiff's Compressed Work Schedule (CWS) and charging plaintiff AWOL for ignoring the new work schedule. Plaintiff claimed that the revocation of his CWS and charging him AWOL was "blatant disparate treatment" (ROl, Ex. 15).

Plaintiff's claim may be distinguished and does not fall under 28 CFR. 1614.301 (Relationship to Negotiated Grievance Procedure) provides in pertinent part:

In his grievance, Plaintiff claimed blatant disparate treatment.  In his complaint, Plaintiff claimed hostile work environment (harassment), race and age discrimination in his June 2002 formal FED complaint not because of the revocation of his CWS and the AWOL complaints but because of the mistreated meted out to him by Mr. Vincent. (Plaintiff Exhibit 4, Answers to Interrogatories pp 3-7).  These complaints are not rooted in the same factual nucleus as the grievance.  Plaintiff was specifically given a right to sue by the EEOC on July 13, 2005.  (Plaintiff's Exhibit 5).

Considering Plaintiff's Complaint is separate and not routed in the same facts, thus court should sustain Plaintiff's claim.

III.     Plaintiff Has Establish Sufficient Evidence of a Hostile Work Environment

Plaintiff has established that he was subjected to treatment that was sufficiently severe or pervasive as to constitute a hostile work environment, and the stated actions by Mr. Vincent were a result of his membership in a protected class (Black).

To establish the existence of a hostile work environment based on harassment because of race or age in violation of Title VII and the ADEA, a plaintiff must prove that: 1) he was subjected to discriminatory intimidation, ridicule, and insult; 2) the actions were based upon his membership in a protected class; 3) he found the actions to be abusive or hostile, and 4) the actions were sufficiently severe or pervasive that a reasonable person would find that they altered the conditions of his employment and created an abusive or hostile work environment. See Harris v. Forklift Systems Inc., 510 U.S. 17, 21 (1993).  A workplace environment becomes "hostile" only if the offensive conduct "permeate[s] [workplace] with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim employment

and create an abusive working environment." <u>Barbour v. Browner</u> 181 F.3d 1342, 1347-48 (D.C. Cir, 1999), (quoting <u>Oncale v. Sundowner Offshore Serve, Inc</u>. 523 U.S. 75, 78 (1998).

To determine whether those conditions exist, the courts consider: 1) the frequency of the discriminatory conduct; 2) the severity of the conduct; 3) whether the conduct is physically threatening or merely offensive; and 4) whether the conduct unreasonably interferes with the employee's performance. <u>Faragher v. Boca Raton</u> 524 U.S. 775, 787-88 (1998).  In determining whether the behavior was objectively offensive, the Court must judge the behavior "from the perspective of a reasonable person in the plaintiff position, considering pall the circumstances. <u>Stewart</u> 275 F at 1133, quoting <u>Harris</u>, 510 U.S. at 23.

Based on the aforestated, Plaintiff has established that he was subjected to a hostile work environment prohibited by Title VII or the ADEA. (Plaintiff Exhibit 4, Answers to Interrogatories pp 3-7).  Plaintiff stated that Mr. Vincent frequently yelled at him during discussions about his work over a period of several weeks in late April and early May 2002.  Plaintiff further stated that Mr. Vincent, called plaintiff into his office numerous times a day, repeatedly called him on the phone, constantly sent him emails, changed his CWS, charged him with AWOL and physically blocked his path when he sought to leave the office (Compl. ¶T 6—19)

Mr. Vincent's admits that his management style was intense. He has been described as "hyper" by one employee, and his tone of voice could become strong and louder on occasion (See Affidavit of Bells Vood, ROl, Ex. 9 at 2-3) . Another employee in the office, James Smallwood, described the atmosphere in the office as having "hot

moments," and describing Mr. Vincent as someone who would "get behind it" when things were not going well with a contracting issue (ROI Ex. 8 at 3-4).  This type of conduct directed only on Smith who is Black creates a hostile work environment.  Mr. Vincent's actions were too severe to plaintiff that he was hospitalized.

The plaintiff also states that Mr. Vincent threatened him and that he physically blocked his path, but the record evidence demonstrates that these "threats" related solely to plaintiff refusal to adhere to the new work schedule or complete his work assignment.  Admittedly Mr. Vincent advised plaintiff that his OWS was temporarily revoked, that he would place him on AWOL if he ignored the new schedule.  Defendant fails to explain how physically blocking ones path would not constitute a threat or even an assault and battery.  This escalated to the extend that Plaintiff had to file an Offence Incident Report with the Federal Protective Service.  (Plaintiff Exhibit 5).  Mr. Vincent does not dispute blocking Plaintiff's path so that he could not leave his office.  Apparently the consequences Mr. Vincent referred to in his warning to Plaintiff including physical threats.  (Vincent Dep, 102-104).

III. <u>Plaintiff Cannot Establish Discrimination Based on Race</u> or Age

Plaintiff has established sufficient evidence that would permit a reasonable juror to conclude he was the victim of race or age discrimination.  Plaintiff has shown that he was the only employee that Mr. Vincent mistreated, and that he was treated differently than other similarly situated employees not within the protected groups when his CWS was revoked, when he was charged AWOL for failure to report to work after his schedule was changed, or when he was issued a proposed suspension.  Plaintiff has established that the

20

reasons given for the actions taken were pretext for race or age discrimination by Mr.

Vincent. <u>Burdine</u> 450 U.S. at 256.

    IV.   <u>Plaintiff Has Proven Retaliation</u>

Plaintiff states that "constant threats, harassment and acts of ordering plaintiff

back to a hostile work environment - was an act of retaliation for plaintiff's complaints to

the Union" (Complaint, ¶ 35).  A plaintiff establishes a prima case of retaliation by

demonstrating that (1) he engaged in protected behavior; (2) the employer took a

materially adverse action against plaintiff that a reasonable employee would believe was

designed to dissuade a reasonable worker from making or supporting a charge of

discrimination; and (3) there is a causal link between the adverse action and the protected

activity. <u>Rochon v. Gonzales</u> 438 F.3d 1211, 1219-20 (D.C. Cir. 2006).

Plaintiff's states that he was retaliated against because of his complaints to the Union.

(Union grievance See pp. 13-14).  Plaintiff states that Mr. Vincent took the adverse

actions against him because of his complaints to the Union.  Plaintiff must demonstrate

"materially adverse consequences . . . such that a reasonable trier of fact could conclude

that the plaintiff has suffered objectively tangible harm" which would have dissuaded a

reasonable employee from making or supporting a charge of discrimination. Plaintiff fell

sick, could not return to work for almost one year, and incurred medical bills due to Mr.

Vincent's actions.

Plaintiff has demonstrated that the defendant took a materially adverse action

against the plaintiff when he was advised to return to his original work station on July 29,

2002, when the agency knew Mr. Vincent was still there and Mr. Vincent was the cause

of Plaintiff's sickness.

## **CONCLUSION**

Wherefore, Plaintiff has established a prima facie case of discrimination, a reasonable juror could conclude that defendant's reasons were a pretext for discrimination, harassment and retaliation against Plaintiff.  This Court should dismiss defendant's motions and give the Plaintiff an opportunity to present his case before a jury.

Respectfully submitted,

_____/s/_____

Rev. Uduak James Ubom, Esq. (D.C. Bar 449102)

7600 Georgia Ave. NW., Suite 411

Washington, DC 20012

Tel. (202) 723-8900,  Fax (202) 723-5790

Attorney for Plaintiff

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 7, 2007, I caused a true and accurate copy of the forgoing Plaintiff Opposition Motion to be served, electronically, via ECF filing upon;

DIANE N. SULLIVAN, D. C, BAR #12765

Assistant United States Attorney,

Civil Division, Judiciary Center Building,

555 Fourth Street, N.W.,

Washington, DC. 20530

Counsel for Defendant

_____/s/_____

Rev. Uduak James Ubom, Esq.