EXHIBIT
4
IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

*******************************
CLifFORD F. SMITH          *
    Plaintilf,     *
         *         Civil Adion No. 05ù2042 (CK
ALPHONSO R. JACKSON,   *
Secretary,      *
U.S. Department ofHousing and       æK
Urban Development   *
    Defendant, æK
*******************************




PLAiNTIFF, CLifFORD SMITHS ANSWERS TO

DEFENDANTÆS FIRST SET OF INTERROGATORJES TO PLAINTIFF


    Plaintiff~ Cliffrd Smith, by Rev. Uduak J. Ubom, his attorney, answers First Set of
Interrogatories propounded by the Defendant, and states:

    (a)    The infcrmation contained in these Answers is being provided in accordance with

the provisions and the intent ofthe Federal Court Rules of Civil Procedure, which require
disclosure of all facts, which may be relevant or may lead to the discovery of relevant
information. Accordingly, the party answering these Interrogatories, by providing information
requested does not waive objections to its admissions as evidence on grounds of materiality or
relevancy or other proper grounds for objection.

    (b) The infcrmation supplied in these answers is not based solely upon the knowledge
of the party, his agents, representatives and attorneys, unless privile~d.

    ⌐ The word usage and sentence structure may be that of the attorneys assisting in
the preparation of these answers, and thus, does not propose to be the exact language of the
executing party.

    1.    State each and every address at which ycu have resided in the past ten years, and
the dates during which you resided at each address given

Answer:

203 Battersea Lane, Fort Washington, Maryland 20744, March 1991 to Present

1

2. Identif~y all documents or other tangible evidence which relate in any vvay to the

allegations of race, color and age discriminaticn, retaliation and a hostile work environment
which ycu have made in this civil action.

Answer:

Memorandums, Letters of Suspension, Reasonable Accommodation requests and
responses, UnionÆ s request for æDemand to Bargainö, Emails, Performance Appraisals,
Federal
Police Report, Primary thctors certificates, and Cardiologist reports, Stress Psychiatrist report,
DepartmentÆs own NursesÆ reports, and Union Reports, etc.

3 .     State whether you have been involved in any litigation, brought by you or against
you; ifso, identify: the style of the case; the docket number; the court in which the action was
filed; the nature of the action; and the current status or final disposition.

Answer:

No

4. Have you filed cr threatened to file anyEEO complaints other than the complaint
at issue in this case; if so, identify: the agency or employer against which the threat or complaint
was made; the date of filing; tl~ nature of the complaint; and the current status or disposition.

Answer:

No

5 . IdentiI~j each and every witness you intend to call at the trial of this action.

Answer:

Connie Duckett, Union Representative,

James Smaliwood, was my office mate in the Procurement Management Divi~on,

Gloria Anderson, Union Representative, retired Union representative for the Department,

Linda Nessi, Operations Director, for the Department (I received a letter to returned to work

from her stating that their was a change in environment),
Kathy Tanner, Retired colleague ,(observed incidents at work and described it to James
Smallwood, and remarked upon how I could tolerate such terrible conduct),
Sherry Bolden, Management assistant for the Procurement Management Division ,who
observed and overheard many outburst from the Deputy director (DD), and whom I requested to
be my witness and the office door was slammed in her face By the DD,

Jacque Meraceron, Labor Relations Representative for the Department who was handling my
case, and

Brenda Boden, retired, former 39 year HUD employee who experienced the DDÆs bizarre
behavior, and possible who will be identified asthey become available.

    6. Describe in detail each and every reason upon which you base your claim of race

2
discrimination andfor compensatory damages as alleged in your Complaini including, but not
limitedto, the medical terminology identifyingeach medical condition; the nature, extent and
duration of any ailment or loss; each and every fact and occurrence upon which you rely in
claimingcompensatory damages as a result of such discrimination the date and circumstances of
emotional pain, sufferir~, inconvenience, mental anguish, loss of enjoyn~nt of life, future
pecuniary losses and other nonpecuniary losses that you attribute to race discrimination or any
other basis for your claim for compensatory damages.

    Answer:

AGE & Racist treatment in comparison to my peers, hostile environment, potential viclence in
the work place. I am black and 70 years old. And Tom Vincent and Don Shade are White. And
none ofthe atrocities committed against me was visited on any white colleague or employee in
the agency. Award letters submitted by two of my peers that were rejected with the explanation
that the recommendation did not come from a higF~r source the Director), boarder line violence

in the work place due to being subjected to Tom Vincent, Deputy Director (DD) deliberately
blocking my path out of my office, and exclaimirg that ôI should push him out ofthe wayö or
æsqueeze byÆ himin order to exit the office, after retrieving another individual(the instigator) as
a
witness, yet reffising my requests to the same entitlement, the intentional delay in assigning me
to another office as prescribed by the Reasonable Accommodation Doctor who stated exactly
that after examining the claim, the Daily harassment utilizing miail and personal attacks
proportionally cutrageous in comparison to normal office daily ativities, refusal to sign off on
my request for Reasonable Accommodations, and reassignmeat even with the producing of
medical evidence from myPrimary doctor, Cardiologist, and Stress Doctor, consistent personal
harassment by sending me email all day bng exclaiming threats of charging me with
disciplinary actions, leave without pay (LWOP), Absent without leave (AWOL), deliberately
canceling my work schedule (conspiring with the new team leader) under false pretense, and
having n~ suspended, besides receiving to assistance, direction or supervisory input from the

him; inwhich case I had to become resourceful to accomplish and succeed in my daily tasks. I was also admonished and I was forbidden to seek help from the sources I established, induding rapid approval of my reqiest for contract services packages. (Additional information to follow).

7.     Describe in detail each and every reason upon which you base your claim of color discrimination and for compensatory damages as alleged in your Complaini, including, but not limitedto, the medicalterminology identifyingeach medical condition; the nature, extent and duration of any ailment or loss; each and every fact and occurrence upon which you rely in claimingcompensatory damages as a result of such discrimination the date and circumstances of emotional pain, sufferir~, inconveniences mental anguish, loss of enjoyn~nt of life, future pecuniary losses and other nonpecuniary losses that you attribute to color discriminaticn or any other basis for your claim for compensatory damages.

Answer:

Initially, the problem existed since my arrival into the Procurement Management Division in 1998. I entered the new arena under protest and I was the only Systems Accountant reassigned to replace a GS -14, without a promotion, that was another ploy by my old managers so that a favored indivilual of their choosing would receive the promotion. Due to the ill feelng

3

and difficult circumstances created by the DD I became totally dependent upon myself and my colleagues to accomplish my offÈe duties (things were in such array we all had to rely on each other for support). Except for periodic staff meetings, we had practically no contact. From 98 thru 01, I was discontented about my performance appraisals which I received a æFully Successfulö and I refused to sign off on them even though it stated that it did not matter. This was because I deserved and æOutstandingö considering what I had accomplished throughout this period of time, and my prior ratings. The outright defamation of my chaacter became blatant in the latter part of 01 when I started working with my prior Director, and his Assistant on a contract. Prior to them I worked with two individuals located in their Department on the potential contract for their program area and all was going well

With the assignment of the new persons (Gabrielle Scandone who had at the time no knowledge of what had transpired with the contract nor was the former GTMÆ s), things started spiralir~ into maj or problems arxl delays. The overall picture changed when I had requested to be taken off the contract due to the lousy disposition and unqualified hdividuals that replaced the original GTMÆ s. The contract package finally reached the Contract Office aal the table of contents had to be adjusted and a change of infcrmation would have to be added. I received an email ccncerning the changes, and the TL volunteered my services to because she was not able to make the adjustment. This was normally a Contract task completed in the Contract award office, so to be spiteful I was directed to accomplish the task, and I explainedthis but received negative responses. The team leader came into my office(we had a major disagreement the day before) and asked me about the changes and I said that I had every thing under control, but revising the content sheet of the contract was not my task, and that she should leave me along so I could get my work done. The TM went to the Director and embellishingthe incident told him that I said to æget the hell out of my officeÆ v~hich was not true, at least not in those exact

terms,
she lied.

I believe the spat I had with the new appointed Team leader (TL), on April 25, 2002, who had no supervisory authority, angered her to the point that she was seeking vengeance. A meeting ensued, after several contacts by the Director occurring in my d~Æfice, and a meeting was commenced with the Director, Deputy Director (DD), Team leader and myself in the Directors office at about 3 :40:pm at which time I was asked to input the information from the email into the contract within a specific period (20 minutes) of time. I disagreed with the timing and the Director became livid w~h rage using profanity, and demanded that I complete it by 5:00 PM. (all ofthis began approximately on April 25, 2002 and lasted through July 30, 2002)

However, I explained that I would see what I could but I would not concur on the exact time It would be finishel knowing that the Contract Specialist had already informed me that the contract was a ædone dealÆ and I did not have to do anything, and also realizingthat the time element was nothing more than an excuse by them to trap me. The DD and the TL both said that it could be done, yet neither had the experience nor knowledge to do so and when I informed them of what I knew about the contract they totally disiegarded the infermation.

The DD then explained to me since I was having major computer problems (can be verified by James Smallwood), after I spoke to him, to have the input completed before I left for the day. I continued to have computer trouble and I informed him, and this was about 4:45 pm.

4
Since he was preparing to go home he asked me to have it done before I left. At exactly 5 : 00 PM
he called me into his office (*and the TL just left as I walked into his office), and told me that SINCE I WAS NOT FINISHED AT 5:00 PM I would haveto come in the followir~ day. Since it was my day off I explained to him that I had made plans that could not be changed and I would not be in, and also that the information demanded of me was really irre~vant since the contract was in the hands of the contract specialist. He left the office and upon his departure said to me that ifl did not come in the following day I would be subject to disciplinary a~tion. I did not come in since I had completed the package into his in box then I left for the day.

Things starting to gather momentum, with verbal abuse, and harassment when I returned to work Monday, It was at this time the DD started berating me cu a daily basis throughout the day using the contract as a disguise since he felt that things were not moving fast enough. He started criticizing me exclaimirg that ôI did not know what I was doingö, I was incompetent, I had better get certain thin~ done or I would suffer disciphnary action, and I was presented with a memorandum revoking my Compressed Work Schedule (CWS) since I did not come to work that Friday, which was my day off (I had already worked my 40 hcurs, and I did not want compensatory time off).

This was nothing more than retaliation for my not working on my day off, and I knew there was a lot more to these attacks than the contract situation which was really non-existent. His verbal and email attacks became so frequent, and the daily itutine of callirg me into his office at least eight or nine times a day inquiiing about a contract that he felt I was responsible for not having it awarded even after I had explained the status to him, and that the contract office was processing the contract for award (and it was out of my hands). These, sometimes explosive, meeting in which I thought he was losing it, began to affect my daily rcutine, and I would have to go to the medical clinic on the 7th floor due to the acceleration of my blood pressure, and heart
palpations in which case they would keep me there for periods oftime or call my doctor who would tell them to tell me to go home since I did not want an ambulance to take me to the hospital. The DD would be informed of these occurrences, but disregarded them and charge me with LWOP and AWOL. At one time I thought he was really trying to cause my demise with his æI donÆt care attitudeÆ.

I also believe that the Director knew ofthe situation but refused and was involved due to the fact that the DD had him over a barrel because of a conflict of interest issue concerning him and his wife who also worked in Procurement Contracts area.

Mr. Vincent, Deputy Director (DD) called me into his office several times on May 2, 2002 to discuss the status of a contact. During this conversation the DD made negative remarks and threatened me again as usual with disciplinay action. I requested a Union representative be present due to the frequency and nature of these meetings but he denied my request. I later suffered chest pains, warm feeling and shortness of breath and went to the health unit to check my medkal condition.

A nurse at the health unit took my blood pressure fol1o~ving the meeting with Mr. Vincent. My blood pressure had escalated to a dangerous level. My blood pressure was s190/77 at 2:10 p.m., 188/91 at 2:15 p.m. and 183/98 at 2:25 p.m. I was retained at the health unit for a

5

considerable time. I was advised to go home due to the hostile environment I encountered at work. I saw Dr. Yasmin Panahy the following morning.

Dr. Panahy advised me to remain home and out of the hostile work environment since it could become very dangerous and possibly fatal. I returned to Dr. PanahyÆs offEe on May 6, 2002, and I was advised to stay home and not to return to work. I was provided with two disabiliy certificates to present to my employer.

On May 14, 2002, I returned to work and submitted two disability certificates to Mr. Vincent. The certificates specificallystate that a stressful hostile environmeat could be dangerous and life threatening to me. Mr. Vincent disregarded these notices from the physician and continued harassing me and threatening me with disciplinary action for missing work and followii~ the physicianÆs instructions. Mr. Vincent threatened and placed me on Absence Without Leave status (AWOL) and on Leave Without Pay (LWOP).

Mr. Vincent held numerous meetings with me on May 14, 2002, which occurred as frequently as five to eight or more times per day. Mr. Vincent would follow up these encounters with many e-mails per day in whk~h he charged me with various disciplinay infra~tions. The situation reached a point where I on many occasions, had to go to the health unit only to be informedthat my blood pressure was so high I could not return to work.

On May 22, 2002, Mr. Vincent stormed into my office at approximately 5 :20 p.m. in a hysterical manner and demanded that I work on days I was not previously scheduled to work. I tried to leave the office to avoid confrontation and to prevent another stressful occurrence which would again elei~te my blood pressure. However, Mr. Vincent blocked the doorway and I could not leave. I picked up a cup from my desk and said I needed to get water from the cooler. He finallymoved aside, however Mr. Vincent followed me to the water cooler and in a boisterous manner continued to threaten me with disciplinaiy action, and AWOL if I failed tc work on the days Mr. Vincent requested. I went into a colleagueÆ s office as Mr. Vincent turned away and yelled that I was going to ôpay dearlyö and was ôgoing to suffer the consequences.ö I felt anxious as a result of this encounter. I was drained and felt pains in my chest and experienced a shortness of breath.

Mr. Vincent contacted me by phone on May 30, 2002, pursuant to my request to contact a contractor to clarify an outstanding issue. Mr. Vincent malidously yelled at me during this phone conversation and treated me in an undignified manr~r. After this conversation, I went to the health unit and was again retained because of an escalated blood pressure level.

On June 5, 2002, Mr. Vincent entered my office and began harassing and verbally abusing me. Mr. Vincent returned a few seconds later along with team leader Brenda Lambert. Mr. Vincent blocked the doorway and prevented me from leaving my office. Mr. Vincent told me that I was going to respond to his questions. As I attempted to leave, Mr. Vincent threatened me and blocked my way out and told me to ôpush him out of the way or squeeze by.ö I called security and they referred me to the Federal Protection Agency. The incident was reported the followir~ morning.

On June 12, 2002, Mr. Vincent again confronted me with threats. This time, I had to call a union representative to my office. The union representative appeared at my office and encountered the irrational and undignifed behavior of Mr. Vincent. The union representative

6

had a several words with Mr. Vincent and then told me to leave with her due to the hostile encounter with Mr. Vincent and the potential for violence in the work place and the union representative felt threaten of physical harm by Mr. Vincent. Mr. Vincent screamed to me not to leave with the union representative and made more threats. I left with the union representative and she immediately reported the incident to Labor Relations, Employee Relations.

After this inck~nt, I again reported to the health unit where I was retained due my hi~i blood pressure level. My blood pressure was at 170/100 at 3 :00 p.m. and at 140/70 at 3 :20 p.m. and 3 :45 p. m., respectively. This elevated blood pressure level was largely due to the encounter with Mr. Vincent My blood pressure was elevated even though I am on blood pressure

medication. When I returned to my offie, I was informed that I would be immedintely moved from the hostile environment to a non-hostile office on the ninth floor. I was informed I would now report to the Director and have no more contact with supervisor Thomas Vincent or team leader Brenda Lambert.

Even though I was assigned to another office and Mr. Vincent was replaced by the Director as my new supervisor, Mr. Vincent continued his harassment and showing up at my new office. In addition, Mr. Vincent was still placing me on AWOL and signing my time and attendance cards.

During this short period in the new location, I continued to frequently experience sharp needle-like pains in my chest, shortness of breath, blood pressure escalations and numbr~ss in my righthand. I also experienced an outbreak of blisters. These symptoms are consistent with symptoms I exemplified while being in a hostile work environment while aipervised by Mr. Vincent.

On July 3 1 , 2002, I was informed that I had to return back to the same hostile work environment from which I was recently removed. On August 1 , 2002, my primary physician and psychiatrist disagreed with the decision, noting it would be detrimental to my physical and mental health. I informed my Doctor and I was told not to report back to the old office because it would be detrimental to my health. So I filed for workmanÆ s Compensation due to stress and medical reasons. I was out of work for eleven (1 1) months under the care of my Doctors, and returned receiving a letter from Linda Nessi, OperationÆs Director concerning a change in the immediate environment ( Tom Vincent, Deputy Director was forced to retire and Don Schade, Director resigned for another position outside of the Department)July.

8. Describe in detail each and every reason upon which you base your claim of age discrimination and for compensatory damages in your Complaint, including but not limited to, the medical terminology identif~ng each medical condition; the nature, extent and duration of any ailment or loss; each and every fact and occurrence upon which you rely in daiming compensatory damages as a result of such discrimination; the date and circumstances of emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, future pecuniary losses and other nonpecuniary losses that you attribute to ace discrimination or any other basis for your claim for compensatory damages.

Answer:

Please refer to Answers to Interrogatory 7 above

7

9. Describe in detail each and every reason upon which you base your claim of retaliation and for compensatory damages as alleged in your Complaint, including but not limitedto, the medicalterminology identifyingeach medical condition; the nature, extent and duration of any ailment or loss; each and every fact and occurrence upon which you rely in claimingcompensatory damages as a result of such discrimination the date and circumstances of

emotional pain, suffering, inconvenience~, mental anguish, loss of enjoyment of life, future pecuniary losses and other nonpecuniary losses that you attribute to discrimination based on retaliation or any other basis for your claim for compensatory damages.

Answer:

Please refer to Answers to Interrogatory 7 above

1 0.    Please identify each individual who you claim discriminaed against you based upon your race, color, and age and who allegedly retaliated against you.

Answer:

Tom Vincent and Don Shade

1 1 .    Describe in detail each and every reason upon which you base your claim of a

hostile work environment and for compensatory damages as a result as alleged in your Complaint, including, but not limited to, the nature, extent and duration of any such discrimination; each and every fʰct and occurrence upon which yai rely in claiming compensatory damages based upon a hostile work environment; the date and circumstances of emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, future pecuniary losses and other non-pecuniary losses that you attribute to a hostile work environment or any other basis for your claim for compensatory damages.

Answer:

Please refer to Answers to Interrogatory 7 above

12. Identify each and every person directly or indirectly involved in or who has knowledge of the facts, occurrences, or bases for your claim of discrimination based on race, color, age, retaliation and hostile work environment, or for compensatory damages described in your answer to Interrogatories 6 through 10 above, and identify all oral or written statements, communieations by all sigh persons.

Answer:

Please refer to Answers to Interrogatory 5 above

13. Identif~,Æ each and every physician, health care provider or professional you have

8

consulted, whether for diagnosis, treatment, advice, examinaticn, certification, or any other purpose, in connection with the bases ofyour claim for compensatory damages and for each state: the person field of specialization; the person qualifications and number of years of experience; the dates or time period ofyour consultation(s) with that person; the reason for the consultation(s); and the terms of any rmiuneration you paid or agreed to pay the person.

Answer:

On May 3, 2002, I was examined by Dr. Yasmin Pamhy who wrote that I have been under undue stress recently at work and my blood pressure was extremely high yesterday. I had dilated cardiomyopathy and peripheral arteriosclerosis. This makes acute elevations in my blood pressure very dangerous.

Dr. Panahy writes again on May 9, 2002, that I have been under undue stress at work. Dr. Panahy recommends that the contract on which I was working on be reassigned and that I be reassigned to another team to prevent further undue stress.

On August 1, 2002, I was examined by Dr. Panahy. Dr. Panahy stated that I was unable to return to work at this time. Dr. Panahy points to the fact I was diagnosed with cardiac disease and, under the recent work-related stress, my blood pressure has increased and has been difficuk to control. I also experiences intermittent chest pains caused by this stress and high blood pressure. Dr. Panahy states that I should stay off work until my cardiologist clears me because it is medically un~ife for me to be in any hostile work environment

I was seen by psychiatrist Dr. Frank E. Michener several times prior to starting in May of 2002 and on through the present. In the initialmental status examination, Dr. Michener confirms the stress symptoms and concerns about the impact of work-related stress on my heart and blood pressure. Dr. Michener agreed fully v~ith Dr. PanahyÆsrecommendation that I should be on medical leave until my caitliac status can be more fully e~aluated and until a plan for me to be in a different work environment can be implemented on a permanent basis.

In a report dated September 12, 2002, Dr. Panahy writes that my blood pressure had been under excellent control and in the 120/80 range and I had no past history of anxiety or stress prior to incidents with Mr. Vincent. However, on May 2, 2002, a nurse from the health unit where I work called Dr. Panahy reporting that I was in her office and my blood pressure was very hi~. The nurse had taken my blood pressure several times and it was in the 180-190/90-100 range and I appeared to be under so much stress at work. Dr. Panahy advised the nurse over the telephone to tell me to increase his dosage of blood pressure medication and see Dr. Panahy the following day.

Dr. Panahy reports that during examination I manifested physical signs of stress from my job including elevation in my bhod pressure, shortness of breath, chest pains and oral ulcers. Again, Dr. Panahy advised me that I should stay away from my stressful work environment until my cardiac status has been fully evaluated.

Again, Dr. Panahy recommends that I be reassigned to a different work environment and writes that the current hostile work environment could be detrimental to my health. Dr. Panahy adds that she sees a direct causal relationship between the stress caused by my current

9

environment and the elevation ofmy blood pressure and the psychological stress I was experiencing.

Cardiologist Dr. Richard Katz writes in a report dated September 7, 2002, that he has been seeing me fbr several years for mild cardiomyopathy, hypertension and atherosclerosis. He adds that I have been under extreme stress and have taken time off from work as a result. He writes that I was seen in his office after a stressful partial day in the hostile work environment and my blood pressure reading was 190/70 in the right arm and 1 84/80 in the left arm. My blood pressure was still high despite taking three medications. Dr. Katz concludes that my overall stress from the work environment is only aggravating the atherosclerotic compromise.

In a letter dated February 6, 2003, Dr. Katz writes that I was unable to return to my full activity. He adds that it would be highly preferable that I do not enter a setting of high emotional stress, since this can have adverse effects on his cardiovascular condition.

Dr. Panahy writes in her letter dated March 1 8, 2003, that I have been unable to return to my priorwork environment due to high levels ofemotional stress which can have a serious adverse effect on my cardiovascular system, which manifests through out-of-control blood pressure, chest pains and shortness of breath. This is exactly the condition I have experienced in working in the abusive and hostile work environment.

14.    Identify any and all other physical ailment, loss, disability, aid/or medical condition from which you have suffered at any time.
        Answer:
    a.    Ruptured disc in my back 1972 and recovery.
    b.    Slight Cardiomyopathy. 1997 to present
    c.    Hypertension  1998? to present
    d.    Border Line Diabetic   Summer 2005 to present
    e.    Stress Blisters 2002 to 2002
    f.    Major Back pain        May,2002 to Aug,2003
    g.    Depression    June, 2002 to?
    h.    Will ha~e to get Doctors printout

15.    Identify any and all documents that refer or relate to or reflect any consultations and/or services that you received from the individual(s) referred to in Interrogatory 13

Answer:

Certificates from Dr. Panahy and letter(s), Primary Doctor

Letter (s) from Dr. R. Katz, Cardiologist

Letter (s) from Dr. F. Michener, Psychiatrist

10

Note (s) from Department of HUD Health Unit nurses

Letter(s) from Reasonable Accommodation reviewing Doctor.

WorkmanÆs Compensation Claim form

Federal Police report

Note:

All feesfor health and Psychiatrist services were co-paid out of pocket and my health insurance. During the period I was out on sick leave after I ran out of leave and sick time, I had to pay my own insurance with no Government offset until I returned to work. I was out on workmanÆs Compensation from work starting July 31, 2002 through July 2003. I received clearance when I informed my Doctors that I received a letter from the Department, (Linda Nessi) stating that the hostile environment was eliminated.

16. State whether you have ever suffered or sought treatment or counseling fbr any physic4 nervous, emotional or mental illness ci disorder, and if so, state or identify with particularity: the nature, extent and duration of such illness or disorder; the inclushe dates of the illness or disorder; the name and address of each medical practitioner or other health care provider who has treated, examir~d, or consulted with you, concerning each illness or disorder and state the approximate date(s) of each treatment, examination or consultation; and if the illness or disorder resulted in any disability, describe each disability and its duration.

Answer:

Not until the incidents occurring with my employment have I ever suffered any or sought treatment or counseling until the incidents occurring with my immediate supervisor, Director, and newly appointed team leader. All my prior medical conditions were totally and completely under control by my ThysiciarE. All of my physical p~oblems began to accelerate to dangerous level during this outrageous period from April 25, 2002, in which case I had to be treated, and I also had to seek out a recommended Stress Psychiatrist, Dr. Michener, to treat me through this crisis period as well as my Primary Physician, and Cardiologist.

DoctorÆs Treatment Days:

Dr. Yasmin Panahy

5-03-02.          5-06-02, 5-17-02, 6-06-02, 7-11-02, 7-25-02, 8-01-02, 8-27-02,

9-10-02,9-16-02,9-26-02, (additional dates to follow looking for papers)


Dr. Frank Michener

5-20-02,          6-11-02, 7-19-02, 8-30-02, 9-16-02, 10-04-02, each month until the present


11
Dr. Douglas Feldman (Blisters)


7-18-02,          7-23-02, 7-30-02, (additional date to follow)


Dr. Marc Danziger

7-9-02


George Washington Hospital

9-3-02,          9-5-02, 9-12-02,


Calls received from Dr. Katz

9-17-02,          9-27-02, 2-03, (research being done to accumulate additional dates)
I will p~ovide additional information as it becomes available,


        17.     List and identify each document that was consulted or relied upon in responding
to these interrogatories.

        Answer:

        List of Documents:

Doctors Certificates, letters, Reasonable Accommodation request form and response,
WorkmanÆs Compensation form CAl, Memorandums, letter reports from Doctors, Union
request filing gievances, Union memo requesting a æDemand to Bargainö which was ignored,
memorandum to suspend, actual suspension letter, Federal Protection harassment report, etc.

18.    If there are additional facts not otherwise set forth in your responses to these interrogatories that relate to your past or current health status and the claims and allegations

raised in your complaini, please state these facts and explain each in full and complete detail.

Answer:

I will p~ovide any additional fa~ts as they become available during the course of discovery.

19.    Identify the dates, including nDnth and year, on which you learned Of each and

every discriminaory, retaliatory or hostile act set forth in yair complaint or any disabling or handicapping condition which you contend is at issue in this litigation and identify the physicians who diagnosed such condition.

Answer:

12

4-25-02    Beginning of attack on my credibility, competence, verbal abuse, buildingof a case to discrimirute against me and to make me retire.

3-25-02    My scheduled day off inwhich for retaliatory reasons I was ordered to work

3-29-02    My compressed work schedule was revoked in additional retaliatory abuse, and charges of AWOL were initiated since I continue to work on my old compressed schedule

4-1 1-11    Harassment really went into full bloom with accusations that I was holding up the contract, and requesting status reports and that I did not know what I was doing, and I was incompetent, and the massive irx~rease in email, and visits to his offee from verbal reports on same contract.

4- 1 - 1 . 1 . 1  Calling me into his offee all day long requesting status reports and verbally abusing me with negative remarks about my understanding about contracts, and my failuie as a Government Technical Representative, This was not true.

4-1-1 . 1.2    Even though I receive a Fully Si.ecessful performance evaluation and I disagreed with the rating.

4-2- 1 . 1 . 1   I was advised by my Doctor to remain home and out of the hostile environment since it was dangerous for my health

Upon my visit to the my Primary Doctor I was informed to remain home

(5-9/17-02) and I was referred to a Situational Stress Doctor

4- 1 3-02     I returned to work submitting two (2) Disability Certificates from my
Primary Doctor, (Dr. Panahy), however Mr. Vincent, the Deputy Director
totally disregarded them and continued to harass me with emails, constant
visits calling me to his office, where there were no witnesses, and
increasing his verbal abuse upon me æyelling I v~s going to suffer the
consequences of, and he would continue to put me on AWOL, and
LWOP, becoming more hostile and boisterous with each negative
statement directed at me. The doctorsÆ report meant nothing to him. I
believed now that his intent was for me to suffer a total mental
breakdown, a stroke or heart attack, with no personal or legal
consequences.

4-21-02     I was approached by the Deputy Director and he was ranting and raving
and threatening me with disciplinary action and adjusting my time sheets
since I continued to remain on my compressed schedule I was informed by
the Union to remain on my compressed schedule since he refused to honor
their æDemand to BargainÆ. He walked into my office at 8:05 AM. (He
was very careful on some occasion not to have any witness around, in his
endeavor or should I say mission, so that I could not prove discrimination
or any other charges). His behavior became so irrational that I refused to
respond to his remarks or questions since they were the same ones over

13

and over again. When I went to leave my office he blocked my way after
several attempts to exit I just stood near my desk and pickup my cup to get
some water, which is good for helping to relieve stress, per my Doctor.
When I again tried to exit he again blocked my path. I said that I needed
some water and he finally moved so that I could exit, but he was quite
reluctant. I went to the water cooler and got some water he was right
behind me ranting and raving ofwhat he was going to do to me. Upon my
return I stopped into one of my colleagueÆ s office and he continued to
follow me yelling and screaming what he was going to do to me. He
finallyturned around and went back into his office yelling out threats to
me, then slammed his office door. The following day the incident was
related to my office mate, James Smallwood by Kathie Tanner who stated
that she did not know how I could tolerate such berating, and threats
coming from the Deputy without becoming totally hostile.

5-3 1-02     The Deputy, Tom Vincent submitted a proposal to suspend me for five (5)
days.

5-4-1 . 1 . 1     The Deputy, Tom Vincent and I had another confrontation. He entered
my offie threatening me and acting deranged. He left out of my office in
a rampage and immediately returned with the newly appointed team

leader, Brenda Lambert who had a pad a pencil. On this occasion, he
completely, with the team leader standing behind him, intentionally
blocked the inner pathway to my office, and when I tried to leave he
prevented me from doing so by straggling the path and continuing his
threats, finally telling me to æpush him out of the wayÆ or æ squeeze byÆ if I
want to exit my office, and that he was going to æmake me respondÆ to him
at all cost. I called security and he let me exit, following behind me
ranting and raving, with the team leader on his heels with her note pad.
He finally went back into his office again screaming at me, and
threatening me. Security showed up the following day and I filed a
harassment complaint.

　　　　6-12-02

　　　I will p~ovide additional information and dates as I recall them during the course of
discovery.

　　　20.　　Do you intend to call any expert witnesses? If so, please provide all the
information required by Rule 26(a)2, of the Federal Rules of Civil Procedure.

　　　Answer:

　　　Dr. Panahy, Dr. R. Katz, and Dr. F. Michener. I will piovide their address and
curriculum vitae within 30 days. I reserve the right to identify additional expert witnesses during
the course of discovery.

14
Raphael D.
BL, LLB
　　　　21.Provide the following information concerning each and every expense and claim
　　　　15
for damages that you assert you have incurred as a result of the discriminatory conduct alleged in
this action, induding the amount, nature and date of each expense or claim for damages
incurred; the name and address 0: all persons to whom payment was or wiII be made; the date
that payments for expenses incurred were made; the form of each payment already made
(personal check, money order, etc.); the name and address of each person(s) who made or will
make each payment and/or each anticipated payment; the nature, amount and date that you
expect to incur any additional expense; any reiniursemeut received for these expenses, or
payments made relating to these expenses by any person or organization and the identification of
the person and organization.

　　　Answer:

I am still compiling my bills aid will ~ovide them within two weeks.

I, Cliffbrd Smith states under oath pursuant to penalties of perjury that the following answers are true to the best of my knowledge.

Mr. Clifford Smith

REV UDU~S~M, ESQ Bar #449102

CERTIFICATE 0 SEI~YJ~E

I hereby certify that a copy of the foregoing was served by First-Class Mail; postage prepaid on October 24, 2006 to:

DIANE N.. SULLIVAN, D. C, BAR #12765

Assistant United States Attorney

Judiciary Center Building

555 Fourth Street, N

Civil Division

Washington, DC. 20530
EXHIBIT
5
American Federation of Government Employees
Local 478
Aftlllat9cj with AFL.ClQ

451 7ö Street SW, Suite 3139
Washington DC 20410

~ Edthe EIIcr~es        . Phone. 202~7t&.3J77
  President 3nd Natlona~ Vice Pres~cier~t    .        Fa~ 202-7~8-763~
. .        April 30, 2002

MEMORANDUM FOR: Norman Mesewicz, Deputy Director,
Labor and Employee Relations
          ~ ~ ~ ~ i~J~   ~
FROM:          Consuella B. Duckett, Representative, AFGE Local 476


SUBJECT:     Management Initiated Schedule Change to Work
Schedule ~ Clifford F. Smith


         In order to reserve the unionÆs rights to bargain,
our preliminary proposals are as followa:


1.       Management agrees that until negotiations are completed
and an agreement is signed evidencing the mutually agreed
upon terms of this change to work echadule, management
will not cause the employeeÆs work schedule to be
changed.

2.       Management will provide the union with correct/all
information pertaining to this position/employee being
withdrawn from CWS..

3.       Management will identify the employeeÆs immediate
supervisor.

         The Union reserves the right to bargain, amend or add
proposals, based upon managementÆs responses to these
preliminary proposals, in accordance. with Article 5. 1 will
be representing the employees involved in this move.

         Thank you for your cooperation.
j*#ioiT ú
MAY 2 2002

MEMORANDUM FOR: Thomas Vincent, Deputy Director, Procurement Management
         ..         ~ . . Division ~


FROM:          Clifford F ~i~it1~ ~ Management V
Division


SUBJECT:     Rebuttal to Management Initiated Schedule Change to My Work Schedule

I received you letter dated April 30, 2002, in reference to my work schedule effective May 5, 2002, with Article 17, Section 17.07 (5) ofthe HUD/AFGE negotiated agreement and Section 9 of the Alternative Work Schedule (AWS) Programs Policies and Procedures. In your letter you stated that the present 4- 1 0 Compressed Work Schedule from 7:00 a.m.- 5:30 p.m. effective May 5, 2002, will be cancelled and I am directed to report to duty every day on a fixed schedule from 8:45- 5: 1 5 p.m. and I am appalled, and I firmly disagree with your bias decision. V

V        I realize that the Procurement Management Division is responsible for many time sensitive issues when dealing with the implementation of contract, and I have consistently met the challenge without being harassed, and being subject to an array of nτgative accusation concerning my performance on this potential contract by you, my supervisor, and the newly appointed team leader (who is a bargaining unit employee). I V        inherited this SASI contract approximately a month ago, and as the newly appointed GTR
on this contract, I have serviced the contract with due diligence, as I have with the other contracts I have been assigned in my tenure here in the Procurement Management Division.

You state in your memo that I have received advice and guidance during past meetings from both and the team leader on planning myworkload, and that is not true. You have done nothing but accuse, criticize, and tell me that I am the GTR, and I should not be asking for advice at my grade leveL Thank goodn~ for my colleagues, certain contract specialist, and contract officers for their assistance *ith my transition from Accountant to Contract Oversight Specialist (GTR), In past meetings with Program area, OCPO, V GTMÆs I have brought issues to the table and they have been discussed and resolved, due to the confusion surrounding this contract. This contract has had an award date speculated and changed due to various issues that I have no control over. I knew of the potential award date ofFriday, 4-26~02, however, from the email message I opened on 4-25-02 the award did not occur, however, it wasnÆt dueV to the receipt ofthe report since I had sent a copy to the Contract Specialist. The reason why I changed the date from Thursday to Monday was due to a request from the Program Area Branch Chief~ who was onjury duty and requested a change, which I obliged. There was nothing wrong with my decision since the contract still has not been awarded.
Ifmy deadline was so unacceptable, and could have been avoided, why didnÆt the team leader, resolve the situation in my absence instead ofsending email in my absence knowing that I would not see it until my return, thatÆs what a team leader is all about? I am ai~ Accountant (by degree and experience) and I was ~~jmilarrnatched whenj_~y~ V ~ thISJOb. I have carried out all my assignment with no major problems that I have not been able to resolve, and now all ofa sudden, I need all this micromanaging. Where have you and the team leader been for the last three (3) years? Just a few months ago you distinctly informed me of the good work that I had accomplished, I believe your behavior to be discriminating and a setup to rate me fully, marginal or unsatisfactory. I also believe that is why I have not received my rating and the rating cycle ended January 3 1 , 2002. 1 have not received any notification as to why my rating has been delayed. (Violation of the negotiated agreement Article 37).

I totally disagree with you stance concerning my work schedule, If you would stop your irrational behavior, in which I feel that I am working in a hostile, stressful situation, I believe that everything will come together faster.

Finally, according to the union an employee has only one supervisor. Therefore, the ôso calledö team leader, Brenda Lambert (who is also bargaining ) should not be attending any meetings concerning my work. Nor do I have to send work through her. I have no other reasonlalternative to believe she is also being used as a back up to set me up! V


cc: Don Schade, Director, Procurement Management Division
cc: Consuella Duckett, Union Representative V
cc: Gloria A. Anderson, Union Representative
cc: Brenda Lambert, Contract Oversight Specialist V V
cc: Clifford F. Smith; Contract Oversight Specialist:
TO:     Thomas Vincent

FROM ChffoidF

SUBJECT: Reassignfli~flt to New Team     V V


I have verbally requested in a prior meeting to be removed from the present group with the team leader, Brenda Lambert, and my request was denied. I verbally requested this morning, 5~2 1~02, during our meeting that I be rea~signcd to the group under Bernard Morton, and I was informed that it was ôduly notedö, and nothing happened.

This is written confirmation o. our~ previous conversations concerning my request to be reassigned to the other group. V


1 am submitting this message to confirm my verbal requests to be assigned to a new Team. Let me know if there is anything else I need to do to make this happen.
ThOMAS YFNCENTÆS CONDUCT ON 6~O5-O2


At approxIm*tely 4:40 1 was in my office working on several contracting jssues. when suddenly Thomas appeared. He appeared to be extremely upset. He commenced grilling me as to why I did not come into his office for a 4:30 PM meeting, and that he sent me an email. I did not open any email since I was working on a CMRB issue, and also a HUD 24002, Performance V      Evahiation draft format I was working on which I wanted to use when I received the evaluations from the GTMÆs. Thomas said that he wanted me in his office and left my office. V V

Since I knew exactly what hiS reasons were for having the meeting in his office (Thomas, has been doing this meeting thing to me, very often, in the process of supporting his fabrications, and trying to build a disciplinary case against me with the help of Brenda Lanibert, the recently appointed team V leader) TV continued to work on my tasks and then went to deliver the copied CMRB papers to the customer who requested the information. When I returned (4:55 PM) I was informed that Vincent had come back into my office and went back to his own office. Since I knew what was going to happened, I decided that I WoUld not be put into another æsetupÆ position again so he could charge me with various charges (insubordination, not following dfre~tion, AWOL from meeting).

Suddenly, he barged into my office somewhat V irate and propped his foot °~ my wastepaper basket, and commenced his usual harassing technique (Why this, where that, etc3. I had on several occasions requested Union Representation, however, he always refused to have anyone in his office that would corroborate on my behalf, but Brenda was æOKÆ as far as he was V concerned because she was his support. Brenda, I know, would ærubber stampÆ anything he wrote or said since her goal was to hold on to her fairly V recent promotion. Prior to her promotion, she was going to sue them (Don/Thomas) if she did not get a promotion. V

Thomas stood over me and commenced to batter me with questions which I did not respond to. He became more enraged and informed me that he wasnÆt leaving my office until I responded to his interrogating questions about why I had missed a meeting scheduled for 4:30 PM. V J had aheady informed him that I did not read any email because I was busy. I saw the rage in his expression, the way he glared at me, and in his stance which made me decide not to respond because he became threatening and I poised myself for defense watching his movements.

Vincent then sat down in the extra chair adjacent to me and continues hVIS abusive dictatorial interrogation trying to elicit a response from me. I just look at him and shook my head for I did not want to exacerbate the situation. He then started telling me in a boisterous voice thatö he was dfrecting me to tell him where I was between 4:30 & 5:00 PM, without taking into consideration that he was in my office at 4:40 PM informing me of the meeting that was suppose to occur at 4:30 pm (I later monitored his phone call and he distinctly stated that it was 4:40 PM and he was in his office waiting for me? How could he be in two (2) places at once??).

VincentÆs, habit, on an almost daily basis accompanied by Brenda Lambert, was to call me into his office between 4:30 PM & 5:15PM and ask me about the status of the Refund contract, using that *s a disguise so he could write me up with all the various charges that I have been charged with for over a month (It started with the SASI contract). Vincent usually waits

until Don, the Director, leaves for the day, however, I know that the Director has been part ofthis continuous and unrelenting harassment program.

He then informed me that he wasnÆt going to leave me alone, and I had better speak to him. He was so irrational, I didnÆt know what was on his mind and whether I was in any grave danger or not so I poised myself for the unexpected.    V V
V       Vincent then abruptly left my office abOut 5 : 1 5PM and came back with Brenda Lambert, and slammed my office door, exclaiming that Brenda was going to be a witneu to this foray and then started again trying to interrogate me as to why I missed the meeting (In the beginning it was V questions on the Refund contract he wanted me to V answers, now It turned into where was I between the hours of 4:30 & 5:00PM when he had Juit left my office a little while ago? Is there something wrong with V this picture?), where was I for that period oftirne, and that he was going to put me on AWOL for the æA hour. IVremained calm but poised for anything sudden and continued to ignore him. He was being ridiculous for a supervisor. V

I was becoming extremely STRESSFUL so I got a paper cup from off the credenza, and as I turned around to walk out of my office Vincent blocked my path. I said to him that ~he was in my way and would he moveÆ since the water cooler is outside my office. He said, no he wasnÆt, however his whole body continued to straddle the small walking space area. I said to him again, thathe was blocking my way, and would he move, and he said I want to V ~ kflOW:V where you have been from 4:30 to 5:00 PM, and I said again that he was blocking my way and to let me pass yet he still refused to move. I then said to him to ælet me pass thatÆs all I want you to doö and he said æoh you can squeeze byÆ. I said No! Then he said to me ôto push my way throughö. VJ REFUSED TO PUSH MY WAY THROUGH! He was really trying to set me up for major disciplinary action, æassault!

He then continue to block my way and I asked him again to let me pass, and he said he would when I answer his question, and he was finish with me. I then told him I had nothing to say to him, so let me out, I was now extremely STRESSED, however., I tried to remain as calm as I could. Finally I just turned my back on him and went to the WifldoW, watching him through the glass, yet, to~Lly ignoring him V V V

I realized that he was trying to æbaitÆ me as he tried to do On Wednesday, 5~22O2 when he blocked my path in my office so I could not get out to go to the menÆs room or to get water, Finally, when he realized that I wasnÆt about to fall into his trap, he Ieftjust enough space for me to pass and, slowly, without touching him in any manner, I passed by him and went to the water cooler for water and when I did he followed me to the cooler, and then into TessieÆs office where ~I stopped for a moment, and

then back to my office, ranting and threatening me with disciplinary action and AWOL charges. I had sent him a message, and ccÆd others, that I would V not be available for work Thursday, 5-23M2, and Friday, 5~24M2 and also that following Monday, which was a holiday and they were my days off. V

It was just about time for me to leave for the day (5 :23 PM) when the incident finally ended. I started toWalk into my office and he was right on my heels, and Vincent fmVally decided that I would not respond and turned V around and went to his office and slammed the door. I immediately called Security and reported the incident and I was informed that no one was available by a Sgt. White, and to file my complaint in the morning. I also explained to her that there were two of them, Vincent and Brenda, and Sgt. White explained to me that it did not matter to file early in the morning.

EÆc//ib/T 7
Employee
Crievance
U.S. Departm.nt of HaU~Iri9
~nd Urban Developm.nt

use~iform ~ proendur.
U~ of this rc~rm s ~ at step I .          V
Chu~konso(tho~~:    ~ Stap I fl stap 2        0 Stop 3
              ~          ~          ~
Cortsugllu ~. Duckett, Lo~af 478      I      (202) 70÷~3Q77X.237~

8t~fl)~ dv~cÆib. the In~dwd coua~n~ gr~evvnc.. ncl4a 4ai~, time. ~nd p~ac~.
mar~aQc~m~nC oVfIcIa~* 1nvaIv~d, If eny

Previously, on AprU 30, 2002, the Urnon, on behaVIfofClVjf~ord F. Smith. tiled a Dem~d To aar~ⁿn for a Ma.nagcinent
Initialed Change to Work Schedule. Torn Viaccn~ (Si~perv~or) proposed tc hiwe the emp1oy~ work 5 4~ys p~r week irn~sead
of wcrking 4 10 hour days. Mr. Vincent proceeded ahea)ci with the chan~c in work schedule. As oftoday, the Union hai not reccive4 a rcspo,~se ~ the request. The work ~chcdute clu~ngei were done without proper
notit~caLion to th~ Uiiion, therefore, 4enyin~ the Unjon the right to represent the emptoyec.

ù V_ _ ~ _. --- -- - _V:_~ ~ .~ --   V ~ ~ ~ ~ V ~___~ ~ ~ ~____V_____~ ~ V ~ ~ ~
~4t~ntIty ~hv ~itI~I~(;) ~r uect~an(e) of ho mb.6ter $Rr.ambnt I ~ ~ ~ ~( ~ *i~~~j ic~ h~Æe
b.sr~ v~a$.I~:

Article 4. EMPLOYEE ~GUTS/STANt~AR~j~ OF CONDUCT
Article 5, MIDÆTET&M BAI(GAININU V
Article 17, HOURS OF DUTY~~ALTERNATIVE WOPJ( SCHEDULES V

t°~nLiVy IM r*rn*dy ~i

C C~~ase and doai~t the bh~twg disp~ri~te treatment of the employee.

0        Employee wiil resume the previsous CWS until such ume as a meeting is scheduled and an a~groement
jg signed acknowledging the new arro~ngemcnts.

~ndIor Mv~or ~ ~ ti~~ r~rnt(c~r eroou~
~        S The ~ ~~$f!~ fl~ r~p~n~g~fty ~or m.oIIri~ ~ time J1qy~It~ (or atN~ fIr~~frt~ and ~pp.~I t~r this ~rIa~ane~,
. Afl~c~ !~popw oflMr r~cc~a 0? tnform~U grIev~nc. ~IaC&48&Ion, If any.

j~Li~ f6Æ~ VL~C:I;~
_1l~

I y~jr ~ns~c~ not r~Tvi~iiy°tj, ~s1~cU,1
Vrt~~~c to the natt Mep ~1 U~. UrI.v~nc~s proc~sc~t~~ b~ &~nJn~ j~ d~t4ng
this for~p~ (~L ~IQ~%t) sni~ ~tt~ehIr~g a o~~py of man*~ement8 r~p1~. Ar~
addiU~na~ tn(ur~tion ~QU b&I*V~ 1 p.ttIr~sn1 should ~Iaa p,s atti~ehad
-        ~ __*_~___~ ~V
        Emnlouee        LLS. Department of Hou~In~
        r .~        irncl Urban thw~I°prnant
        VV ~ V Grievance        ~ V ~

U~e of ?hls form is optson~I ~1 stap 1.
        CP~ick ~ of (hi bci~ia:        ~ St~p I        ~ Step 2        ~ Step 3 V
        ~4~lT~ af 3r~.v~*t:        ~        Off~c. Co~*:  Di~ty Pha~
        Ciiffo;~ F. Smkh        .        (202) 7084077
        ~ Pt LMWii~ ~ 01 ~i~y):        O~o~ Ca4..  ~ ~
        Consije~I~ ~. Duckeft, Local 47b    ~        (~32) 7O8-3O77X.~37B

aru.nv d~cr~ thy iricidaiit ~usfrtg ~ri.v~ne~. Ine~i4~ ~ LIme, ~ pl~&. man~g~munf offlolais
Invc~v~d It sny

Previously, the Union (tied ~ dornand to barg4in in regard~ to ~i work scheduLe cluuige initated
by my supeMgar, Tom
Vincent, Uc h~s 4rbritrarily ignored the dern~nd, as ~ resuit, h~ posted me on 16 Hours AWOL
(Absent WithOUt Leave) on
my Time and Attendance Card for J~y fÆcrj~ 09~02. AItho~&h I completed a SFÆ 7 1 ~tong
with two doctor certificates to
cover ~Y. absence, he coded my Time Card based on the NEW schedule (8 hours per day,
Mond~sy throu~,h Friday).

This t~ctio~ w~s totally rnappropr~te ~nd not in accorcIai~ with the Contract. IN ADDITION,
TLLE~ UNION tflD NOT
RBCEIVE PROPER NOTTCE OF THIS WOitK SCFfl3DIJLE CFLANGE.
b1~pplwnEr,t,
V        ~i1~tfrymi

I~w or regul~(~n
Article 4, EMPLOYI~E RJGHVTS/STANDARDS OF
aN~~
CONDUCT
Article 5, 1~fZD-T~M BAR/IMNINO

Article I 7, HOURS OF DUTY.ALTER~NATIVE WORK SCIfl~D tiLES
~òòV ~ ~ V ~ V ~
- ~      V ~~~VVVV  V ~ ~ ~V

l~*ntl!i Ipi~ ramedy y°u ~s~:

0        Cease az~d desi~ the blatant disp4r4~e ~reatrnent,

0        Correct the T&A (Piy Period O9-O2)~ reri~ove the 16 ho~~rs of AWOL , pay VsaI4~
aceordtngly.

0        Continue working on the previous ~the4u1e (I C.) hours per d~y Monday through
Thursday) until an ~greemenc
is s~gne4 ac~owle~g~,~ consent of tho p~rries in thIs mt~ter

U Rt&cijid all notice& that reflect a ch~n~e in my work schedule

~      0 Th~ ~mplo~a. ba~r~ th~ ~ loi rn~etIng ai~ flrn~ umits (or atr~~ ~ ~ appeal a? th1~ t~rIevance,

*      Attach t~ copy oflhsr raQ°,d of infQrmaIl grIevag~ce ~lse~g~j~ It any

11 ycur 9~eVh~i~ih not rnDlv*d to your ~atlafic~n, yn~ piay au~q~ ~riavanca to th~ nazi stap ol th~ ~rt.var~a prneadu,o by vign~n~ und dattn~ t~~ia ?Oyn~ (at dQt~l) ~nc1 attacl~In9 a copy Of man;gaji~~lÆ~ ,spty. ~ny a~dIL~anal inf~r~t~n ~QU b~)I~V& I~ pertjr~$~ eh~4~ ~ bu
.- -~    - . ;~-? HUt) ODEED ~ 97c387238
O1/2S/~0~
~ VV V
NO.141      ~

Emn~ovee      U.S Oep~rtmer~t of Hau~~fl~
r-      æ      zrnd U~fl De~e1opmeflt
~ one Qf ~ ~      ~ Step I      ~ SteP 2 ~ ~ Step 3
No~7t~mith    V V

~ ~ ~

~ th~ Union filed a ~ t~ b~rgaifl in reg~rd~ to a work sc~edute ~ i.~it~ted by my sup~~~᠁~Æ Tarn
Vi~cen~ H~ h~ ~bntiafl1Y ~or~d th~ ~ a~ a ~su~t~ h~ pasted m~ on t6 Ho~c2 AWOL (Absent Without Le3vt) on
my Time and A~en~~ C~id br P~y Pei~ 09-02. A1thou~1 I compi~ted ~ SF 7 1 ~1ong with ~᠁ doc~O~ ~ to
covet my absonCe, he coded my Ti,iie Card b~ed on the NEW ~chedute (~ t~ourS per ~ Mon~Y thmug~ ~

~ action W~ tot~y ~napprOP~~ and nO~ ~fl accOr~~ wj~h th~ Contr~t ~ AflD~TIONs ~ ~TON D~ NOT
~ECEWE oPJ:~VRNoTiCE OF ThIS WO~ -SCHEDULE CHANGE

~ t~e tct~(~ ~ ~ct~afl(G) of th~ ~a~t8r ~ ~ 1~C~1 ~ ~W Or re9U1~U0fl all~~ to fl~V~ b~fl vIoI~t~

A~c~e 4~ EMPLO~E RIGHTS/STANDARDS OF CONDUCT
A~c1e 3~ M1D~~~ ~ARGk~l~0

0      Cease ~d des~s~ the blatant d~Sparat~ tr~U~eflt

0      CorreCt the T~A (Pay pe~d 09-02), rernavC the t6 hours of AWOL , pay ~a1a~ ~ccordinglY

0      CantiflUe wor~in& on th~ previouS SCh~U~ (10 hourS ~B1 d~ Moud~Y ~rough Thursd~Y~ unt~t an
is Sj~T~Cd ~c~cnowledg~g Consent ofthe parties ~n thiS matter

0      ResciM aU not~cCS that re~ect a ch~ge ~n my ~or~ sthedule

. Q~e5t1ofl5 ~~~/or f~dh~1 cC~P⌷:~~ ~ th~ ~ ~hQU~ b6 ~ ~ the ~ r~pie~I;V~ ~fld th~ ~rtev~pL
.      Th~ ampto~ee °~ar~ ~ ra~P~~t~ for ~oet1r~g afl tIme trnIt~ (O( ~ tlnling ~flL1 ~PP~1 at ~lS ~r1evanc~.
a ~ ~ GO~ Of ~her recard ot ~fQ~a~l ~ ~ It a~y
            :~t;1a ~f Ge1~flt & ~ ~       ~       AGkno~dQemer\t of r~c&Pt by M~na~ament (~ pe~on~fl~ ~    V
            )t ytu( 9fl8~ ce ~ ~ ~~QIV~ ~⌷~ ~ ~t1S(~Ct~~ Y~ ~ ~ t~⌐  5j~~u(e QI G~IOv~Al & gr(e~i~flC~ ta ~ fl~ ~ ~ ~ ~1~r~a p~°i~dU(~ ~ si~n~rlQ and datU~

~1i~ form (~ rl~t) ~Iic1 att~cP~r\g ~ COPY ~ m~n~Gemeflt~ (~P~ Afl~?
~ inf⌐~t~Cfl ~U ~ Is pfl~fl~ ~9haut~ 3I~~ b~ ~~Ch~V      x      Farm HUP~~15 (4i~(
1/64
j~: 27
HUt) ODEEO -~ 97c387238
Em~IOVee    U.S. c~ep~rtment O~ H~3U~1~
        I..Æ ~ ~       ò~      and Urb~
        HO.1~4i-      Q~i5
        Ch~C~ ~ne 01 ~ bQJ(es:      ~ St$P 1      ~ St~ 2      D Step 3
        V M~m~ ~ ~ V                  om~ Coda:      ~
        p~-t~es Gr16V~nCS                (202) 70&4&77
        ~ o~ U~Lon ~        ~ ~            ~±c~ C~d@   ~
        Co~5U&1a S. ~ Lo~i 478      (202) ~
~ d~~C1b° ~ ~ ~u&fl9 9r~flC~ ~nciud~ ~at~ time. a~d p~C5~ mana~e~~ 0fl1cla~ n~Iv~ 1 an~

~re~OU&Y. OB Ap~I 3O~ 2002, the Union, on behalf of Clifford F. SrniLh~ ft~ed a To Bar~t0 for a
Tn~tiated ~ ~O Work Sche4~ Torn V~flC~fl~ (Supe~SOr~ proposed to have th~ emplOYee
W01~ 5 days per W~ in~e~d
of WO~~ ~ ~ ~ut days. ~. VV~n~efl~ proceeded ahead with the ~ha~ge ~n work ~chedu1e.

As of today, the Union h~ ~ot rcc~I~~ a responSC to the reque~. ~e work schedute ~ were done ~thout pcop~T
~0t1~~t~Ofl ~ ~ U~on, therefore ~~ying the Union th~ n~t ~ represent the e~p~OY~

ArticÆe 4~ EM?LOY~E ~GTS1sT~S OF CONDUCT
A~icte 5~ MiD~TE~M ~

0      Cease ~nd de~st the bÆatant disparate treaLm~ of the emp~OY~

a      Emp~oYC~ wit~ resuniC the previsOuS CWS until such Urne a~ a meet~flg is sch~du~e~ and ~ agreement
~ signed ~k~~w~igfl1g Lh~ new ~.rrangem~ts

~rÆ~Qn ~
n~ ~~~IQ( 1urtM~ c~rr~pand~P~ ~æ this Th~i~ ~r~ouk~

,        TM emP$~~ ~(G t~ r~pon~bItI~ rar m~e(~ ~ t~m~ ~ (or at~e fIn~i~9 and ~PP~t Of th~
~rlevanCo
, A~C~ a cocY ~l tper record of lntOfmat~ grIe~flGe d~Gus~Q~. ~t ~


S1~n~(ut~ ~



~uT ~ ~ not ~ ~ ~Ou~ ~ ~ ~ su~mtt t~


V., ~ ~ .~u(~n ~U ~ ts ~
~f4~f~C~ t° th~ n~ ~t~p ol th~ grleÆ~an~ ~r~~edui~ b~ ~tQn1flg and da~nc
~ form (~t ~M) and ~ ~ ~ O~ mafl~9ements (e~
ofrny work:
~, .;~ ~


ments are attached):
~OÆ:~~) æ3~Æ
r d/~Æ~-C.
Administrative
Instructions
Accommodation Request
For Persons With Disabi~flties
V        Requester V
QlhoÆs, SLIC/1 ~3 immed!at~ StipfIfVtSOI,
Empioy~e A.~.~1~1~9flCV° Sb~I(, L)is~b$^n$(fy
Pmgra(T1 Man~3ge( . sa;eGiive Pf~c.9rfluflf
~o,ti1iia~or rr)8)? help eniployea complota
this sectiofl.

Requester
U.S. Department of }~ous~fl9 and Urban DaveLopment

Office of Fair Housing arid Equal Opportuflay
~~recomplettng this form read t~e rever.~e.
Entries:        May be either handwritt*~fl or typewritten.
Forms Supply: Use loGal offici~ copier for initial supply & providing completed copieS.
Copies RetaThed By: (1) Office ofAdministVratiofl (2~ Disability Program Manager or EAP
Steff
Q~natjnqOfflc~(4) ~
I reqiiesL~.he fi        ò        . . ? ~ to Si


-t~JO
My me.dical 1im~
Cc1(~l ~

Name,.-.. ~ V
?1,tt~ t~i
onimen S
May be ~ompIe~ If fo~ Is !n~Ia1&d by




~ments (ent~ requited it sa;wroVa~ 3 r~omme~ded)
        ~ M~ ~W ~iJ~2~ ~ ~ ~        ~%/~ ~



~
Emplo,v&e 4ssisfaaco Stah~ DisabilIty
Program Manager ~ Sei9CtIV~ P!acemOflt
Coo~ft~BtO( $tCV
        V        ~ Namq, s~gnatur~~ date: V

~ V ~ ~ V ~ V ~ ~ ~ ~ ~ ~ ~--

Comrfleflt~ (entry r~qu~red f d~&approV9~ a racammended)
Approval        ~~\~(1~__ ~  -
P~ma~ O~aniz&IOfl H08d
                Name ,~gr~eture. dale

I V      ~ V ~ ~ ~


Comments (entry r~quIr~(I T d~sappc~)Val ~ recommended):


-~-
        . , .    Name ~Qfl9t~~ date:
        Un S vat a t I y        Date Received:        Not Available L~        Available ~

~        Name nignalure rj~te:
        I        ~
Comments (ontry ~iqu~ted ~ fuixis are not present~Y av&~ab~e~V
        ~        . .        ~ I ~
        .        ~ . ~,    fort-n HU0~1O    (1~

        Accommodation Request        u.s. D~partmont of HQU~9 and Urban Deve~0Pmeflt
~ ~        tWTht~s1orm read the re :ceof Falrh 9~
        I        # ~æI   EfltrleE M~y be either hnndwr/(tefl or typewritt6n.
        ,flS~1UC~~OflS            Forms Suppiy U~o /ot~ai office copier for 1nIti~I
~LJPP1Y & providing compl~ed cOp1~S
        COPI&3 RafaInad By: (1) Office 0(Adfljfl1StT8tÆ0~ (2) Disability program Manager ot
EAP Staff;
- V~~~~~        ~~_~~
Requester        I reques ~ fol owi        ccc od~tion(S) to suppo he pe ~ rmance of my work:

E~~E~t T~~jo ~ &!~6n~~~
        111 O( IflòY  ôô com~~        ~ I    ~ ò ~~~~ . cr i        . ~        ~ ~        . t
this siCliOflÆ        1v~y me~cai ~imitatio.w~onditu~fl is (if necessarY, rnedic~ doci~unentS
are~ttached):
tw)rfl\1c~eXw~y ~ ,QK~ ev~Ov~ fr~hC~-) ~3~Æ V

H~ ~ ~ ~1 ~ ~ ~ I~ ~ ~ ~ ~
~ ~0~ft~rii ~k1, ~th~di~
Name. Ignab~rs, SocIal Secwttyj4un~bet .organlzatkÆfl c I & RoOm~U1~~b8r ~
k~t ~~/-1 ~ ~ æ~ 1~~k~- I ~ ~ ~ r~~~Æ~ii ~&44t V2~
k~i~~qgft~ ~- ~ -
Requester V
Comments
May b* ~ La lnIU.fed by
~        ~

1mmed~ate
Supervisor V
∫~1ght.
Em~y.* ,&u4sfanc* Stat D#uMUy
Proqreni Managuf SeI.G*Ii?* P~ao.mWI
Cooajlnator .~c.
Approval
Py~mwy Oi~.nIr.bon Head
　　　　　　　form HUD~1OOO (1 1/~

Date Received:

P4~ma. 3~Qfl~tUf~ data:

dlaapprova4 a rec~mm.nded)

Date Received:

Mama, s4~nstu~ date:
　　　　　:VVVV::VVV,V,VVV~VVV V ~ ~ ~ ~　　~ ~ V~ VV~V ~ ~ ~ ~ ~~òò~V ~
V~VVVVVVVV V V~V VVV~VVV ~ ~ VVVVV~~ ~　　~

Date Received:        Disapproved   Approved

Names signature dat:

Comments (entry requIred 1 ~$aapprova1 a racommended)
~.-
~        ~

V        VV      ~        ~        V

Name Signature date:
V
VV~VV~~ V  ~VVVV
V        ~

,
ot Ayailable E          Available El

Funds
            .        Iù
Avatlaoihty

Date Received:

N

Name, atgnature, data:

VV      V ~      ~        V        ~

ù ù -~--~-ù
Comments (entrg require
d 1 tu
V        ~ ~

nds are not prescntl~ av

.
atlable)

txttÆ&ti

~.      V      :3
~FENSE/1NCIDE~ REPORT        ~. TYPE      REPORT CQN~ROL
,      V      f~71   C. 5UPPtEMEN~T    SYMBOL ~ ~ ~
TrnJCT1ONS ARE PRiNTED 5~ÆARATELÆ(. IF ADDITIONAL        Lii ~. ~R1G1NAL.
a. CONTINUATION  ciÆ FOLLOWUP ~  p~ ~
~CE IS NEEDED. USE REVERSE OF FORM; IDENTIFY ITE
coDe NO.    2~ SORT ~ TYPE OF QFFE~SE OR INCIDENT    V ~ CASE CO~ROL NC.
0 ~ ~rq ~      w ~ ~ ~ ~ ~ ? ~ F ~
BUtLDLNG NO. V ~ At~Of~ESS
V ~ ~ ~      ~ 2 ~ V      5/ V ~k 5~    S~
.MAME ,OF AGENCYIBUBEAU ~ ~ 1    A C ~ 9. SPECIFIC LOCATION    IC.
LOCATIC~
UD    ~ V ~ G C 0   ~ ~    V V    o ~ 0 F~ A V
. OATUT)ME OF OFFENSEJINCI~~    2. DA ~ 13. OAThJT1ME REPORTW    14.
DAY   ~ ~ jumsolCitoN (Xi
)    0 æ5~ oA    I 4 c~j ~ 0    0 l.a O~ ~ e   ~ ~J   2.,C~NCUI~REN1
~    ,6 El DO4OK5TRAIOR5 ~ ~æ NO EVACUATED  s. TIME S~TAR b TiME END
~    3 PA~T~A1.
~ ~.   ~      ~      ~-    4 PROPR$ETAJ~Y
ID    CODE      NAME AND  AOORESS      ~      AGE S~.X    RACE
IN4LFY CO      TELEPHONE
(5)      (a)      Ic). (d~    I.)    tf)
~. V      l.isl Name. FirTL M~ddte tnh1~      .      .
.   HO
s~1 LLI~F~Z   . V
~ ~   .    Number, Street Apt. No.. City V    Stitt      t
~ ~5 0
~      ~ V~ ~$ ~ <      V      7c~~T
21
c~      L&$~t ~ First, Midale Initial    .    .      .
Hum er. Street, Apt a., City w~d State    ~ . .    .    P C 4   ~U~IME5~
9, a. STATUS ~. T~A1% C. MALI   d. MODU.    . ò. COt.Ofl (T.pIBCt&    I. IOtKTlfll*
AMCT~IflST1C~    V ~
~ S1UtEN    5U5P~CT .    .    FEDEV ~LPROTECTIVE SERVICE
~    ;uY~i.    ~ER5ONA1~ æ~ ,iEc,~mA- ~ ~ STATE TA~ $0. .      PL
YIN    OFFI.CIA    ~F~fl~ICE    RECORD
>    VA~UALI~U    R~c~~Ifl    ~    r      . .
0.   ~ KAM~ OF ITEM      ~. U ITT C. OWWERSHI?    .
. ~M.$O      N?.ME
V      ~ ~    0    P!ft3OI4A~.  ~ 0 N    V V   ~
L EIU      I.COLOI~ ~      V    ~ ~O~L

. V

D    ~    DViStribU    -    V
:    ~ ~    I. ~i,iU3UAL DA UK1OU~ FEAIUREZ    Rel ea~ ed By r ~
~.    I. P~ t~U ~    .    L ~A~J3 0 P~O    V V YALUE $ C~t 0 ..    . V
~ 0 S~C~M~O    0 ~s~cu~o    0 ~covua    0 MI5SI~~    V ~ PA~T1AL ~ECOV~1
;:~ .~ ~ ~. . .
, I. Nij~~OFlflM æò  ~    . .. DA iT1i.QW$ER5)W~ V ..liANO~AME V
~ V    . V ~ ;ort. 0 ~ V
: p. ~R1    ~    . q. COIWi    .    1. M    V    ~
*. vAuJ~    L UPaUSUAL OR UNIQUE F~ATUPILS
U. P OPE~fl WA~    æ. 51* S OF PROPE V ~ALU& EC~ÇMD    ~    . ~ :
~ ~    DPAR1,AL:covaaT ~ 4:~~V~J~
~CV~E19Cti7~~    $Y~⁝~ (~PCII~ ~ z~t2~IT~ d~f

~ ~ ~    ~pecvtS~I ~ ~ i~L ~ ~ ~ ~ ~ V ~id ~ ~
.    TIME ~    l3~V EVIO~$CI    ~ lAS NO.    L TTPf    .    ~æ ~ ~
~ ~Q1IFIED   ARR$V~~DThS D~o ~ /    \    V
≈:M:ARTM~ ~ ~ Ii   Ii i~ ~ ~ ~~:::::51    4    ~JTiii~IATTACHMENT$
tSPICUY)
~ . I I i ~ I ~ ~:~f  C. ~    ò    S. ~    V    _____
~ aufl~~fll$c  2S. SUSPECT STATUS    L DISPOSITION OF SUSPÇCT
~~÷~T~Uj.c1fy)    ~ +~    ~LL~L\D~~&flF1EO 0 ~ ~4~I(ACT    ~ æ ~ AMISTED
0 ~ J~⁝~ NO _____
b.    OV~f  d $ONù~UVT    ~ NOT
~ J~..  Q ~) p ~O    0 EMP1O~1fl    0 EMP~oÆrn    0  &~E5T~O 0 ~
R~1EASEO    0 ~ ~IA
~    C.*p~.tt ~A Ferii 3157 wheC tk*ÆI s s SVSPRCL. Afl.. Bargluy. aasr~tary, At..
R.b~sry. R.bb.rÆi. òr a Wuap.i Is ~t1.
7.    TI~    æ~ R1~cEi~ a ò    b.    RR~O    1~ùH~~aOTO ~iRvtI:E
.    - 2~k. M~1EWfDIT - MAMtW1tI1*~)AMD 5%~NATUB~ ~
V    ~ l~7 0    ~7    jioi~~il/i    .
:3*. 8 E V b~ NAME r~stsd~ AI~O 5I~NATU    ~i4    Ic. OATt    )    ~
1 ~ L J~ Ui1/iq~x ò~~V V ~o~ ~
43. ~    I, FPI DETECTM    C. ~ poua    ~ æ. t; ~ G1HEK (~SpecUy 31. CA3~
32*. AP?f~OV%NG OF)~i~Ni~EPrtB1*~ ~ a. OATt
l~EFERRED   bLOCAL policE    4. F6~ ~ ~ ~ENTt~dÆC    I PROPtR~T~ ~ ~
~ ~42S2
OETE~1VE ~ ~TNA~.1 ARL ~ OM~ ~ :    NO ~    ~ NO   0 sia ~
3ENERJAL SERVICES ADMLNLSTRATION    V ~    GSA FORM 3155 ~REV.
7~B3)

GSA FORM 3155 (REV. 7~83)    , OFFENSE/INCIDENT REPORT    p.
TYPE ~    ~ ~    V    ~ SUPPLEMENT    ~ V
.~TflU~T1ONs ARE PRINTED SEPARATELY. IF ADthTIONAL I ~ a. ORIGiNAL El b.
CONTINUATION El OR FOLLOWUP æ PB -i~6 ~1
p~E IS NEEDED~ USE REVERSE OF FORM; IDENTIFY ffEMS.~

.CODENO.    2*. SORT
3TYPE OF OFFENS~bR tP4CIt~ENT        ~ CASE Cd~7ROL~NC.
il~ ~ ~ I o    ~
.       BUILD(p4G NO.
        ~~~___V    w 1~ !~J~ I _I ~ ~ ~1 ~j ~

6.      AOORESS V
. NAME VOF AcENcv/euREAi~F
~5I V ~ 5f    s~_    ~bC ~ VV    -    -
L A~NCTIBUREAU CODÇ ~. SPECIFIC LOCAIWN
        LOCATIoN
        ~UD ~    ~1~!c1~    ~ ~    ~V ~    ſ[~Joj~j~
1. DATEJTIME OF OFFENSE/INcio~j~~    ~DA ~ 13. OATE1TIME REPORTED    14.
DAY    15. JUR1SOICTI0N (Xi

~ ~ 7-kY JE~1:,~~ ùii
~ NO D(MoK5~TO~5 ~ 17 NO EVACUATED ~. TIME STAR1b TIME END ~ ~~
~    ~    ~    I ~    1 I I ~ ~
        I D CODE.    ~ V ~    NAME.AND ADDRESS    ~ AC    ~ ~ ~ ~v ~ V
        V    (~)    (a)    tc) V~ ~ ~ (ò) ~    4f)    (g)
i:      ù~ Lth1~~~~Nan;e. FirSL Middle Initial    V    V    .    ti~iM~
        SrntT~1 CL1FF~b    F: V    ~ ~-. -a-- ~ V
~ ~ Vt Number, Street, Apt. NQ.. CIty ~ Sta~t    z~P co~.i .~    ~~rj~jj~ ~
)V~JF    sI~(r\e ~is ~    ù    I ~1 L    1    1    ~_ ._    ~-    V
        ~~ ~    L~t N~e, First, Middle lnitia$    V    ò ~ ~    ~
                V            NONE
ù      1 Number. Street, Apt Na.~ City ~d State    .    V ~ V ò ~r C14.) ~ ~ù ~ ù ù ~ù ù
.IU31NES~ ùii:
~ .. STATUS ~    - ù I~ TEAR C. M.~1 ~    ~    I d. MODEL    . a. COLOII
CTi~B.a.αF    rwL.:i:WI1L., ~r....CThRISTIC3ù ù

~       :i SIUtIN fl 5UZPICT
. V j V
FEDEVF æ~L PROTECTIVE

        V    ~
~       V
        SERVICE
~    ~    [JPEII5ONA1. ~icisr~a~~ ~ JSTATE TA~ NO. . ~ Pt. YIN
0FFIClALJ~P~flCE RECORD V
~...    VANDAIJflO I I ~    TIW4 p    -~~j    .ù~ ~ù IDriy3G~~T I%4~p~j j    - -
:0. 1. NAME OF ITEM    ~. ~UAII~TTT c. OWNERSHIp V ~ BRAND NAME    .1
        ~    V ~    I DSDrT.    DPtftso,sM ~iO N1013 DupJtcata-VD~ Nrt. 1~rw~rr~~
        e~ EJU    - ~ù I. COLON .    ù:1,. ~oaa ù    V V
        ~ ~ I ~ I I    I I I -    D4 No~ Ditriut~3~e~ T~estro~
        A. Vrv~[ I I I I ~    L UNUSUALwI UwbtJ~ FEA1UIL~Z            Relea3

j~:-~~PftOfr~IIn WA.3        .        L 5TATU$ O~rROPE~Ifl    -      V
VALUE N COYt 0    I
~ suun~O      0 i,~s~cim~o   0 VNECOV~EO        D MI$$IN~    V V    PANT1AL
N~C0VE~T J
I. NAME 1W lflM    æ V    ~      . a9UAJτfify~a. OWNERSNW      ~ Vò~ BRA~(QV
NAME V V~
      V      ~ -   . V1 I ~ID ~orr. 0 ~E~5ONAI.
      P:~_~~At ~O{ ~ ~ ~ ~      V ~ ~ V ~ q. COIWH - -    V    ~ ~i:~uoea    .
            .    -    *. VALUE    L UNUSUAL OR UNIQUE FÇATUMS
            -

      ~:~:~hOPERTT WAS        ù 1Æ. 5TA1ò1Is~uF
PROPERTY   ù VALUÇ ~ECOVERFJf
V    ~ . ..~ ~ V ò ~ ~ D_*ECOVE~~~fl~  0 MIS$IN~    Q PA~TIAL ~ECOVERT J

1.    ~ III ~~I4UòIiI Ipac, Ii ~ ala rò~eru ii as~ i.rm~
~    ~rcI~c~ V (~cP~    V,!I.~ ~    ~4    j~Æ- ~ ~,j4J~ ~    ~p ~L ~      ~ V
      ~ ~    ~
      r    ~V    ~ ~ ~ æ~    ~    ~    - V V ~    ~    ~~V! ! ~ ~    ~
      V    ~ VV~V    ~ ?    ~VV( ~    ~ V V ~    V ~    ~    ~_ ~J  VtÆ
~::j:.

4~ ~c~s5~    4 J1~sr~vI~o~ ~Ae RP s~i ~4 ~~~ ⌐~J/~yo Ar~ ~ ~c
      ~ L~ ~ æ~ V 1,~Pr~f ~ 5~r c~g~ I ~ ~ ~ ~n  ~ ~ ~__~_s~ , ~ ~ XIù VS    ~

~ ~ ~ ~eryi5~r S~o~ ~ I~I ~ ~ ~ ~ Q~d V ~ ~ ~P ~ ~ou ~
.    TIME ~/    Z3.VEVIDENCE V TA~NO æ/ 1 LTTPE ~ b.wnERE$~roa~U    V
      C)
      NOTIFICATION    NOTIFiED    ARRIVED    I .
:HE~po-i~    -~ù~~~    ~ - ù D_Ær~s 0 ~æo
AENCT V    ~ L_~_ ...J I J Z4.    ~ ~ COKTI$UAT1QJ(      I .    Ji. OThER
A1TAthMENT~ (Sp~cIty} V V J V
~- - -~ - .    ATTACH- L ~rr V    ~4 STATEMEWT(3) I    ~ .~FINEDEPAIITMEJ!T ~J
I L ùæ 1J_    ~ LII ~ V.    J    V
V AMBU1Aac~    ~a.r. ~ ~ PRopErrr    S. SUPPLE-
I___  I J__ ~ Vt    applicable) ~ RECEIPT(S) V ò    MENTAL    ù    - - V  ~ ~
. BU1LDIN& 25. SUSPECT STATUE    ù    12L DI5POSITLON OF SUSPECT
      NANA~.EB I    I    I    rò-i ~. NOT    r-i ~. ;ovÆi   iùi    , (ùI . ARR
SlED   n c. CITATiON ~
ù~#æJ V~V~~~T___ ~    ~ V ~ ~ L~.J IUENTIF1ED    æ-J CONTRACT    L_J 1. A
      L.J ~.  ISSUED    ~.    ~~pety~ I    ~ I I b.COVÆI    d.NON~V~OVÆT
      b.NOT    V V
      C ~- 3 ~    ~j~ ~ j ~    j I ~ 0 EMPlIflfl    0 EMPLOYEE    0 IIIM5TEO

0 d. RELEASED        0 .. N/A

~V:~! tsmp1.~~ ~sa F.,. 3157 wh,~ t~~a I~ .i Susp.ct. At. Burglary aiirglary At.. Nebbery
R.bb.ry~ òr a Ws.p.a Ii Mssd.        ~
7.      flhI~  ~    - b:~VV       U    c. lUll 0 tb~iAvtc~   ~V_ i_V_~_~REyIE~i_$Y ~
NAME (Primed) ANL~ St~NAThIiE ~      V
        V    ~    S V

i~Lji8L2~:i ~ ~ros~NAIu/~~ - I~T~EQ~i ~ 5.M;1Je~~      ~rb2~. ~ c?2
a.    ji_~~_ ~.*1:~ ~T~_V        19. OTHER (Sp.cify 31, CASE      3aa. APPIIOVINg
OFFICIALS NAME ~PrIit.~~ b. DATE
        CASE L      DETECTIVE1    c.    POLiCE    ~ t. I~ ~      IVI OPEN
        A$EI SIGNATURE
~iEFERRED ~ ~Ii~LPOLt~!rI & VF8IV ~ j~. N/A ~      V ~ UNFOUNDED ~/4~Æ~~4
        74~7
a.    V Lò LA5~    VC_ ~ii~~?r  a~~sti~o NCIC      :. PROPtHfl   V ~ CLEANED
NCJC
        -I 1 DEVEl.OPEO    1    ~    1~~VERED 1 1      1 L REFERRED
DETECTIVE ~ AJIL f ON J J d, SUSPECT~j ~ ~: G NO jùj; ~    V ~ ~ ~ NO ~ N/A ~
DATE V ~
3ENERAL SERVICES ADMLN1STRATION .      ~
fl:Ut:i~Q~L rNL)I~ItY~ ocxÆYiÆ~
CONTrNUAIION SHEET

        ---_- ~    --~ ~ O!~    QeC~(~~~ k~ ~
ù~    ~ ~~~ A~ L ~    - -~
~&~__ ~ : ~/ ~ ~ 5o~P~ti~j L ~ ~VI ~ c~f~r      r~ ~IP ~ ~ -ii
        ~V ~ y~~ n ~ ~    ~ ~ ~V V Jef A1~ ~ ~ Y ~    I ~ æ~
-      Li I d ~    ~ ~ rVV ~    ~    ~ ~ r V ~ ~e~ze ~ -
        ~ - - I    ~ ~ ~ v~    - - V , ~ V
~    ~J ~V ~ /~ F ~ -~~ ~ I V ~ ~ C) ~ ~ ~ù ~
I I ~ TP~ I ~ ~ ~ r~ ; ~n ~ ~ - ~ ~ 195
        ~ k ~ ~    ~ . ~   / ~ ~A ~ ~ P c~ ~rt~v~I q~
~    I I ~    v~r    ~ (i) V ~ æ    ~ ~ ~ ~ / ~ -
        ~    d~ ~ Vt
~ liùi ~ ~k    ~? ~    ▸/e~ ~ ~ L~ ~ (~t~L ~c 4~ ~ ~ ~t -
ù    ~    ~f ~ ~ ~    ~ ~ ~r~V ~ ~ ~ ~    -
V    ò    ~ \    J    ~7    c~~r~e        .        r    ~    o~~r
        ~    ~v ~CV[$~)  ~    ~ +~  ~y    ~vi~r~ y
-    - - ~f ~ ~    + ~ - ~/m~    e ~    ~ 7~  )    ~e    V ~
i_i___    ~ ~ ~ Q:~t~4~JYP  ~    ~ ~
        ~__~1j( ~    -- -

-
ù~

~- - ù
~-

--
V
    - -    V ~ ~ V

FEDERAL PROTECTIVE SEVRVJ~V ~ -
-        ,~, æ            - - - V V ~ ~FFtC~ POLICE RECOR,D    -
    V~        : V~V~    V      ~    ~V    ~    V
    -    V ~ ~  V ~0NO~~Up1jcate~o Not Forw~r~ ~-
    - - -  V~ ~  -    ~ ~ D~~ibutΦShr~ To Destroy
-    -    - ~ - - -    R e 1 e as e dB~ æ ~ -        ù~
ùùù V V -
~4taf~AIUrI~ OF ri r iii~NG vtPli.tM:

~
æ...4\~JL ~ I I\┘1L. IT~Vu_~LJV\

~ V

IAOf3E Ni: i ~~ ~FICER 3IGNATUREt
        f~:./cfLj        ~
PS (NCR~ 14 (3/82~