UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CLIFFORD F. SMITH,

    Plaintiff,

     v.                                                               Civil Action No. 05-2042 (CKK)

ALPHONSO R. JACKSON,
Secretary, United States Department
of Housing and Urban Development

    Defendant.

**MEMORANDUM OPINION**
(March 10, 2008)

Plaintiff, Clifford F. Smith, brings this action against Defendant Alphonso R. Jackson, in

his capacity as Secretary of the United States Department of Housing and Urban Development

("HUD" or the "Agency"), pursuant to Title VIII of the Civil Rights Act of 1964, 42 U.S.C. §

2000e, *et seq.*, as well as 42 U.S.C. § 1981. Plaintiff alleges that he was subjected to a hostile

work environment and disparate treatment based on his race and age,[1] when his former

supervisor allegedly attacked his performance, shouted at him and threatened him with

disciplinary action, revoked his Compressed Work Schedule ("CWS"), charged him with

---

[1] Plaintiff's *pro se* Complaint includes Plaintiff's race-based discrimination and retaliation claims under both Title VII and § 1981, but does not cite the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq.*, and contains only a passing reference to age discrimination. *See* Def.'s Mem. at 1 n.1; Compl. The Opposition filed by Plaintiff's counsel likewise contains passing references to age discrimination but does not cite ADEA, and thus does not clarify whether Plaintiff is attempting to pursue an age discrimination claim in this litigation. As discussed below, Plaintiff asserted such a claim at the administrative level. The Court therefore assumes that he intended to raise such a claim herein and notes that, as discussed below, the same legal framework applies to motions for summary judgment on claims under Title VII, § 1981, and the ADEA.

Absence Without Leave ("AWOL"), issued a Proposal to Suspend him, and physically blocked

his path when he tried to leave his office. Plaintiff further alleges that he was retaliated against

for Union activity when he was ordered to return to a work station from which he had

temporarily been relocated. Defendant has moved to dismiss certain of Plaintiff's factual

allegations, and seeks summary judgment on Plaintiff's entire Complaint. Based upon a

searching consideration of Defendant's motion, Plaintiff's Opposition, Defendant's Reply, the

attached exhibits, the relevant case law, and the entire record herein, the Court shall grant

Defendant's Motion to Dismiss and for Summary Judgment in its entirety.

## I: BACKGROUND

A.    *Plaintiff's Employment by HUD and Work on the SASI Contract*

Plaintiff Clifford F. Smith is an African-American, black male, who was 66 years old at

the time of the events giving rise to this action.[2]  At that point, Plaintiff was employed as a GS-

---

[2] In addressing Defendant's motion for summary judgment, the Court strictly adheres to the text of Local Civil Rule 56.1 (identical to Local Civil Rule 7(h) (formerly Rule 7.1(h)). The local rules for summary judgment "assist[] the district court to maintain docket control and to decide motions for summary judgment efficiently and effectively." *Jackson v. Finnegan, Henderson, Farabow, Garret & Dunner*, 101 F.3d 145, 150 (D.C. Cir. 1996). "Requiring strict compliance with the local rule is justified both by the nature of summary judgment and by the rule's purposes. . . . The procedure contemplated by the rule [] isolates the facts that the parties assert are material, distinguishes disputed from undisputed facts, and identifies the pertinent parts of the record." *Id.* (quoting *Gardels v. CIA*, 637 F.2d 770, 773 (D.C. Cir. 1980)). "[A] district court should not be obliged to sift through hundreds of pages of depositions, affidavits, and interrogatories in order to make [its] own analysis and determination of what may, or may not, be a genuine issue of material fact." *Id.* (quoting *Twist v. Meese*, 854 F.2d 1421, 1425 (D.C. Cir. 1988)). As such, in resolving Defendant's summary judgment motion, the Court "assumes that facts identified by the moving party in the statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." LCvR 56.1; 7(h).

The Court notes that Plaintiff's Responsive Statement of Facts (hereinafter "Pl.'s Stmt.") is only partially compliant with the Local Civil Rules; Plaintiff responds to each of Defendant's factual assertions but, as Defendant notes in its Response to Plaintiff's Statement of Facts

1101-13 Contract Oversight Specialist in the Office of Housing of the Procurement Management

Division of HUD.  Def.'s Stmt. ¶ 1; Pl.'s Stmt. ¶ 1.  From March 2002 until June 13, 2002,

Plaintiff's first-line supervisor was Thomas Vincent, Deputy Director of the Procurement

Management Division.  Def.'s Stmt. ¶ 2; Pl.'s Stmt. ¶ 2.  Plaintiff's second-line supervisor was

Don Schade, Director of the Procurement Management Division.  *Id.*  During the same period,

Plaintiff's team leader was Brenda Lambert, and the other team leader in the office was Bernard

Morton.  Def.'s Stmt. ¶ 3; Pl.'s Stmt. ¶ 3.  Prior to April 25, 2002, Plaintiff was on a Compressed

Work Schedule ("CWS"), whereby he worked four ten-hour days per week and was off every

other Friday and the following Monday.  *See* Def.'s Ex. 5 (EEO Report of Investigation ("ROI"),

Ex. 14 (4/30/02 Mem. from T. Vincent to C. Smith).

        At some point during March 2002, Plaintiff was assigned to handle a contract referred to

as the SASI contract.  *See* Pl.'s Stmt. ¶ 4; ROI, Ex. 7 (10/24/03 Lambert Aff.) at 3; Def.'s Ex. 6B

(2/27/07 Smith Dep.) at 6:14-22.  On Thursday, April 25, 2002, Ms. Lambert went to Plaintiff's

office and attempted to inquire as to the status of the SASI contract, which she believed was due

to be issued the next day.  *See* ROI, Ex. 7 (Lambert Aff.) at 9; Def.'s Ex. 6B (2/27/07 Smith

Dep.) at 15:13-16:16.[3]  Plaintiff responded to Ms. Lambert's inquiry by telling her to leave him

_____

("Def.'s Resp. Stmt."), Plaintiff does not provide record citations in support of many of his own
assertions.  Therefore, Plaintiff's factual assertions only controvert Defendant's assertions to the
extent that they are supported by record evidence.  Finally, the Court cites directly to the record,
where appropriate, to provide additional information not covered in either parties' statements.

        [3] The Court notes that a number of the facts recited in this Background section are
included in Defendant's motion to dismiss and for summary judgment but not in the
accompanying Statement of Material Facts, but are nevertheless necessary to provide context for
facts included in Defendant's Statement.  Because Defendant did not include these contextual
facts in its Statement, Plaintiff has not directly responded to them, but the Court has reviewed the
factual record and relies directly thereon in determining that these contextual facts are

Case 1:05-cv-02042-CKK

alone so that he could get his work done.  ROI, Ex. 7 (Lambert Aff.) at 9; Def.'s Ex. 6B (2/27/07

Smith Dep.) at 16:2-16.  In light of the impending deadline, Ms. Lambert proceeded to report

Plaintiff's behavior to Mr. Schade.  ROI, Ex. 7 (Lambert Aff.) at 9; Def.'s Ex. 6B (2/27/07 Smith

Dep.) at 16:21-23.[4]  Mr. Schade then accompanied Ms. Lambert into Plaintiff's office to discuss

the status of the SASI contract.  ROI, Ex. 7 (Lambert Aff.) at 9; Def.'s Ex. 6B (2/27/07 Smith

Dep.) at 16:21-23.  According to Mr. Schade and Ms. Lambert, Plaintiff could not explain the

status of his assignment on the SASI contract to Mr. Schade, and Mr. Schade therefore instructed

Plaintiff to bring the completed assignment to his office in an hour (i.e., at approximately 2:15

p.m.).  ROI, Ex. 7 (10/23/03 Schade Aff.) at 3; Ex. 7 (Lambert Aff.) at 9.

    When Plaintiff did not bring the completed assignment to Mr. Schade's office at the

designated time, Mr. Schade called Plaintiff into his office.  *Id.*  Also present in Mr. Schade's

office when Plaintiff arrived were Mr. Vincent and Ms. Lambert.  *Id.*; Pl.'s Ex. 4 (Pl.'s Ans. to

Def.'s Interrogs.). at 4.  Plaintiff's supervisors informed him that he was to complete his

---

undisputed.  It would have been helpful if Defendant had, in stating the material facts, included all facts that provide necessary context.  Forcing the Court to mine the factual record is not an efficient use of judicial resources and undermines the goals of Local Civil Rules 56.1 and 7(h), discussed *supra*, note 1.  In the future, Defendant should take care to include in his Statement of Material Facts all purportedly undisputed factual assertions on which he relies in support of a motion for summary judgment.

    [4] In his Statement, Plaintiff "denies that the [SASI] contract was due on April 26, 2002." *See* Pl.'s Stmt. ¶ 4.  Plaintiff does not provide a record citation to support this denial.  During his February 27, 2007 deposition, Plaintiff testified that the April 26, 2002 date was not a firm due date and variously testified that he changed the due date and that the due date was going to be missed.  *See* Def.'s Ex. 6B (Smith 2/27/07 Dep.) at 11:12-13:10; 19:22-20:21.  Defendant maintains that Plaintiff did not have authority to change contract due dates.  *See* Def.'s Resp. Stmt. ¶ 4; *see also* Def.'s Ex. 7 (Vincent 3/28/07 Dep.) at 128:18-129:1.  In any event, Plaintiff admits that he did not tell any of his supervisors that the contract was not due on April 26, 2002. *See* Def.'s Ex. 6B (Smith 2/27/07 Dep.) at 13:5-10; 17:18-20:21.

assignment by 5:00 p.m. that afternoon.  ROI, Ex. 7 (Lambert Aff.) at 10; Def.'s Ex. 6B (2/27/07

Smith Dep.) at 27:10-14; Pl.'s Ex. 4 (Ans. to Interrogs.) at 4.  Plaintiff asserts that he did not

agree to the 5:00 p.m. deadline, but admits that it was imposed.  Def.'s Ex. 6B (2/27/07 Smith

Dep.) at 27:10-14; Pl.'s Ex. 4 (Ans. to Interrogs.) at 4.  At approximately 4:45 p.m., Plaintiff

informed Mr. Vincent that he had encountered computer difficulties while attempting to

complete his assignment.  Pl.'s Ex. 4 (Ans. to Interrogs.) at 4-5; Def.'s Ex. 6B (2/27/07 Smith

Dep.) at 27:17-28:13; Def.'s Ex. 7 (3/28/07 Vincent Dep.) at 44:9-45:19.  When it became clear

to Mr. Vincent that Plaintiff would not complete the assignment before 5:00 p.m., Mr. Vincent

told Plaintiff that he had to report to work on Friday, April 26, 2002 to finish the assignment.

Pl.'s Ex. 4 (Ans. to Interrogs.) at 5; Def.'s Ex. 7 (Vincent Dep.) at 46:18-47:4.  Friday, April 26,

2002 and Monday, April 29, 2002 were Plaintiff's scheduled days off on his CWS.  Def.'s Ex. 14

(4/30/02 Mem. from T. Vincent to C. Smith); Pl.'s Ex. 4 (Ans. to Interrogs.) at 5.  Thus, by

requiring Plaintiff to report to work on Friday, April 26, 2002, Mr. Vincent was cancelling

Plaintiff's CWS.  Def.'s Ex. 7 (Vincent Dep.) at 46:18-47:4.[5]

Plaintiff asserts that he informed Mr. Vincent that he would not be coming in to work on

Friday the 26th because he had already worked his scheduled 40 hours for the week.  Def.'s Ex.

6B (2/27/07 Smith Dep.) at 29:16-31:12; Pl.'s Ex. 4 (Ans. to Interrogs.) at 5; Def.'s Ex. 7

(Vincent Dep.) at 47:5-15.[6]  Plaintiff also asserts that he believed he had completed the

_____

[5] According to Mr. Vincent, he offered Plaintiff the options of working late to complete
the assignment or receiving overtime if he worked on Friday April 26.  Def.'s Ex. 7 (Vincent
Dep.) at 46:18-47:4.  Plaintiff denies being told that he would receive overtime if he worked on
Friday the 26th.  Def.'s Ex. 6B (2/27/07 Smith Dep.) at 31:20-23.

[6]Although Mr. Vincent testified during his deposition that Plaintiff told him he had
already worked his 40 hours for the week, *see* Def.'s Ex. 7 (Vincent Dep.) at 47:5-15, in a

5

assignment by 5:00 p.m., although he admits that he might have left something out.  Def.'s Ex.

6B (2/27/07 Smith Dep.) at 29:23-30:11; Pl.'s Ex. 4 (Ans. to Interrogs.) at 5.  Mr. Vincent

warned Plaintiff before he left the office that Plaintiff's failure to report to work on April 26th

would result in disciplinary action.  *Id.*  Plaintiff did not report to work on Friday, April 26 or

Monday, April 29, 2002, but returned to work on Tuesday, April 30, as if his CWS was still in

effect.  Def.'s Stmt. ¶ 4; Pl.'s Stmt. ¶ 4; Pl.'s Ex. 4 (Ans. to Interrogs.) at 5; Def.'s Ex. 7 (Vincent

Dep.) at 66:5-7.  On Friday, April 26, Ms. Lambert reviewed the work Plaintiff had submitted at

the end of the previous day and determined that it was "substantially not completed and several

of the items [Plaintiff] considered to be complete had errors."  ROI, Ex. 7 (Lambert Aff.) at 10.

     B.    *Ramifications of the SASI Contract Difficulties*

When Plaintiff returned to work on Tuesday, April 30, 2002, Mr. Vincent advised

Plaintiff that the SASI contract was his responsibility, that he had not completed the assignment

in a satisfactory manner, that he had disregarded a direct order from his supervisor by not

reporting to work on Friday, April 26th, and that this was grounds for disciplinary action.  Def.'s

Ex. 7 (Vincent Dep.) at 66:8-69:8; Pl.'s Ex. 4 (Ans. to Interrogs.) at 5.  On the same day, Mr.

Vincent issued a memorandum to Plaintiff temporarily revoking his CWS effective May 5, 2002.

ROI, Ex. 14 (4/30/02 Mem. from T. Vincent to C. Smith); Def.'s Stmt. ¶ 5; Pl.'s Stmt. ¶ 5.  Mr.

Vincent stated that the revocation was based on Plaintiff's failure to complete the SASI contract

---

roughly contemporaneous memorandum Mr. Vincent stated that Plaintiff "did not provide any
reason why [he] could not report for work, nor did [he] imply that [he] would not come in the
following day."  *See* ROI, Ex. 14 (4/30/02 Mem. from T. Vincent to C. Smith).  Even if it is not
clear whether Plaintiff advised Mr. Vincent that he would not report to work on April 26, there is
no dispute that Mr. Vincent believed he had ordered Plaintiff to do so.  *See* Pl.'s Ex. 4 (Ans. to
Interrogs.) at 5; Def.'s Ex. 7 (Vincent Dep.) at 46:18-47:4.

assignment on April 25, 2002, as well as Plaintiff's disregard of Mr. Vincent's order to report to work on April 26, 2002, and was intended to "enable Management to meet the operational needs of the office and better monitor [Plaintiff's] workload management." ROI, Ex. 14.[7] Mr. Vincent specifically noted that within sixty days management would review Plaintiff's workload and ability to meet deadlines, as well as the needs of the office, and determine whether Plaintiff could return to his CWS. *Id.*

Despite Mr. Vincent's revocation of Plaintiff's CWS, Plaintiff continued to work the hours of his CWS during the months of May and June 2002. Def.'s Stmt. ¶ 6; Pl.'s Stmt. ¶ 6. On April 30 or May 1, 2002, Plaintiff's Union submitted a "Demand to Bargain" memorandum on Plaintiff's behalf, which requested that Management not change Plaintiff's CWS pending resolution of an agreement on that issue. *See* Def.'s Ex. 15 (4/30/02 Mem. from C. Duckett to N. Mesewicz). Mr. Vincent did not accede to this request, apparently based on advice that a change in an employee's work schedule was not subject to union bargaining. Def.'s Ex. 7 (Vincent Dep.) at 71:9-72:4; ROI, Ex. 21 (9/9/02 Mem. from T. Vincent to C. Smith).[8]

---

[7] In his Statement, Plaintiff "states that Mr. Vincent changed his work schedule because Plaintiff was insubordinate, and as a black man stood up to him." Pl.'s Stmt. ¶ 5. Plaintiff does not provide any record support for this assertion and the record is devoid of such evidence. Plaintiff's pure speculation thus does not controvert the reasons for the revocation that Mr. Vincent stated in his April 30, 2002 memorandum. Moreover, the Court notes that Plaintiff's statement appears to admit that his failure to report to work on April 26, 2002 and April 29, 2002 constituted insubordination.

[8] Plaintiff admits continuing to work his CWS despite being aware that Mr. Vincent had revoked the schedule, but asserts that he did so on the instruction of his Union. Pl.'s Stmt. ¶ 6. However, the Union was not Plaintiff's supervisor, and regardless of Plaintiff's rationale, it is undisputed that, from Mr. Vincent's perspective, Plaintiff disregarded the revocation throughout May and June 2002. Further, although the Union submitted a Demand to Bargain regarding Plaintiff's CWS revocation, Mr. Vincent's subsequent actions clearly indicated his belief that Plaintiff's CWS had been revoked. As such, by continuing to work his CWS during May and

7

C.    *Plaintiff's Allegations of Hostile Work Environment*

According to Plaintiff, when he returned to work on April 30, 2002, Mr. Vincent began "berating [him] on a daily basis throughout the day using the contract as a disguise since he felt that things were not moving fast enough." Pl.'s Ex. 4 (Ans. to Interrogs.) at 5. Plaintiff asserts that Mr. Vincent's "verbal and email attacks became so frequent, and the daily routine of calling me into his office at least eight or nine times a day inquiring about [the SASI] contract . . [were] sometimes explosive . . . ." *Id.* In particular, Plaintiff describes an incident on May 2, 2002, in which he asserts that Mr. Vincent called Plaintiff into his office several times to discuss the status of the SASI contract and "made negative remarks and threatened [him] again with disciplinary action." *Id.*[9] According to Plaintiff he "later suffered chest pains, warm feeling and shortness of breath and went to the health clinic[,]" where the nurse found his blood pressure to have "escalated to a dangerous level." *Id.* Plaintiff further asserts that he "was advised to go home due to the hostile work environment [he] encountered at work." *Id.* at 6.[10]

Plaintiff saw his physician, Dr. Yasmin Panahy, the following morning–May 3, 2002–and asserts that she told him to remain at home rather than returning to work. *Id.* Plaintiff saw Dr.

---

June 2002, Plaintiff assumed the risk that management would not conclude his CWS had been improperly revoked. *See* Def.'s Resp. Stmt. ¶ 6.

[9] Plaintiff also asserts that Mr. Vincent denied his request to have a Union representative present during his discussions with Mr. Vincent. *See* Pl.'s Ex. 4 (Ans. to Interrogs.) at 5. During his deposition, Mr. Vincent admitted denying Plaintiff's request, stating that he "consulted with our labor relations person and was told that because this . . . was a regular, routine work assignment that I wanted status [for], that [Plaintiff] had no right to a union representative present." *See* Def.'s Ex. 7 (Vincent Dep.) at 77:14-24.

[10] Plaintiff's Answers to Defendant's Interrogatories are replete with references to a "hostile work environment" and "harassment." *See* Pl.'s Ex. 4. The Court's quotation from those Answers in no way indicates any legal conclusion on the Court's part.

Panahy again on May 6, 2002 and asserts that she again told him to stay home.  *Id.*  Plaintiff

returned to work on May 14, 2002 and submitted two letters from Dr. Panahy regarding his

absences.  Def.'s Stmt. ¶ 14; Pl.'s Stmt. ¶ 14; ROI, Ex. 17, Attachments X (5/3/02 Mem. from

Dr. Panahy) and Y (5/9/02 Mem. from Dr. Panahy).  Dr. Panahy's letters indicate that Plaintiff

was under her care, as well as the care of a cardiologist, Dr. Katz.  ROI, Ex. 17, Attach. X (5/3/02

Mem. from Dr. Panahy).  In her May 3, 2002 letter, Dr. Panahy states, "[Plaintiff] has been under

undue high stress recently at work and his blood pressure was extremely high [on May 2, 2002],"

notes that elevated blood pressure might be extremely dangerous for Plaintiff given his heart

condition, requests that Plaintiff's supervisors "take this into consideration," and reports that she

had instructed Plaintiff to walk away from stressful situations.  *Id.*  Dr. Panahy's May 9, 2002

letter is more specific, recommending that Plaintiff's "recent contract (SASI) that has caused

undue stress be reassigned and that he be reassigned to the other team."  ROI, Ex. 17, Attach. Y

(5/9/02 Mem. from Dr. Panahy).

Plaintiff asserts that "Mr. Vincent disregarded these notices . . . and continued harassing

me and threatening me with disciplinary action for missing work. . . ."  Pl.'s Ex. 4 (Ans. to

Interrogs.) at 6.  However, the record flatly contradicts Plaintiff's claim that Mr. Vincent ignored

Dr. Panahy's letters.  Rather, in a memorandum dated May 21, 2002, Mr. Vincent acknowledged

receipt of those letters and requested additional medical information "to better understand

[Plaintiff's] condition(s) and its impact on [his] performing [his] duties and any future requests

for leave as an accommodation."  Def.'s Stmt. ¶ 15; ROI, Ex. 16 (5/21/02 Mem. from T. Vincent

to C. Smith).  Mr. Vincent specifically requested that, by June 3, 2002, Plaintiff furnish a detailed

medical statement addressing nine questions about his medical condition.  *Id.*  When Plaintiff did

not respond to Mr. Vincent's request, Mr. Vincent made a second request via memorandum dated June 11, 2002. Def.'s Stmt. ¶ 16; ROI, Ex. 19 (6/11/02 Mem. from T. Vincent to C. Smith). Finally, on June 17, 2002, Theodore Ford, Director of the Resource Management Division, sent Plaintiff a memorandum requesting the medical information that Plaintiff had not provided in response to Mr. Vincent's requests. Def.'s Stmt. ¶ 17; ROI, Ex. 19 (6/17/02 Mem. from T. Ford to C. Smith). Plaintiff admits receiving these requests for additional medical information, and admits failing to provide the requested material. Pl.'s Stmt. ¶¶ 15-17. Plaintiff maintains–and appears to have maintained at the time–that Dr. Panahy's letters were sufficient to answer the requests for additional medical information. *Id.*

In support of his claim that Mr. Vincent "harassed" and "threatened" him, Plaintiff alleges that Mr. Vincent held meetings with Plaintiff "as frequently as five to eight or more times per day," and "would follow up these encounters with many e-mails per day in which he charged me with various disciplinary infractions. The situation reached a point where I on many occasions, had to go to the health unit." *Id.* Although Plaintiff includes more specific allegations regarding a handful of meetings, discussed below, his complaint regarding the majority of the meetings appears to relate to their frequency, rather than what occurred during them.[11] Further, although Plaintiff focuses upon Mr. Vincent's e-mails, he does not provide copies of any such e-mails or even cite to the e-mails proffered by Defendant, which date from the end of April and

---

[11] Although Plaintiff's Complaint includes some more specific allegations of comments made by Mr. Vincent during various meetings, *see* Compl. ¶¶ 6, 9, 12, 14, 16, Plaintiff does not point to such allegations in support of his Opposition. The Court's review of the record reveals various allegations of comments made by Mr. Vincent, which Mr. Vincent denied making during his deposition. *See* Pl.'s Ex. 4 (Ans. to Interrogs.); Def.'s Exs. 6A (12/4/06 Smith Dep.), and 6B (2/27/07 Smith Dep.); Def.'s Ex. 7 (Vincent Dep.). It is therefore possible that a factual dispute exists as to what Mr. Vincent said to Plaintiff during meetings in May 2002.

beginning of May 2002.  *See* ROI, Ex. 17, Attachments J-T.  While those e-mails reflect that Mr.

Vincent sent Plaintiff multiple e-mails on some days, the Court notes that they reflect efforts on

Mr. Vincent's part to ascertain the status of the SASI contract.  *Id.*  During his deposition, Mr.

Vincent testified that he used frequent e-mails as a management tool and "sent multiple, constant

e-mails to people to make sure that the work was moving."  Def.'s Ex. 7 (Vincent Dep.) at 128:7-

128:18.  Mr. Vincent testified that it was not unusual for him to e-mail an employee multiple

times per day or to require an employee to come to his office several times a day if he was

working on a contract they were involved with.  *Id.*  Mr. Vincent also described his management

style as "demanding," but not "particularly tough."  *See id.* at 124:14-125:8.  That description is

corroborated by the affidavits of Plaintiff's former colleagues that were submitted in connection

with the EEO investigation into Plaintiff's claims.[12]  As Defendant notes, those same former

colleagues either do not report, or specifically deny, Mr. Vincent making comments relating to

age or race or treating anyone adversely based on a racial or age-related bias.  *See generally*, ROI,

Ex. 7 (Lambert Aff.), Ex. 8 (Smallwood Aff.), Ex. 9 (Wood Aff.).[13]

According to Plaintiff, on May 22, 2002, Mr. Vincent "stormed into [his] office at

approximately 5:20 p.m. in a hysterical manner and demanded that [Plaintiff] work on days [he]

---

[12]  One employee describes Mr. Vincent as a "supportive supervisor" who "could get 'hyper'" but "got things resolved," and whose voice was strong and could grow loud on occasion. ROI, Ex. 9, (10/30/03 Wood Aff.) at 2-3.  Another described the office atmosphere as having "hot moments" and "low moments," and stated that when things were not going well with a contract, Mr. Vincent could "get behind it," but that he did so regardless of the employee assigned to the particular contract.  ROI, Ex. 8 (11/4/03 Smallwood Aff.) at 3-4.

[13]  Ms. Lambert is a Black female and was over 40 years old at the time, Ms. Wood is from the Philippines and was 51 years old, and Mr. Smallwood is a Black male who was 50 years old.  Def.'s Mem. at 20 n.4; ROI, Ex. 10 (Listing birthdates).

was not previously scheduled to work."  Pl.'s Ex. 4 (Ans. to Interrogs.) at 6.  Plaintiff claims that

he tried to leave his office to avoid a confrontation that might elevate his blood pressure, but Mr.

Vincent blocked the doorway and prevented Plaintiff from leaving.  *Id.*  Although Mr. Vincent

allowed Plaintiff to leave his office to get water, Plaintiff claims that Mr. Vincent followed him

to the water cooler and "in a boisterous manner continued to threaten me with disciplinary action,

and AWOL if I failed to work on the days Mr. Vincent requested."  *Id.*  Plaintiff's account of the

May 22, 2002 incident is contradicted by Ms. Lambert's EEO affidavit, in which she indicates

that Mr. Vincent blocked Plaintiff's path simply by standing in the doorway of Plaintiff's office

because it did not have a large walkway.  *See* ROI, Ex. 7 (Lambert Aff.) at 5.  Ms. Lambert

further states that Mr. Vincent was attempting to get information from Plaintiff about the status

of a work assignment and describes Plaintiff as "belligerent."  *Id.*

  During his deposition, Mr. Vincent did not recall the May 22, 2002 incident specifically,

but explained that because Plaintiff's CWS had been revoked, he would not have been ordering

Plaintiff to work on his days off, but rather on days he was required to work under his new

schedule.  Def.'s Ex. 7 (Vincent Dep.) at 87:5-88:17.  To that end, also on May 22, 2002, Mr.

Vincent sent Plaintiff an e-mail reminding him that his CWS had been revoked and that he would

be charged AWOL if he did not report to work in accordance with his new schedule.  ROI, Ex.

17, Attach. T (5/22/02 e-mail from T. Vincent to C. Smith); Def.'s Stmt. ¶ 7; Pl.'s Stmt. ¶ 7.

When Plaintiff did not comply, he was charged with AWOL.  Def.'s Stmt. ¶ 8; Pl.'s Stmt. ¶ 8.

  Plaintiff asserts that on June 5, 2002, Mr. Vincent again blocked his path and prevented

him from leaving his office.  Pl.'s Ex. 4 (Ans. to Interrogs.) at 6.  Plaintiff called security, was

referred to the Federal Protection Agency, and reported the incident the following morning.  *Id.*;

12

Pl.'s Ex. 9 (6/6/02 Incident Report).  Mr. Vincent does not recall the June 5, 2002 incident.

Def.'s Ex. 7 (Vincent Dep.) at 96:1-17.  Plaintiff claims that Mr. Vincent "threatened" him again

on June 12, 2002.  Pl.'s Ex. 4 (Ans. to Interrogs.) at 8.  Although Plaintiff does not specify the

nature of the "threats," the Court notes that his other allegations relate to threats of disciplinary

action for failure to follow orders.  In any event, Plaintiff alleges that he responded to Mr.

Vincent's "threats" by calling a Union representative, who advised Plaintiff to leave with her.

Pl.'s Ex. 4 (Ans. to Interrogs.) at 6-7.  Plaintiff states that after this incident he again reported to

the health unit where he was found to have elevated blood pressure.  *Id.* at 7.  Mr. Vincent does

not recall the June 12, 2002 incident.  Def.'s Ex. 7 (Vincent Dep.) at 96:1-17.

> D.    *Additional Events*

On May 29, 2002, Plaintiff filed a Step One Union grievance challenging the revocation

of his CWS and his AWOL charge, which he described as "blatant disparate treatment."  Def.'s

Stmt. ¶ 10; Pl.'s Stmt. ¶ 10; Def.'s Ex. 15 (5/29/02 Step 1 Grievance).  Mr. Vincent eventually

denied Plaintiff's Step 1 Grievance on behalf of the Agency on September 9, 2002, *see* Def.'s Ex.

21 (9/9/02 Mem. from T. Vincent to C. Smith), and Plaintiff admitted in his deposition that

neither he nor his Union pursued his grievance beyond Step 1, Def.'s Ex. 6B (2/27/07 Smith

Dep.) at 52:16-53:4.

On May 31, 2002, Mr. Vincent issued a Proposal to Suspend Plaintiff for five days on the

charges of failure to follow a direct order, failure to follow a proper order, insolent or

disrespectful conduct towards his team leader, and absence without leave.  Def.'s Stmt. ¶ 11;

Pl.'s Stmt. ¶ 11; ROI, Ex. 17 (5/31/02 Proposal to Suspend).  Plaintiff responded with a Rebuttal

to Proposal to Suspend, in which he addressed Mr. Vincent's charges by making the same

assertions raised in the instant litigation.  Def.'s Stmt. ¶ 12; Pl.'s Stmt. ¶¶ 11-12; Def.'s Ex. 18

(Rebuttal to Proposal to Suspend).  Plaintiff was suspended without pay for two days on August

19 and 20, 2002.  Def.'s Stmt. ¶ 13; Pl.'s Stmt. ¶ 13.

On an unidentified date prior to June 11, 2002, Plaintiff submitted an Accommodation

Request regarding his heart conditions and high blood pressure, in which he asked to be provided

with a "Low stress/non-Hostile environment" and "No lifting, limited walking/stairs."  Pl.'s Ex.

8 (Accomm. Request).[14]  Despite Mr. Vincent's apparent rejection of that request and Plaintiff's

failure to respond to Mr. Vincent and Mr. Ford's requests for additional medical information, the

SASI contract was eventually reassigned to a lower grade Contract Oversight Specialist.  ROI,

Ex. 6 (Schade Aff.) at 3.  In addition, on June 13, 2002 Plaintiff was temporarily relocated to the

ninth floor of the HUD headquarters building and ordered to report to Mr. Schade and to Bernard

Morton, the other team leader in the Procurement Management Division.  Def.'s Stmt. ¶ 18; Pl.'s

Stmt. ¶ 18.[15]  During his deposition, Plaintiff admitted that his Division did not have offices on

that floor.  Def.'s Ex. 6B (2/27/07 Smith Dep.) at 80:10-11.  Plaintiff also testified that he

experienced no difficulties working for Mr. Schade and Mr. Morton during June and July 2002,

Def.'s Stmt. ¶ 19; Pl.'s Stmt. ¶ 19; Def.'s Ex. 6B (2/27/07 Smith Dep.) at 81:23-25, and that he

did not have any physical contact with Mr. Vincent during that period, despite the fact that Mr.

Vincent sometimes came to the ninth floor.  *Id.* at 82:16-85:21; Def.'s Stmt. ¶ 20; Pl.'s Stmt. ¶

---

[14] Plaintiff also appears to have submitted a written request to be reassigned to the other team leader on May 21, 2002.  *See* Pl.'s Ex. 6 (Mem. from C. Smith to T. Vincent).  That request does not mention Plaintiff's medical conditions.

[15] The record suggests, as does Plaintiff, that this reassignment was the result of negotiations between Mr. Schade's supervisor and Plaintiff's Union.  *See* ROI, Ex. 6 (Schade Aff.) at 4; Pl.'s Stmt. ¶ 18.

20.[16]  Plaintiff also had no contact with Ms. Lambert during the period.  *Id.*

On July 29, 2002, Plaintiff was advised that he was reassigned to his previous workspace on the second floor, effective August 4, 2002, where Mr. Schade would become his permanent supervisor.  Def.'s Stmt. ¶ 21; Pl.'s Stmt. ¶ 21; ROI, Ex. 20 (7/29/02 Mem. from T. Ford to C. Smith).  The memo advising Plaintiff of his reassignment specifically stated that he was "to return to [his] original workstation in Room 2220 since that is where [his] supervisor [was] located."  *Id.*  The memo further instructed Plaintiff that his request to no longer report to Ms. Lambert and Mr. Vincent was granted, and that he was "to report directly to Mr. Schade, without any direct contact with [his] former supervisor and Team Leader."  *Id.*  Finally, the memorandum advised Plaintiff that he could return to his CWS and that any AWOL charges after July 14, 2002 would be expunged.  *Id.*

Plaintiff did not return to work at his second floor work station.  On August 1, 2002, he filed a workers' compensation claim asserting that he was unable to work due to the agency's actions that allegedly created a hostile work environment.  Def.'s Stmt. ¶ 22, Pl.'s Stmt. ¶ 22. Plaintiff did not report to work from August 1, 2002 until June 2003.  ROI, Ex. 23 (Record of Leave Activity).  The Agency issued a response to Plaintiff's workers' compensation claim on October 29, 2002, Def.'s Stmt. ¶ 23; Pl.'s Stmt. ¶ 23; ROI, Ex. 22 (10/29/02 Letter from T. Ford to N. Lee), and the Department of Labor's Office of Workers' Compensation Programs denied Plaintiff's claim on January 27, 2003, Def.'s Stmt. ¶ 24; Pl.'s Stmt. ¶ 24; Def.'s Ex. 4 (1/27/03 Letter to C. Smith).  On June 4, 2003, Mr. Ford requested that Plaintiff return to work in light of

---

[16] Plaintiff asserts that Mr. Vincent continued to sign Plaintiff's time sheets during the period before Plaintiff's supervision was formally reassigned to Mr. Schade, i.e., before August 4, 2002.  Def.'s Ex. 6B (2/27/07 Smith Dep.) at 83:23-84:8; ROI, Ex. 6 (Schade Aff.) at 5.

staffing changes in the Procurement Management Division. Def.'s Ex. 3 (6/4/03 Letter from T. Ford to C. Smith). Plaintiff appears to have worked in the Procurement Management Division from June 2003 through August 2004, when he was reassigned to the Records Management Division at HUD. *Id.*; ROI, Ex. 23 (Record of Leave Activity); Def.'s Ex. 6B (2/27/07 Smith Dep.) at 105:12-107:18.

     E.    *Procedural History*

     Plaintiff first contacted an EEO counselor regarding allegations of race, sex, and age discrimination on June 24, 2002. ROI, Ex. 2 (7/31/02 EEO Compl). Plaintiff filed a formal EEO complaint on July 31, 2002, alleging that he was subject to a "blatant pattern of hostility, harassment, discrimination, and disparate treatment" based on his race, sex, and age, when Mr. Vincent threatened him with discipline, revoked his CWS, charged him with AWOL, blocked his path, and proposed a five-day suspension. *Id.* On July 13, 2005, the Agency issued a Final Decision, finding that Plaintiff was not discriminated against because of his race, sex, or age. Def.'s Ex. 1 (7/13/05 Final Agency Decision). The Agency dismissed Plaintiff's claims relating to the revocation of his CWS and his AWOL charge pursuant to 29 C.F.R. §§ 1614.107(a)(4) and 1614.301(a), because Plaintiff had elected to file a grievance on those issues before he filed his EEO complaint. *Id.* The Agency further concluded that Plaintiff had failed to sustain his burden of proof on his claims that he was discriminated against or subjected to a hostile work environment when Mr. Vincent blocked his path and proposed a suspension. *id.* Plaintiff filed his Complaint in this action on October 14, 2005. Defendant filed its motion to dismiss and for summary judgment on May 7, 2007, Plaintiff filed his Opposition on June 7, 2007, and Defendant filed its Reply on June 14, 2007.

## II: LEGAL STANDARDS

*A.     Motion to Dismiss*

Defendant argues that Plaintiff's legal claims must be dismissed insofar as they are based on the revocation of his CWS and his AWOL charge, because he filed a grievance regarding those claims, and thus was required under 29 C.F.R. § 1614.301 to pursue them through HUD's negotiated procedures rather than by filing a complaint with the EEOC. Defendant does not specify whether it moves to dismiss those claims under Federal Rule of Civil Procedure 12(b)(1) or 12(b)(6), and in fact provides legal standards for both rules. *See* Def.'s Mem. at 9-10. The cases addressing this issue–on which Defendant relies–have considered it under Rule 12(b)(1), and the Court agrees that it relates to Plaintiff's exhaustion of his administrative remedies and thus to the Court's jurisdiction to entertain Plaintiff's claims. *See Wood v. Rosell*, 357 F. Supp. 2d 123 (D.D.C. 2004); *Johnson v. Wilson*, No. 90-798, 1990 WL 300243 (D.D.C. Nov. 13, 1990), *aff'd Johnson v. Peterson*, 996 F.2d 397 (D.C. Cir. 1993).

A court must dismiss a case when it lacks subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). In addressing a motion under Rule 12(b)(1), the Court may "consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Coalition for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003) (citations omitted). In so doing, the Court may consider materials outside the pleadings. *See Jerome Stevens Pharm., Inc. v. Food & Drug Admin.*, 402 F.3d 1249, 1253 (D.C. Cir. 2005); *Artis v. Greenspan*, 223 F. Supp. 2d 149, 152 n.1 (D.D.C. 2002). "At the motion to dismiss stage, counseled complaints, as well as *pro se* complaints, are to be construed with sufficient liberality

17

to afford all possible inferences favorable to the pleader on allegations of fact." *Settles v. U.S.*

*Parole Comm'n*, 429 F.3d 1098, 1106 (D.C. Cir. 2005). In spite of the favorable inferences that

a plaintiff receives on a motion to dismiss, it remains the plaintiff's burden to prove subject

matter jurisdiction by a preponderance of the evidence. *Am. Farm Bureau v. Environmental*

*Prot. Agency*, 121 F. Supp. 2d 84, 90 (D.D.C. 2000).

      B.    *Motion for Summary Judgment*

      A party is entitled to summary judgment if the pleadings, depositions, and affidavits

demonstrate that there is no genuine issue of material fact in dispute and that the moving party is

entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56©); *Tao v. Freeh*, 27 F.3d 635, 638

(D.C. Cir. 1994). Under the summary judgment standard, Defendant, as the moving party, bears

the "initial responsibility of informing the district court of the basis for [its] motion, and

identifying those portions of the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits which [it] believe[s] demonstrate the absence of a

genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Plaintiff, in

response to Defendants' motion, must "go beyond the pleadings and by [his] own affidavits, or

depositions, answers to interrogatories, and admissions on file, 'designate' specific facts showing

that there is a genuine issue for trial." *Id.* at 324 (internal citations omitted).

      Although a court should draw all inferences from the supporting records submitted by the

nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar

summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To be

material, the factual assertion must be capable of affecting the substantive outcome of the

litigation; to be genuine, the issue must be supported by sufficient admissible evidence that a

reasonable trier-of-fact could find for the nonmoving party. *Laningham v. U.S. Navy*, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987); *Liberty Lobby*, 477 U.S. at 251 (the court must determine "whether the evidence presents a sufficient disagreement to require submission to a [fact-finder] or whether it is so one-sided that one party must prevail as a matter of law"). "If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50 (internal citations omitted). "Mere allegations or denials in the adverse party's pleadings are insufficient to defeat an otherwise proper motion for summary judgment." *Williams v. Callaghan*, 938 F. Supp. 46, 49 (D.D.C. 1996). The adverse party must do more than simply "show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, while the movant bears the initial responsibility of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact, the burden shifts to the non-movant to "come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Id.* at 587 (citing Fed. R. Civ. P. 56(e)) (emphasis in original).

Importantly, "[w]hile summary judgment must be approached with specific caution in discrimination cases, a plaintiff is not relieved of her obligation to support her allegations by affidavits or other competent evidence showing that there is a genuine issue for trial." *Morgan v. Fed. Home Loan Mortgage Corp.*, 172 F. Supp. 2d 98, 104 (D.D.C. 2001), *aff'd*, 328 F.3d 647 (D.C. Cir. 2003); *see also Marshall v. James*, 276 F. Supp. 2d 41, 47 (D.D.C. 2003) (special caution "does not eliminate the use of summary judgment in discrimination cases") (citing cases). "Summary judgment is not a 'disfavored procedural shortcut,' but is an integral procedural tool which promotes the speedy and inexpensive resolution of every case." *Marshall*,

276 F. Supp. 2d at 47 (quoting *Celotex Corp.*, 477 U.S. at 327).  Accordingly, the Court reviews

the defendant's motion for summary judgment under a "heightened standard" that reflects

"special caution."  *Aka v. Washington Hosp. Ctr.*, 116 F.3d 876, 879 (D.C. Cir. 1997) (internal

quotations omitted), *overturned on other grounds*, 156 F.3d 1284 (D.C. Cir. 1998) (en banc).

Nonetheless, while this special standard is more exacting, it is not inherently preclusive.

Although more circumspect, the Court will continue to grant a motion for summary judgment in

which the nonmoving party has failed to submit evidence that creates a genuine factual dispute

and the moving party is entitled to a judgment as a matter of law.

### III: DISCUSSION

At the time that Plaintiff filed his Complaint in this action he was proceeding *pro se*, and

his Complaint is somewhat obtuse as to the precise legal claims asserted.[17]  Nevertheless, the

Court's review of the Complaint and Plaintiff's Opposition–which accords with Defendant's

interpretation–suggests that Plaintiff is pursuing the following legal claims: (1) disparate

treatment discrimination on the basis of race and age; (2) hostile work environment on the basis

of race and age; and (3) retaliation based on race and age.  Plaintiff's disparate treatment and

hostile work environment claims appear to be based on five factual allegations: (1) the revocation

of Plaintiff's CWS; (2) Plaintiff's AWOL charge; (3) Mr. Vincent's alleged attacks on Plaintiff's

performance, shouting at Plaintiff and threatening him with disciplinary action; (4) the Proposal

to Suspend Plaintiff; and (5) Mr. Vincent's alleged physical blocking of Plaintiff's path.

---

[17] Plaintiff has since retained counsel, who filed Plaintiff's Opposition to Defendant's
Motion for Summary Judgment.  The Court notes that Plaintiff's counsel did not, as he might
have, move to amend Plaintiff's Complaint in order to clarify the legal and factual grounds for
this action.  Such clarification would certainly have been beneficial for both the parties and the
Court.

Plaintiff's retaliation claim is based primarily on his reassignment to his second floor work station.

Defendant asserts that Plaintiff cannot assert claims based on the revocation of his CWS and his AWOL charge because he opted to file a grievance on those charges. The Court addresses Defendant's motion to dismiss on that ground before turning to Defendant's motion for summary judgment, which relates to all of Plaintiff's claims.

A.    *Defendant's Motion to Dismiss*

As set forth above, Plaintiff filed a Step One Union grievance on May 29, 2002 challenging the revocation of his CWS and his AWOL charge, and asserting that the actions constituted "blatant disparate treatment." Def.'s Stmt. ¶ 10; Pl.'s Stmt. ¶ 10; Def.'s Ex. 15 (5/29/02 Step 1 Grievance). Defendant asserts that, as a result, Plaintiff was barred from filing an EEO complaint based on those actions. Defendant is correct that under the Civil Service Reform Act ("CSRA"), a federal employee who believes he has been discriminated against and whose agency's negotiated agreement permits the acceptance of grievances alleging discrimination may file *either* a grievance or an EEO complaint, but not both. 5 U.S.C. § 7121(d); 29 C.F.R. § 1614.301(a) (2003).[18] An employee who files a timely written grievance irrevocably chooses the negotiated grievance procedure route, and is precluded from filing an EEO complaint on the "same matter." *See Johnson*, 996 F.2d at 399; *Am. Fed. of Gov't Employees, Local 2052 v. Reno*, 992 F.2d 331, 332 (D.C. Cir. 1993). Furthermore, judicial review is only available to an employee alleging a "pure discrimination" claim after he has

_____

[18] The parties do not dispute that HUD's Negotiated Agreement provides for the acceptance of grievances that allege discrimination, Def.'s Ex. 1 (7/13/05 Final Agency Decision) at 2; Ex. 2 (Negotiated Agreement).

exhausted his administrative remedies in dealing with his grievance, and appealed the final

agency action on his grievance to the EEOC.[19]

Plaintiff does not dispute that he filed a grievance regarding the revocation of his CWS

and his AWOL charge.  Instead, Plaintiff contends that he may nevertheless pursue those claims

in this litigation because his grievance alleged "blatant disparate treatment" while his EEO

complaint alleged hostile work environment and race and age discrimination "not because of the

revocation of his CWS and the AWOL complaints but because of the mistreated [sic] meted out

to him by Mr. Vincent."  Pl.'s Opp'n at 18.  While Plaintiff thus argues that his EEO complaint

and grievance did not involve the "same matter," his argument is unavailing.

In *Guerra v. Cuomo*, 176 F.3d 547, 550 (D.C. Cir. 1999), the D.C. Circuit referred to the

following test for determining whether a grievance and complaint cover the "same matter": "If

[the employee] raised a topic in both documents, or if the arbitrators assigned to handle the

grievance would necessarily have needed to inquire into a topic in discharging their duties. . . ,"

the same matter is involved  (quoting *Facha v. Cisneros*, 914 F. Supp. 1142, 1149 (E.D. Pa.

1999)).  The D.C. Circuit further noted that courts have "tended to construe the term 'matter' to

encompass more than a legal claim and instead to encompass the 'underlying action' or the

'topics' raised."  *Id.* (quoting *Facha*, 914 F. Supp. at 1149 and *Bonner v. MSPB*, 781 F.2d 202,

---

[19] Section 7121(d) of the CSRA covers both "pure discrimination" complaints and
"mixed case" discrimination cases, which are those in which the complaint of employment
discrimination stems from an action that can be appealed to the Merit Systems Protection Board
("MSPB").  *See Johnson*, 996 F.2d at 398-99; *Wood*, 357 F. Supp. 2d at 129 n.10; 5 U.S.C. §
7121(d); 29 C.F.R. § 1614.302.  Actions appealable to the MSPB include removal, reduction in
grade, and reduction in pay, but not the actions–a change in work schedule, charge of AWOL and
proposal to suspend–that Plaintiff alleges.  5 U.S.C. §§ 7512, 7701(a), 7702; *see Wood*, 357 F.
Supp. 2d at 129 n. 10.  Because Plaintiff's claim is thus a "pure discrimination" claim, Plaintiff's
ultimate avenue of appeal would be to the EEOC rather than the MSPB.  *See* 5 U.S.C. § 7121(d).

204-05 (Fed. Cir. 1986)). Interpreting the D.C. Circuit's guidance in *Guerra*, in *Wood*, Judge

Richard J. Leon considered whether a grievance and complaint "are rooted in the same factual

nucleus" in determining whether they involved the "same matter." *Wood*, 357 F. Supp. 2d at

131.

Applying these tests to the instant case, the Court concludes that Plaintiff's grievance and

EEO complaint involve the "same matter" to the extent that they are both rooted in his

complaints about the revocation of his CWS and his AWOL charges. While Plaintiff is correct

that his EEO complaint contains additional allegations of a hostile work environment created by

Mr. Vincent, it also undoubtably addresses the "topics" of his CWS revocation and AWOL

charge. *See* ROI, Ex. 2 (7/31/02 EEO Compl.). Indeed, the remedies that Plaintiff sought in his

EEO complaint included restoration of leave that he claimed he was erroneously charged when

his CWS was revoked and expungement of all AWOL charges. *Id.* Further, the ROI makes clear

that the EEO investigator in this action "necessarily . . . needed to inquire into [the topics of

Plaintiff's CWS revocation and AWOL charge] in discharging [her] duties." *Guerra*, 176 F.3d at

550. The Court also notes that there is no actual disparity between the legal theories raised in

Plaintiff's grievance and his EEO complaint because Plaintiff's EEO complaint alleges a "blatant

pattern of . . . disparate treatment in the workplace," ROI, Ex. 2 (7/31/02 EEO Compl.), while his

grievance alleges "blatant disparate treatment." Def.'s Ex. 15 (5/29/02 Step 1 Grievance).

Moreover, even if such a discrepancy existed, it would represent a change in legal theories, but

would not alter the conclusion that Plaintiff's grievance and EEO complaint relate to the same

factual matter. *See Wood*, 357 F. Supp. 2d at 130-31; *Guerra*, 176 F.3d at 550.

While Plaintiff's filing of a grievance regarding his CWS revocation and AWOL charge

thus irrevocably committed him to resolving his claims regarding those matters through the negotiated grievance procedure, it is clear that Plaintiff did not exhaust those procedures.  HUD's Negotiated Agreement sets forth a three-step procedure for grievances, which may be followed by arbitration.  *See* Def.'s Ex. 1 (7/13/05 Final Agency Decision) at 2; Ex. 2 (Negotiated Agreement).  Following arbitration of a grievance, an employee who has chosen the negotiated grievance procedure may appeal the arbitrator's decision to the EEOC, and "[o]nly after the EEOC has rendered a decision or failed to do so within 180 days may the employee . . . initiate suit in district court."  *Johnson*, 996 F.2d at 401.  During his deposition, Plaintiff admitted that neither he nor his Union pursued his grievance beyond Step 1.  Def.'s Ex. 6B (2/27/07 Smith Dep.) at 52:16-53:4.  As Plaintiff has not exhausted his administrative remedies, dismissal of his claims regarding his CWS revocation and AWOL charge is appropriate.

> B.    *Defendant's Motion for Summary Judgment*

Plaintiff's claims regarding his CWS revocation and AWOL charge, however, are only two of the five factual grounds he asserts support or are encompassed in his claims of disparate treatment discrimination and hostile work environment.  The parties do not distinguish between Plaintiff's factual grounds in addressing Defendant's motion for summary judgment.  As such, the Court considers whether, assuming *arguendo* that Plaintiff's factual allegations regarding his CWS revocation and AWOL charge were not barred, any of his legal claims would survive Defendant's motion for summary judgment.

> 1.    *Plaintiff's Disparate Treatment Claim*

> a.    *Proper Standards*

Plaintiff's Complaint alleges that he "is the only employee who suffered the

discrimination because he was Black" and thus appears to assert a claim of disparate treatment

discrimination under both Title VII and § 1981. *See* Compl. ¶¶ 31, 41. Pursuant to Title VII, it is

unlawful for an employer "to discharge any individual . . . because of such individual's race,

color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Pursuant to 42 U.S.C. §

1981, "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to

make and enforce contracts . . . as is enjoyed by white citizens . . . ." 42 U.S.C. § 1981(a). As

amended by the Civil Rights Act of 1991, "§ 1981's prohibition against racial discrimination in

the making and enforcement of contracts applies to all phases and incidents of the contractual

relationship . . . ." *Rivers v. Roadway Express*, 511 U.S. 298, 302 (1994). Under either Title VII

or §1981, Plaintiff must demonstrate by a preponderance of the evidence that the actions taken by

his employer were "more likely than not based on the consideration of impermissible factors"

such as race, ethnicity, or national origin. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248,

254 (1981) (internal quotation marks and citation omitted). In so doing, "the plaintiff may prove

his claim with direct evidence, and absent direct evidence, he may indirectly prove

discrimination" under the burden-shifting analysis created by *McDonnell Douglas Corp. v.

Green*, 411 U.S. 792 (1973). *Brady v. Livingood*, 456 F. Supp. 2d 1, 6 (D.D.C. 2006).

Where, as here, the record contains no direct evidence of discrimination, it is necessary to

apply the *McDonnell Douglas* tripartite burden-shifting framework. *Cones v. Shalala*, 199 F.3d

512, 516 (D.C. Cir. 2000) (citing *McDonnell Douglas*, 411 U.S. at 802). The *McDonnell

Douglas* framework applies to both claims brought under both Title VII and § 1981. *Mitchell v.

DCX, Inc.*, 274 F. Supp. 2d 33, 45 (D.D.C. 2003) (citing *Patterson v. McLean Credit Union*, 491

U.S. 164, 186 (1989), *superseded in part by* The Civil Rights Act of 1991); *see also Carter v.

*George Washington Univ.*, 387 F.3d 872, 878 (D.C. Cir. 2004) (*McDonnell Douglas* framework applies to claims brought pursuant to § 1981).[20]  It is the district court's responsibility to closely adhere to this analysis and go no further, as it does not sit as a "super-personnel department that reexamines an entity's business decisions." *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (internal citation and quotation marks omitted).

Under the *McDonnell Douglas* paradigm, Plaintiff has the initial burden of proving by a preponderance of the evidence a *prima facie* case of discrimination.  *McDonnell Douglas*, 411 U.S. at 802.  If he succeeds, the burden shifts to Defendant to articulate some legitimate, non-discriminatory reason for Plaintiff's termination, and to produce credible evidence supporting its claim.  *Id.*  Defendant's burden is only one of production, and it "need not persuade the court that it was actually motivated by the proffered reasons."  *Burdine*, 450 U.S. at 254; *see also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993) ("[T]he determination that a defendant has met its burden of production (and has thus rebutted any legal presumption of intentional discrimination) can involve no credibility assessment.").  As such, while "the *McDonnell Douglas* framework shifts intermediate evidentiary burdens between the parties, [t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  *Morgan v. Fed. Home Loan Mortgage Corp.*, 328 F.3d 647, 651 (D.C. Cir. 2003), *cert. denied*, 540 U.S. 881 (2003); *see also Burdine*, 450 U.S. at 253.

_____

[20] The *McDonnell Douglas* framework also applies to claims of discrimination under the ADEA.  *See Hall v. Giant Food, Inc.*, 175 F.3d 1074, 1077 (D.C. Cir. 1999); *Paquin v. Fed. Nat'l Mortgage Ass'n*, 119 F.3d 23, 26 (D.C. Cir. 1997).  Although it is not clear that Plaintiff intends to assert such a claim, the Court considers Plaintiff's allegations of race and age discrimination together, pursuant to the *McDonnell Douglas* framework.

If Defendant is successful, "the *McDonnell Douglas* framework -- with its presumptions and burdens -- disappear[s], and the sole remaining issue [is] discrimination *vel non*." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142-43 (2000) (internal citations and quotation marks omitted). At that point, Plaintiff has the burden of persuasion to show that Defendant's proffered reason was not the true reason for the employment decision. *Burdine*, 450 U.S. at 256. Pretext may be established "directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* at 256; *see also Reeves*, 530 U.S. at 143. "Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Reeves*, 530 U.S. at 147 (citing *St. Mary's Honor Ctr.*, 590 U.S. at 517) ("[P]roving the employer's reason false becomes part of (and often considerably assists) the greater enterprise of proving that the real reason was intentional discrimination."); *see also Aka v. Washington Hosp. Ctr.*, 156 F.3d 1284, 1290 (D.C. Cir. 1998) (en banc) ("[A] plaintiff's discrediting of an employer's stated reason for its employment decision is entitled to considerable weight.").

Notably, the Supreme Court has taken care to instruct trial courts that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves*, 530 U.S. at 148. The Court of Appeals for the District of Columbia Circuit has distilled this analysis, noting that the fact-finder can infer discrimination from the combination of:

> (1) the plaintiff's *prima facie* case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff (such as independent

27

> evidence of discriminatory statements or attitudes on the part of the employer) or
> any contrary evidence that may be available to the employer (such as evidence of
> a strong record in equal opportunity employment).

*Aka*, 156 F.3d at 1289.  However, evidence in each of the three categories is not required.  *Id.*

"At this stage, if [plaintiff] is unable to adduce evidence that could allow a reasonable

trier of fact to conclude that [defendant's] proffered reason was a pretext for discrimination,

summary judgment must be entered against [plaintiff]."  *Paquin v. Fed. Nat'l Mortgage Ass'n*,

119 F.3d 23, 27-28 (D.C. Cir. 1997).  "[T]he court must consider all the evidence in its full

context in deciding whether the plaintiff has met his burden of showing that a reasonable [fact-

finder] could conclude that he has suffered discrimination."  *Aka*, 156 F.3d at 1290.

### b.    Application of the McDonnell Douglas *Analysis*

Plaintiff's Opposition focuses on the revocation of his CWS, his AWOL charge, and the

Proposal to Suspend as grounds for his disparate treatment claim.  *See* Pl.'s Opp'n at 20.  At the

outset, the Court notes that Defendant has already articulated a legitimate non-discriminatory

reason for each of these actions, in Mr. Vincent's April 30, 2002 memorandum revoking

Plaintiff's CWS, *see* ROI, Ex. 14, and May 31, 2002 Proposal to Suspend, which includes the

grounds for Plaintiff's AWOL charge, *id.*, Ex. 17.  As the D.C. Circuit recently reiterated in

*Czekalski v. Peters*, 475 F.3d 360, 364 (D.C. Cir. 2007), "once a defendant has proffered such a

nondiscriminatory explanation, it has 'done everything that would be required of [it] if the

plaintiff had properly made out a *prima facie* case.'"  *Id.* (quoting *U.S. Postal Serv. Bd. of*

*Governors v. Aikens*, 460 U.S. 711, 715 (1983)).  Thus, whether Plaintiff actually made out a

*prima facie* case "'is no longer relevant,' and the only question is 'whether the defendant

intentionally discriminated against the plaintiff.'"  *Id.*  Nevertheless, the Court evaluates

Plaintiff's *prima facie* case because, as noted above, it "'is part of the evidence [the Court] must consider in addressing the question' of whether [Plaintiff] has created a genuine issue of [religious or national origin] discrimination." *Id.* (quoting *George v. Leavitt*, 407 F.3d 405, 413 (D.C. Cir. 2005)).

Plaintiff claims disparate treatment discrimination, and thus makes out a *prima facie* case "'by establishing that: (1) [he] is a member of a protected class; (2) [he] suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination.'" *Id.* (quoting *George*, 407 F.3d at 412); *see also Stella v. Mineta*, 284 F.3d 135, 145 (D.C. Cir. 2002). As an African-American over 40 years of age, Plaintiff is a member of a protected class under Title VII, § 1981, and the ADEA. Defendant does not challenge whether Plaintiff's CWS revocation, AWOL charge, and Proposal to Suspend constitute adverse employment actions, and the Court therefore assumes as much *arguendo*. *See* Pl.'s Opp'n at 20; Def.'s Mem. at 21. Defendant focuses his attention on whether Plaintiff can establish the third prong of his *prima facie* case. Def.'s Mem. at 21. Plaintiff may do so by "demonstrating that [he] was treated differently from similarly situated employees who are not part of the protected class," *George*, 407 F.3d at 412, or may show that "the discharge was not attributable to the two [most] common legitimate reasons for discharge: performance below the employer's legitimate expectations or the elimination of the plaintiff's position altogether," *id.*

Defendant correctly argues that Plaintiff "has failed to produce any evidence that he was treated differently than other similarly situated employees not within [his] protected groups when his CWS was revoked, when he was charged AWOL . . ., or when he was issued a proposed suspension." Def.'s Mem. at 21. To show that another individual is similarly situated, Plaintiff

must "demonstrate that all of the relevant aspects of their employment situation are nearly identical." *Childs-Pierce v. Util. Workers Union of Am.*, 383 F. Supp. 2d 60, 73 (D.D.C. 2005) (citing *Phillips v. Holladay Prop. Servs.*, 937 F. Supp. 32, 37 (D.D.C. 1996), *aff'd Phillips v. Holladay Corp.*, No. 96-7202, 1997 WL 411695 (D.C. Cir. Jun. 19, 1997); *Neuren v. Adduci, Mastriani, Meeks & Schill*, 43 F.3d 1507, 1513-14 (D.C. Cir. 1995)), *aff'd* No. 05-7121, 2006 WL 1878891 (D.C. Cir. Jun. 27, 2006)). Thus, "the co-workers must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct . . . ." *Id.*

Here, Plaintiff alleges that he "was the only employee that Mr. Vincent mistreated," and that he has therefore shown *per se* that he was treated differently than other similarly situated employees. Pl.'s Opp'n at 20. However, Plaintiff fails to specifically identify even one comparator, i.e., another employee to whom he was similarly situated as a matter of law. Without even the identification of an alleged comparator, the Court cannot determine that Plaintiff's "employment situation [was] nearly identical" to any other employee's. Moreover, it is doubtful that Plaintiff could identify a similarly situated employee because "Plaintiff's [own] disciplinary history with defendant [may be] a relevant factor that distinguishes [him]." *Childs-Pierce*, 383 F. Supp. 2d at 75. The record is entirely devoid of evidence that any other employee experienced the type of difficulty in completing an assignment that management believed Plaintiff was encountering, disregarded a direct order as to work schedule, or exhibited what management perceived as insubordination. The record in the instant case is silent as to whether Plaintiff's position has been eliminated. Nevertheless, although Plaintiff does not argue as much, he might meet the third element of his *prima facie* case by demonstrating that he did not perform

30

below Defendant's legitimate expectations. *See George*, 407 F.3d at 412. The Court interprets

the gist of Plaintiff's allegations to be that he was living up to management's expectations for his

position. As such, Plaintiff might succeed–albeit barely–in making out a *prima facie* case of

disparate treatment discrimination. As the D.C. Circuit has instructed, the Court makes "these

points on the prima facie case not to evade the ultimate question of discrimination *vel non*, but

rather because [Plaintiff's] prima facie case is part of the evidence [the Court] must consider in

addressing that question." *Czekalski*, 475 F.3d at 366 (quoting *George*, 407 F.3d at 413).

 In response to Plaintiff's claim that his CWS revocation, AWOL charge, and Proposal to

Suspend represented disparate treatment discrimination, Defendant points to the legitimate, non-

discriminatory reasons that are encapsulated in Mr. Vincent's memorandum and Proposal to

Suspend. According to Defendant:

> Plaintiff's CWS schedule was changed because he failed to complete his [SASI
> contract] assignment by the due date and failed to adjust his schedule to see that it
> was completed on time. Plaintiff was charged with AWOL because he ignored
> management's revocation of his CWS and continued to work on the schedule he
> preferred. The proposed suspension was because Plaintiff failed to follow a direct
> order, failed to complete an assignment, failed to report to work consistent with
> the new work schedule, and because he was insolent and disrespectful towards his
> team leader.

Def.'s Mem. at 22; ROI, Ex. 14 (4/30/02 Mem. from T. Vincent to C. Smith); ROI, Ex. 17

(5/31/02 Proposal to Suspend). Defendant thus succeeds in meeting its burden of production

under the *McDonnell Douglas* test by offering a legitimate, non-discriminatory reason for

Plaintiff's termination.

 Given these credible, legitimate non-discriminatory factors identified by Defendant,

Plaintiff now must seize the "opportunity to discredit the employer's explanation," *Aka*, 156 F.3d

at 1288, by demonstrating that the proffered reasons are a mere pretext for discrimination, *see*

*Paquin*, 119 F.3d at 26-27.   As always, Plaintiff retains the "ultimate burden of persuading the

court that [he] has been the victim of intentional discrimination." *Burdine*, 450 U.S. at 256.

However, "one way for a plaintiff to show that an adverse employment decision was made for a

discriminatory reason is to show that the nondiscriminatory explanation the defendant proffered

for its decision was false." *Czekalski*, 475 F. 3d at 366 (citations omitted).  Plaintiff's

Opposition–in which he devotes a scant paragraph to his disparate treatment claim–baldly asserts

that he has established pretext, but completely fails to cite to any record evidence to show that the

Mr. Vincent's asserted reasons are false and that his decisions were actually based on Plaintiff's

race or age.

Significantly, the Court is without authority to "'second guess an employer's personnel

decision absent demonstrably discriminatory motive.'" *Fischbach*, 86 F.3d at 1183 (quoting

*Milton v. Weinberger*, 696 F.2d 94, 100 (D.C. Cir. 1982)).  As a result, "[o]nce the employer has

articulated a non-discriminatory explanation for its action   . . . the issue is not 'the correctness or

desirability of the reasons offered . . . but whether the employer honestly believes in the reasons

it offers.'" *Id.* (quoting *McCoy v. WGN Continental Broadcasting Co.*, 957 F.2d 368, 373 (7th

Cir. 1992)).  Plaintiff does not proffer any evidence that Mr. Vincent did not honestly believe that

he was justified in revoking Plaintiff's CWS after he failed to complete the SASI assignment by

the due date, in charging Plaintiff AWOL when he did not report to work according to his new

schedule, and in proposing to suspend Plaintiff based on his work performance.  Nor does

Plaintiff's *prima facie* case indicate evidence of pretext; as discussed above, Plaintiff does not

point to any similarly situated individual treated differently, establish that his position was not

32

eliminated, or establish that he was living up to his employer's expectations.  In contrast, the

Court notes that evidence of a strong record in equal opportunity employment may be considered

on the ultimate issue of discrimination *vel non*. *Aka*, 156 F.3d at 1289.  Here, as noted above,

Plaintiff's former colleagues, who are members of Plaintiff's protected classes, disavow any

belief that Mr. Vincent treated anyone adversely based on a racial or age-related bias.  *See*

*generally*, ROI, Ex. 7 (Lambert Aff.) ( Ms. Lambert is a Black female and was over 40 years old

at the time); Ex. 8 (Smallwood Aff.) (Mr. Smallwood is a Black male who was 50 years old); and

Ex. 9 (Wood Aff.) (Ms. Wood is from the Philippines and was 51 years old).   Further, the Court

notes that in his deposition, Mr. Vincent testified that, of his twenty-five employees,

approximately twenty were black.

At bottom, Plaintiff offers only his own speculation that his CWS revocation, AWOL

charge, and Proposal to Suspend were motivated by race and age discrimination.  However,

Plaintiff has not proffered any evidence upon which a reasonable trier of fact could conclude that

the legitimate non-discriminatory reasons Defendant offers for Plaintiff's CWS revocation,

AWOL charge, and Proposal to Suspend are pretext.  As such, Defendant is entitled to summary

judgment on that claim.

### 2.    *Plaintiff's Hostile Work Environment Claim*

Age-based hostile work environment claims are analyzed under the same standard as Title

VII hostile work environment claims.  *Gustave-Schmidt v. Chao*, 360 F. Supp. 2d 105, 108 n.1,

120 (D.D.C. 2004).  Thus, to establish his claim of a hostile work environment, Plaintiff must

demonstrate that: (1) he is a member of a protected class; (2) he was subjected to unwelcome

harassment; (3) the harassment occurred because of the plaintiff's protected status; (4) the

harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment in question but nonetheless failed to either take steps to prevent it or afford the plaintiff prompt remedial action. *See Baloch v. Norton*, 355 F. Supp. 2d 246, 259 (D.D.C. 2005) (citing cases); *Gustave-Schmidt*, 360 F. Supp. 2d at 120.  In determining whether a hostile work environment exists, the Supreme Court has directed the courts to look at the totality of the circumstances, including "'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88 (1998) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).  While the plaintiff is not required to plead a *prima facie* case of hostile work environment in the complaint, the alleged facts must be able to support such a claim.  *See Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1114 (D.C. Cir. 2000).

The Supreme Court has held that a hostile work environment exists only "[w]hen the workplace is permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris*, 510 U.S. at 22 (quotation omitted).  In addition, the Supreme Court has circumscribed the definition of a hostile work environment so that "[t]hese standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code.'" *Faragher*, 524 U.S. at 788 (citations omitted).  Indeed, these standards are intended to "filter out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing.'" *Id.* (citations omitted).  "Even a few isolated incidents of offensive conduct do not amount to

34

actionable harassment." *Stewart v. Evans*, 275 F.3d 1126, 1134 (D.C. Cir. 2002).

Here, Plaintiff "state[s] that Mr. Vincent, called plaintiff into his office numerous times a day, repeatedly called him on the phone, constantly sent him emails, changed his CWS, charged him with AWOL and physically blocked his path when he sought to leave the office."  Pl.'s Opp'n at 19.  Defendant, in turn, argues that these allegations, "even if believed to be true, [are] simply not severe or pervasive enough to be considered harassment."  Def.'s Mem. at 18.  As an initial matter, the Court notes that insofar as Plaintiff attempts to base his hostile work environment claim on his CWS revocation and AWOL charge, he cannot simply regurgitate his disparate treatment claims in an effort to flesh out a hostile work environment claim.  *See Keeley v. Small*, 391 F. Supp. 2d 30, 51 (D.D.C. 2005) ("The remainder of plaintiff's alleged 'hostile' events are the very employment actions he claims are retaliatory; he cannot so easily bootstrap alleged retaliatory incidents into a broader hostile work environment claim.").

In any event, the Court agrees with Defendant that, even if all of Plaintiff's allegations about Mr. Vincent's behavior are accepted as true, they do not rise to the level of severe and pervasive treatment sufficient to alter the conditions of his employment.  *Harris*, 510 U.S. at 22 (quotation omitted).  Based on the record, it appears without doubt that Plaintiff and Mr. Vincent butted heads in April and May of 2002 over the SASI contract, Plaintiff's CWS revocation, AWOL charge, and Proposal to Suspend.  However, Plaintiff's general allegations that "Mr. Vincent frequently yelled at him during discussions about his work over a period of several weeks in late April and early May 2002," does not demonstrate a work environment that was pervaded by discrimination.  *See Singh v. U.S. House of Representatives*, 300 F. Supp. 2d 48, 56 (D.D.C. 2004) ("Criticisms of a subordinate's work and expressions of disapproval (even loud

expressions of disapproval) are the kinds of normal strains that can occur in any office setting.")).

Plaintiff's claims that Mr. Vincent called plaintiff into his office numerous times a day,

repeatedly called him on the phone, and constantly sent him emails, establish nothing other than

that Mr. Vincent was an extremely hands-on manager.  Indeed, Mr. Vincent admitted as much

during his deposition, when he testified that it was not unusual for him to e-mail an employee

multiple times per day or to require an employee to come to his office several times a day if he

was working on a contract they were involved with.  Def.'s Ex. 7 (Vincent Dep.) at 128:7-

128:18.  Defendant likewise admits that Mr. Vincent's management style "on occasion, may have

been intense," *see* Def.'s Mem. at 19, but an "intense" manager does not a hostile work

environment make.[21]

As to Plaintiff's allegations that Mr. Vincent "threatened him," Plaintiff admits (in a

word-for-word recitation of Defendant's memorandum) "that these 'threats' related solely to

plaintiff [sic] refusal to adhere to the new work schedule or complete his assignment" and that

"Mr. Vincent advised plaintiff that his [CWS] was temporarily revoked, [and] that he would

place him on AWOL if he ignored the new schedule."  Pl.'s Opp'n at 20.  In light of these

admissions, no reasonable fact finder could conclude that Mr. Vincent's alleged "threats" were

---

[21] In support of his hostile work environment claim, Plaintiff also refers to the stress and elevated blood pressure that he alleges was the result of Mr. Vincent's behavior.  *See* Pl.'s Opp'n at 20.  Plaintiff's allegations, however, concern his subjective reaction to his work environment, rather than the environment itself.  As Plaintiff himself describes that environment, it cannot be described as a "workplace [] permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of the [Plaintiff's] employment and create an abusive working environment."  *Harris*, 510 U.S. at 22.  Thus, even if Plaintiff could establish a causal connection between Mr. Vincent's alleged behavior and Plaintiff's own medical condition (which the Court notes Plaintiff declined to do in response to Defendant's requests for additional medical information), Plaintiff's subjective reaction would not transform a non-hostile work environment into an abusive one.

anything more than a warning, perhaps a strong one, as to the possible consequences of Plaintiff's actions. Finally, Plaintiff alleges that Mr. Vincent "physically blocked his path," leading him, on one occasion, to call the Federal Protective Service. *Id.* As noted above, Plaintiff's account is somewhat contradicted by Ms. Lambert, who indicates that Mr. Vincent was attempting to get information from Plaintiff about the status of the SASI contract, and blocked Plaintiff's path simply by standing in the doorway of Plaintiff's office. *See* ROI, Ex. 7 (Lambert Aff.) at 5. In any event, taken in the overall context of the conflict between Mr. Vincent and Plaintiff over the SASI contract, Plaintiff's do not establish treatment that is sufficiently severe or pervasive to rise to the level of a hostile work environment.

Moreover, even if Plaintiff could demonstrate sufficiently severe or pervasive treatment, Plaintiff proffers no evidence whatsoever from which a reasonable jury could conclude that Mr. Vincent's alleged treatment of Plaintiff was a result of Plaintiff's age or race. Plaintiff offers only his unfounded conclusion that "[t]his type of conduct directed only on [Plaintiff] who is Black creates a hostile work environment." Pl.'s Opp'n at 20. However, "it must be clear that the hostile work environment was the result of discrimination based on a protected status otherwise the federal courts will become a court of personnel appeals." *Singh*, 300 F. Supp. 2d at 48 (internal citation and quotation marks omitted); *Lester v. Natsios*, 290 F. Supp. 2d 11, 18 (D.D.C. 2003). Here, Plaintiff makes no attempt whatsoever to demonstrate that the treatment he allegedly suffered was based on his age or race, rather than his failure to complete the SASI assignment by the due date, disregard for the revocation of his CWS, and perceived insubordination. As Plaintiff fails to establish as much, no reasonable juror could find in favor of Plaintiff, and the Court shall grant Defendant's Motion for Summary Judgment as to Plaintiff's

hostile work environment claim.

### 3. Plaintiff's Retaliation Claim

Finally, the Court turns to Plaintiff's claim under both Title VII and § 1981 that "Defendant's continuous threats, harassment, and acts of ordering Plaintiff back to the hostile work environment in spite of his Doctors orders, after he was temporarily relocated was an act of retaliation for Plaintiff's complaints to the Union." Compl. ¶¶ 35, 46. Defendant argues that Plaintiff failed to exhaust his administrative remedies with respect to a claim of retaliation, and that, in any event, Plaintiff cannot prove retaliation. Def.'s Mem. at 23-24. The Court addresses each argument in turn.

Defendant argues that Plaintiff did not exhaust his administrative remedies as to his claim of retaliation because his "EEO complaint raised claims of race, sex, and age discrimination, but failed to raise a claim of retaliation." *Id.* at 23. Defendant is correct that Plaintiff did not "check the box" for reprisal on his EEO complaint, *see* ROI, Ex. 2 (7/31/02 EEO Compl.); however, the attachment Plaintiff included with his EEO complaint includes references to Mr. Vincent's "retaliatory conduct," Plaintiff's complaints to his Union, and his "reassignment . . . back to the same hostile work environment." *Id.* The Court therefore concludes that Plaintiff's retaliation claim is not barred, even though not specifically pled in his EEO complaint, because it "could have reasonably been expected to grow out of [his] earlier complaint," and is "like or related" to the claims of discrimination raised in that complaint. *See Wiley v. Glassman*, 511 F.3d 151, 160 (D.C. Cir. 2007) (quoting *Weber v. Battista*, 494 F.3d 179, 184 (D.C. Cir. 2007)).

Turning to the substance of Plaintiff's claim, "[l]ike claims of discrimination, claims of retaliation are also governed by the *McDonnell Douglas* burden-shifting scheme." *Carney v. Am.*

*Univ.*, 151 F.3d 1090, 1094 (D.C. Cir. 1998) (citing *McKenna v. Weinberger*, 729 F.2d 783, 790

(D.C. Cir. 1984)).  To establish a prima facie case of retaliation, Plaintiff must show that (1) he

engaged in statutorily protected activity; (2) a reasonable employee would have found the

challenged action so materially adverse that he would have been dissuaded from making or

supporting a charge of discrimination; and (3) a causal connection exists between the protected

activity and the challenged retaliatory act.  *Rochon v. Gonzalez*, 438 F.3d 1211, 1219-20 (D.C.

Cir. 2006).  "An activity is 'protected' for the purposes of a retaliation claim 'if it involves

opposing alleged discriminatory treatment by the employer or participating in legal efforts

against the alleged treatment.'" *Lemmons v. Georgetown Univ. Hosp.*, 431 F. Supp. 2d 76, 91

(D.D.C. 2006) (quoting *Coleman v. Potomac Elec. Power Co.*, 422 F. Supp. 2d 209, 212-13

(D.D.C. 2006)).  However, the "alleged discriminatory treatment . . . cannot be generic; rather,

the plaintiff must be opposing an employment practice made unlawful by the statute under which

she has filed her claim of retaliation."  *Id.* (citing *Broderick v. Donaldson*, 437 F.3d 1226, 1232

(D.C. Cir. 2006)).[22]  As such, Plaintiff can only base a claim of retaliation on his Union

_____

[22]  The issue of whether claims of retaliation are in fact actionable under § 1981 is
currently pending before the Supreme Court, which heard oral argument on that issue on
February 20, 2008 in the case of *CBOCS West v. Humphries*.  *See Humphries v. CBOCS* West,
474 F.3d 387 (7th Cir. 2007), *cert. granted*, 128 S. Ct. 30 (2007).  The D.C. Circuit has assumed
as much, without explicitly deciding it to be the case. *See Carney*, 151 F.3d at 1094-95.  In
addition, the Court notes that the Civil Rights Act of 1991 added a subsection to § 1981 defining
the phrase "make and enforce contracts" to include "the making, performance, modification, and
termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of
the contractual relationship," 42 U.S.C. § 1981(b); *see also Rivers*, 511 U.S. at 300, 114 S. Ct.
1510, and that "in the aftermath of the 1991 Act, a number of courts have concluded that certain
retaliatory discharge claims are actionable under § 1981," *Hawkins v. 1115 Legal Serv. Care*, 163
F.3d 684, 693 (2d Cir. 1998).  In any event, because Plaintiff also brings his retaliation claim
pursuant to Title VII (and perhaps the ADEA), the Court need not determine whether he might
have pursued a retaliation claim solely under § 1981.

complaints (including his Union grievance) insofar as they alleged discrimination based on race or age. *See Jones v. Billington*, 12 F. Supp. 2d. 1, 13 (D.D.C. 1997) (Kollar-Kotelly, J.); *see also Ramey v. Potomac Elec. Power Co.*, 468 F. Supp. 2d 51, 59 (D.D.C. 2006) (same, citing cases from other circuits).[23]

Furthermore, the Supreme Court recently clarified in *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 126 S. Ct. 2405 (2006), that, because Title VII's retaliation and discrimination provisions are not "coterminous," *id.* at 2414, the anti-retaliation provision of Title VII is "not limited to discriminatory actions that affect the terms and conditions of employment," *id.* at 2412-13. In so doing, however, the Supreme Court emphasized that the "anti-retaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Id.* at 2414. Indeed, "[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." *Id.* at 2415. It is therefore " important to separate significant from trivial harms," *id.*, and to recognize that "the significance of any given act of retaliation will often depend upon the particular circumstances," *id.* at 2415-16.

In light of this guidance, the Court concludes that Plaintiff cannot make out a *prima facie* case of retaliation. As an initial matter, Plaintiff has not proffered any evidence of a causal connection between his Union complaints and the treatment that he received, and appears to rest on the temporal proximity between the two. The "cases that accept mere temporal proximity

---

[23] Of course, Plaintiff's claim that he was retaliated against in violation of Title VII and § 1981 for filing his Union grievance thus reinforces that his grievance raised a claim of discrimination on the basis of race and age.

between an employer's knowledge of a protected activity and an adverse employment action as

sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal

proximity must be 'very close.'" *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74, 121

S. Ct. 1508, 149 L. Ed. 2d 509 (2001) (quoting *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248,

1253 (10th Cir. 2001) and citing *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997)

(3-month period insufficient) and *Hughes v. Derwinski*, 967 F.2d 1168, 1174-75 (7th Cir. 1992)

(4-month period insufficient)).  Here, Plaintiff's Union complaints occurred between April and

June 2002, Plaintiff alleges that Mr. Vincent threatened and harassed him during the same time

period, and Plaintiff was ordered to return to his second floor work station on July 29, 2002.

While Plaintiff's evidence of a causal connection–based solely on this temporal proximity–is

tenuous at best, the Court assumes *arguendo* that Plaintiff could establish the requisite causal

connection.

Plaintiff cannot, however, establish that he suffered "materially adverse consequences . . .

such that a reasonable trier of fact could conclude that [he] has suffered objectively tangible

harm."  *Rochon*, 438 F.3d at 1219 (citing *Brown v. Brody*, 199 F.3d 446, 457 (D.C. Cir. 1999)).

Plaintiff's Opposition does not pursue a retaliation claim based on his allegations of "continuous

threats [and] harassment" by Mr. Vincent.  Nevertheless, the Court notes that Plaintiff does not

allege that the revocation of his CWS or AWOL charge constituted retaliation.  As such, in and

of themselves, Plaintiff's allegations of "threats," which Plaintiff admits "related solely to [his]

refusal to adhere to the new work schedule or complete his assignment," Pl.'s Opp'n at 20, do

not demonstrate that he "suffered objectively tangible harm."

Plaintiff's Opposition asserts that Plaintiff suffered a "materially adverse action . . . when

he was advised to return to his original work station on July 29, 2002, when the agency knew Mr.

Vincent was still there and Mr. Vincent was the cause of Plaintiff's sickness." *Id.* at 21.

However, the memorandum advising Plaintiff that he was to return to his second floor workspace

specifically stated that Plaintiff was permanently reassigned "to report directly to Mr. Schade,

without any direct contact with [his] former supervisor and Team Leader." ROI, Ex. 20 (7/29/02

Mem. from T. Ford to C. Smith). The memorandum also advised Plaintiff that he could return to

his CWS and that any AWOL charges after July 14, 2002 would be expunged. ROI, Ex. 20

(7/29/02 Mem. from T. Ford to C. Smith). As such, Plaintiff's complaint regarding his

relocation boils down to his dissatisfaction at being ordered to work in physical proximity to Mr.

Vincent, which Plaintiff cannot establish constituted a materially adverse action. Indeed, the

record suggests that Plaintiff himself did not regard his physical proximity to Mr. Vincent as

material, because his requests for accommodations focused on the identity of his supervisors and

not the physical location of his workspace. While Dr. Panahy's letters request that Plaintiff be

relieved of the SASI contract and be "reassigned to the other team," they contain no mention of

Plaintiff's physical workspace. ROI, Ex. 17, Attach. X (5/3/02 Mem. from Dr. Panahy); Attach.

Y (5/9/02 Mem. from Dr. Panahy). Similarly, Plaintiff's form requesting an accommodation

asks only to be provided with a "Low stress/non-Hostile environment" and "No lifting, limited

walking/stairs." Pl.'s Ex. 8 (Accomm. Request).

Further, Dr. Panahy's letters contain no suggestion that Plaintiff's stress and high blood

pressure were related to his physical proximity to Mr. Vincent. ROI, Ex. 17, Attach. X (5/3/02

Mem. from Dr. Panahy); Attach. Y (5/9/02 Mem. from Dr. Panahy). If Plaintiff believed as

much, it appears he never communicated that belief or a corresponding request to his managers.

42

To the contrary, Plaintiff repeatedly refused his managers' requests that Plaintiff provide additional medical information in support of his requests for accommodation.  *See* ROI, Ex. 16 (5/21/02 Mem. from T. Vincent to C. Smith); ROI, Ex. 19 (6/11/02 Mem. from T. Vincent to C. Smith); ROI, Ex. 19 (6/17/02 Mem. from T. Ford to C. Smith).  Indeed, Plaintiff still maintains–and appears to have maintained at the time–that Dr. Panahy's letters were sufficient to answer the requests for additional medical information.  Pl.'s Stmt. ¶¶ 15-17.

Moreover, because Plaintiff did not return to work at his second floor work station, he cannot show that he suffered any "objectively tangible harm" as a result of his relocation.  *See* Def.'s Stmt. ¶ 22, Pl.'s Stmt. ¶; ROI, Ex. 23 (Record of Leave Activity).[24]  Plaintiff admitted during his deposition that he encountered no difficulties working for Mr. Schade, the Director to whom he was to directly report on the second floor.  Def.'s Stmt. ¶ 19; Pl.'s Stmt. ¶ 19; Def.'s Ex. 6B (2/27/07 Smith Dep.) at 81:23-25, 82:16-85:21.  And any claim that working in physical proximity to Mr. Vincent might have led to "objectively tangible harm" is purely speculative, in light of Plaintiff's testimony that he had no contact with Mr. Vincent while working on the ninth floor, even though Mr. Vincent sometimes came to that floor.  *Id.* at 82:16-85:21.  The Court therefore concludes that Plaintiff's personal preference for working on the ninth floor–in the absence of evidence that he advised his supervisors of an issue relating to his physical proximity to Mr. Vincent–does not amount to a materially adverse consequence.  As such, Plaintiff fails to make out a *prima facie* case of retaliation.

---

[24] Plaintiff appears to argue that he can demonstrate "objectively tangible harm" because he "fell sick, could not return to work for almost one year, and incurred medical bills due to Mr. Vincent's actions."  Pl.'s Opp'n at 21.  Even if Plaintiff's claims are true, they cannot be the result of the order that he report back to his second floor work station–the action he identifies as allegedly materially adverse–because Plaintiff never complied with that order.

Even if Plaintiff could make out a *prima facie* case, his retaliation claim would not survive Defendant's motion for summary judgment. Defendant proffered a legitimate, non-retaliatory reason when it ordered Plaintiff to return to his work station on the second floor "since that is where [his] supervisor [was] located." ROI, Ex. 20 (7/29/02 Mem. from T. Ford to C. Smith). As Plaintiff admits, despite his temporary relocation to the ninth floor, his Division did not have offices there. *Id.* at 80:10-11. Plaintiff makes no attempt whatsoever to demonstrate that Defendant's reason was either false or was pretext for retaliation, and does not adduce any evidence that he was ordered to return to the second floor as a result of his Union activity. Plaintiff thus fails to bear his "ultimate burden of persuading the court that [he] has been the victim of intentional [retaliation]." *Burdine*, 450 U.S. at 256. As no reasonable trier of fact could conclude that Defendant retaliated against Plaintiff by ordering him to return to work on the second floor, his claim cannot survive Defendant's Motion for Summary Judgment.

## IV: CONCLUSION

For the reasons set forth above, the Court shall grant Defendant's Motion to Dismiss and for Summary Judgment in its entirety. An appropriate Order accompanies this Memorandum Opinion.

Date:  March 10, 2008

_____/s/_____

COLLEEN KOLLAR-KOTELLY
United States District Judge

44